CITRON, J.
I concur with the foregoing opinion of Mr. Justice Grier. .
Mr. Chief Justice TANEY, dissenting.
Norris v. City of Boston, and Smith v. Turner.
I do not concur in the judgment of the. court in these two cases, and proceed to state the grounds on which I dissent.
The constitutionality of the laws of Massachusetts and New York in some respects depends upon the same principles. There are, however, different questions in the two cases, and. I shall make myself better understood by examining separately one of the cases, and then pointing out how far the same reasoning applies to the other, and in-what respect there is a difference between them; and, first, as to the case from Massachusetts.
This law meets the vessel after she has arrived in the har-bour, and within the territorial limits of the State, but before the passengers have landed, and while, they are still afloat on navigable water. It requires the. State officer to go on board and examine into the condition of the passengers, and provides that, if any lunatic, idiot, maimed, aged, or infirm person, incompetent, in the opinion of the examining 'officer, to maintain themselves, or who have been paupers in any other country, shall be found on board, such alien passenger shall , not be permitted to land until the master, owner, consigriee, or agent of the vessel shall give bond, with sufficient security, that no such-lunatic or indigent person shall become a city, town, or State charge within ten years from the date of the bond. These provisions are contained in the. first two sections. It is the third section that has given rise to this -controversy, and which *465 enacts that no alien passengers other than those before spoken of shall be permitted to land until the master, owner,. consignee, or agent of the vessel shall pay to the boarding officer the sum of two dollars for each passenger so landing ; the money-thus collected to be appropriated to the support of foreign paupers.
This law is a part of the pauper laws of the State, and the provision in question is intended to create a fund for' the support of alien paupers, and to prevent its own eitizens from being burdened with their support.
I do not deem it material at this time to inquire whether the sum demanded is a tax or not. Of that question I shall speak hereafter. The character of the transaction and the. meaning of the law cannot be misunderstood. If the alien chooses to remain on board, and to depart .with the ship, or in any other vessel, the captain is not required to pay the money. Its payment is'the condition upon Avhich the State permits, the alien passenger to come on shore and mingle with its citizens, and to rer side among them. • He obtains this privilege from the State by the payment of the money. It is demanded of the captain, and not from every separate passenger, for the convenience of collection. But the burden evidently falls on the passenger; and' he in fact pays if,, either in the enhanced price of his passage, or directly to the captain, before he is allowed to embark for the voyage. The nature of the transaction and the ordinary course of business show that this must be the case; and the present claim, therefore, comes before the court without any equitable. considerations to recommend it, and does not call upon us to restore money to. a party from whom it has been wrongfully exacted. If the plaintiif recovers, he will -^st probably' obtain from the State the money which, he has doubtless already received from the passenger, for the purpose of being, paid to the State; and which, if the State is not entitled to it, ought to be refunded to the passenger. The writ of error, however, brings up nothing for revision here but the constitutionality of the law under which this .money was' demanded. and paid, and that question I proceed to examine.
And the first inquiry is, whether, under the Constitution of the United- States, the federal government has the power to compel the several States to receive, and suffer to remain in association with its citizens, every person or class of persons whom it may be the policy or pleasure of the United States to admit. In my. judgment, this question lies at the foundation of the controversy in this case. I do not mean to say that the general government have, by treaty or act of Congress, required the State of Massachusetts to permit thealiens in question to land. *466 I think there is no treaty or act of Congress which can justly be so construed. But it is not necessary to examine that question until we have first inquired whether Congress can lawfully exercise such a power, and whether the States are bound to submit to it. For if the people of the several States of this Union reserved to themselves the power of expelling from their borders any person, or class of persons, whom it might' deem dangerous to its peace, or likely to produce a physical or moral evil among its citizens, then any treaty or law of Congress invading this right, and authorizing the introduction of any person or description of persons against the consent of the State, would be an usurpation of power which this court could neither recognize nor enforce.
I had supposed this question not now open to dispute. It was distinctly decided in Holmes v. Jennison, 14 Pet. 540; in Groves v. Slaughter, 15 Pet. 449; and in Prigg v. The Commonwealth of Pennsylvania, 16 Pet. 539.
If these cases are to stand, the right of the State is undoubted. And it is equally clear, that, if it may remove from among its citizens.any person or description of persons whom it regards as injurious to their welfare, it follows that it • may meet them- at the threshold and prevent them from entering. For it will-hardly be said that the United States may permit them to enter, and compel the State to receive them, and that the State may immediately afterwards expel them. There could be no reason of policy or humanity for compelling the States, by the power of Congress, to imbibe the poison, and then leaving them to find a remedy for it by their own exertions and at their own expense. Certainly no such distinction can be found in the Constitution, and such a division of power would be an inconsistency, not to.say an absurdity, for which I presume no one will contend. ■ If the State has the power to determine whether the persons objected to shall remain in the State in association with its citizens, it must, as an incident inseparably connected with it, have the right also to determine who shall enter. Indeed, in the case of Groves v. Slaughter, the Mississippi constitution prohibited the entry of the objectionable persons, and the opinions of the court throughout treat the exercise of this power as being the same with that of expelling them after they have entered.
Neither can this be a concurrent power, and whether it belongs to the general or to the State government, the sovereignty which possesses the right must in its exercise be altogether independent of the other. If the United States have the power, then any legislation by the State in conflict with a treaty or act of Congress would be void. And -if the States possess it, *467 then any act on the subject by the general government, in conflict with the State law, would also be void, and this court bound to disregard it. It must be paramount and absolute in the sovereignty which possesses it. A concurrent and equal power in the United States and the States as to who should and who should- not be permitted to reside in a State, would be a direct conflict of powers repugnant to each other, continually thwarting and defeating its exercise by either, and ‘could result in nothing but disorder and confusion.
Again if the State has the right to exclude from its borders any person or persons whom it may regard as dangerous to the safety of its citizens, it must necessarily have the right to decide when and towards whom this power is to be exercised. It is in its nature a discretionary power, to be exercised according to the judgment of the party which possesses it. And it must, therefore, rest with the State to determine whether any particular class or description of persons are likely to produce discontents or insurrection in its territory, or to taint the morals of its citizens, or to bring among them contagious diseases, or the evils and burdens of a numerous pauper population. For if the general government can in any respect, or by any form of legislation, control or re '-ain a State in the exercise of this power, or decide wheth It has been exercised with proper discretion, and towards proper persons, and on proper occasions, then the real and substantial power would be in Congress, and not in the States. In the cases decided in this court,-and herein before referred to, the power of determining who is or is. not dangerous to the interests and well-being of the people of the State has been uniformly admitted to reside in the State.
I think it, therefore, to be very clear, both' upon principle and the authority of adjudged cases, that the several States have a right to remove from among their people, arid to prevent from entering the State, any person, or class or description of persons, whom it may deem dangerous or injurious to the interests and welfare of its citizens; and that the State has the exclusive right to determine, in its sound discretion, whether the danger does or does not exist, free from the control of the general government.
• This brings me to speak more particularly of the Massachusetts law, now under consideration. It seems that Massachusetts deems the introduction of aliens into the State from foreign countries likely to produce in the State a numerous pauper population, héavily and injuriously burdensome to its citizens. It. would be easy to show, from the public history of the times, that the apprehensions of the State are well founded; that a fearful amount of disease and pauperism is daily brought *468 to our shores in emigrant ships, and that measures of precaution and self-defence have become absolutely necessary on the Atlantic border. But whether this law was necessary or not is not a question for this court; and I forbear, therefore, to discuss its justice and necessity. This, court has no power to inquire whether a State has acted wisely or justly in the- exer- ■ cise of its reserved powers. Massachusétts had the sole and exclusive right to judge for herself whether any eyil.was to be apprehended from the introduction of alien passengers from' foreign countries. And in the exercise of her discretion, she had a right to exclude them if she thought proper to do so. Of course I do not speak of public functionaries or agents, or officers of foreign governments. Undoubtedly no State has a right to interfere with the free ingress of persons' of that description. But there does not appear to have been any such among the aliens who are the subjects of this suit, and no question, therefore, can arise on that score. .
Massachusetts, then, having the right to refuse permission to alien passengers from foreign countries to land upon her territory, and the right co reject them as a class or description of persons who may prove injurious to her interests, was she bound to admit or reject them without reserve? Was she bound either to repel them altogether, or to admit them absolutely and unconditionally ? And might she not admit them upon such securities'and conditions as she supposed would protect the. interest of her own citizens, while it enabled the State to extend the offices of humanity and kindness to the sick and helpless stranger ? There is certainly no provision in the Constitution which restrains the power of the State in this respect. And if she may reject altogether, it follows that she may admit upon such terms and conditions as she thinks proper, and it .cannot be material whether the security required be a bond to indemnify or the payment of a certain sum of money.
In a case where a party has a discretionary power to forbid or permit an act to be done, as he shall think best for his own interests, he is never bound absolutely and unconditionally to forbid or permit it.' He may always permit it upon such terms'and conditions as he supposes will make the act compatible with his own interests. I know no exception to the rule. An individual may forbid another from digging a ditch through his land to draw off water from the property, of the party who desires the permission. Yet he may allow him to do it upon such conditions and terms as, in his judgment, are sufficient to protect his own property from overflow; and for.this purpose he may either take a bond and security, or he may accept a sum of money in lieu of it, and take upon himself the obliga- *469 tioa of guarding against the danger. The same rule must apply to governments who are charged with 'the . duty of protecting their citizens. Massachusetts has legislated upon this principle. She requires bond and security from one class of aliens, and from another, whom she deems less likely to become, chargeable, she accepts a sum of money, and takes upon herself the obligation of providing a remedy for the apprehended evil.
I do not undérstand that the lawfulness of the provision for taking bond, where the emigrants are actual paupers and unable to gain a livelihood, has been controverted. That question, it is true, is_not before us in this case; but the right of the State to protect itself against the burden of supporting those who come to ús from European almshouses seems to be conceded in the argument. Yet there is no provision in the Constitution of the.United States which makes any distinction between different descriptions of aliens, or which reserves the power to the State as to one class and denie's it oyer the other. And if no such distinction is to be found in the Constitution, this court cannot engraft one upon it.. The power of the State sis to these.two classes of aliens must be regarded here as standing upon the same principles. It is in its nature and essence a discretionary power, and if it resides in the State as to the poor and the diseased, it must also reside in it as to all.
In both cases the power depends upon the same .principles, and the same construction of the Constitution of the United States,; it results from the discretionary power which resides in a State to determine from what person or description of persons the danger of pauperism is to be apprehended, and to provide the necessary safeguards against it. Most evidently this court cannot supervise the exercise of such a power by the State, nor control or regulate it, nor determine whether the occasion called for it, nor whether the funds raised have been properly administered. This would be substituting the discretion of the court for .the discretionary power reserved to the State.
Moreover, if this court should undertake to exercise this-supervisory power, it would take upon itself a duty which it is utterly incapable of discharging; For how could this court ascertain whether the persons classed by the boarding officer of the State as paupers belonged to that denomination or not ? How could it ascertain what had been, the pursuits, habits, and mode of life of every emigrant, and how' far he was liable to lose his health, and become, with a helpless family, a charge-upon, the citizens of the State ? -How could it determine who was sick and who was well ? who was rich and who was' poor ? who was likely to become chargeable and who not ? ■ Yet all *470 this must be done, and must be decided. too upon legal evidence, admissible in a court of justice, if it is determined that the State may provide against the admission of one description of aliens, but not against another; that it may take securities against paupers and persons diseased, but not against those who are in health or have the' means of support; and that this court have the power to supervise the conduct of the State authorities, and to regulate it and determine whether it has been properly exercised or not.
I can, therefore, see no ground for the exercise of this power by the government of the United States or any of its tribunals. In my opinion, the clear, established, and safe rule is, that it is ■reserved to the several States, to be exercised "by them according to their own sound discretion, and according to their own views of what their interest and safety require. It is a power of self-preservation, and was never intended to be Surrendered.
But it is argued in support of the claim of the plaintiff, that the conveyance of passengers from foreign countries is a branch of commerce, and that' thé provisions of the Massachusetts law, which meet the ship on navigable water and detain her until the'bond is given and the money paid, are a regulation of commerce; and that the grant to Congress of the power to regulate commerce is of itself a prohibition to the States to make any. regulation upon the subject. The construction of this article of the Constitution was fully discussed in the. opinions delivered in the License Cases, reported in 5 Howard. I do not propose to repeat here what I then said, or what was said by other members of the court with whom I agreed. It will appear by the yeport of the case, that five of t-he justices of this court, being a majority of the whole bench, held that the■ grant of' the power to^ Congress was not a prohibition to the States to make such regulations as they deemed necessary, in their own ports and harbours, for the convenience of. trade or the- security of-health; and that such regulations were valid, unless they came in conflict with an act of Congress. After such opinions, judicially delivered, I had supposed that question to be settled, so fa¿ as' any question upon the construction'of the Constitution ought to be regarded as closed by the decision of this court. I do not, however, object to the revision of it, and am quite willing- that it be regarded hereafter as the law of this court, that its opinion upon the construction of the Constitution is always open to discussion .when it is supposed to have been founded- in error, and that its judicial authority should hereafter- depend altogether on the force of the reasoning by which it is supported. Referring to my opinión on that occasion, and the reasoning, by which it is maintained, as showing what I *471 still think upon the subject, I desire now to add to it a reference to the thirty-second number of the Federalist, which shows that the construction given to this clause of the Constitution by a majority of the justices of this court is the same that was given to it at the time of its adoption by the eminent men of the day who were concerned in framing it, and active in supporting it. For in that number it is explicitly affirmed, that, “ notwithstanding the affirmative grants of general authorities, there has been the most pointed care in those cases where it.was deemed improper that the like- authorities should reside in the States, to insert negative clauses prohibiting the exercise of them by the States.” The grant of a general authority to regulate commerce is not, therefore, a prohibition to-the States to make any regulations, concerning it within their own-territorial limits, not in conflict with the regulations of Congress. -
But I pass from this objection, which was sufficiently discussed in the License Cases, and come to the next objection founded on the same clause. It is this: that the law in question is a regulation of commerce, and is in conflict with the regulations of Congress, and with treaties, and must yield to the paramount authority over tliis subject-granted to the United States.
It is a sufficient answer to this argument-, to say, that no treaty or act of Coiigress has been produced which gives, or attempts to give, to all aliens the right to land in a, State. The act of March 2, 1799, ch. 23,. <§. 46, has been referred ter, and much pressed in the argument. But this law obviously does nothing more than exempt certain articles belonging to a passenger from the duties which the United States had a right to éxact, if they thought proper. Undoubtedly the law presupposes that the passenger will be permitted to land. But it does not attempt to confer on him the right.. Indeed, the construction contended for'would be a startling one to the States, if Congress has the power now claimed for it. For neither this nor any other law of Congress prescribes the character or condition of the persons who may be taken on board in a foreign port to be brought to the United States. It makes no regulations upon the subject; and leaves the selection altogether to the discretion and pleasure of the ship-owner or ship-master. ■The .ship-owner, as well as the ship-master, is in many cases a foreigner, acting’ sometimes, perhaps, under the influence of foreign governments or foreign cities, and having no common interest or sympathy with the people of the United States; and he may be far more disposed to bring away the worst and most dangerous portion of the population rather than the moral and industrious citizen. And as the act of 1799 speaks of pas *472 sengers generally, and makes no distinction as to their character or health, if the argument of the counsel for the plaintiff can be maintained, and this law gives every passenger which the ship-owner has selected and brought with him the right to land, then this act of Congress has not only taken away from the States the right to determine who is and who is not fit to be received among them, but has delegated this high and delicate power to foreign ship-masters and foreign ship-owners. And if they have taken on board tenants of their almshouses or workhouses, or felons from their jails, if Congress has the power contended for, and this act of Congress will bear the construction given to it, and gives to every passenger the right to land, then this mass of, pauperism and vice may be poured out upon the shores of a State in opposition to its laws, and the State-authorities are not permitted to resist or prevent it.
It is impossible, upon any sound principle of construction, so to interpret this law of Congress. Its language will not justify it, nor can such be supposed to have been' the policy of the United States, or such its disposition towards the States. The general government merely intended to exercise its powers in exempting the articles mentioned from duties, leaving it to the States to determine whether it was compatible with their interest and safety to permit the person to land. And. this power the States have always exercised before and since the passage of this act of Congress.
The same answer may be given to the argument on. treaty stipulations. The treaty of 1794, article 4, referred to and re-, lied on is no longer in force: But the same provision is, however, substantially contained in the first article of the convention with Great Britain of July 3, 1815, with this exception, that it puts British.subjects in this respect, on the same footing with other foreigners. But the permission there mutually giv-pn, to reside and hire hopses and warehouses, and to trade and traffic, is in express term's made subject to the laws of the two countries respectively. Now, the privileges here given within the several States are all regulated by State laws, and the reference to the laws of this country necessarily applies to them, and subjects the foreigner to their decision and control. Indeed, the treaty may be said to disavow the construction now attempted to be given to ■ it. Nor do I see how any argument against the validity of the State law can be drawn from the aet of Congress of 1819. On. the contrary, this act seems accurately to mark the line of division between the powers of the general and State governments over this subject; and the powers of the former have been exercised in the passage of this law without encroaching on the right's of the latter. It regulates *473 the number of passengers which may be taken on board, and brought to this country from foreign ports, in proportion to the .tonnage of the vessel, and directs that, at the time of making his entry at the custom-house, the captain shall deliver to the collector a list of the passengers taken on board at any foreign port or place, stating their age, sex, and occupation, and whether they intend to become inhabitants of this country, and how many have died on the voyage; and this list is to be returned quarterly to the State Department, to, be laid before Congress. But the law makes no provision for their landing, nor does it require any inspection as to their health or condition. These matters are evidently intended to be left to the State government, when the voyage has ended, by the proper custom-house entry. For it cannot be supposed that, if the legislature of the United States intended by this law to give the passengers a right to land, it would have been so regardless of'the lives, and health, and interests of our own citizens as to make no inquiry and no examination upon a subject which so nearly concerned them. But it directs no inquiries, evidently because the power was believed to belong to the States. And as the landing of the passengers depended on the State laws, the inquiries as to their health and condition properly belonged to the State authorities. The act of 1819 may fairly be .taken as denoting the true line of division between the two sovereignties, as-established by the Constitution of the United States and recognized by Congress.
I forbear to speak of other laws and treaties referred to.
. They are of the same import, and are susceptible of the same answer: There is no conflict, therefore, between the law of Massachusetts and any treaty or law of the United States.
Undoubtedly, vessels engaged in the transportation of passengers from foreign countries may be regulated by Congress, and are á part of the commerce of the country. Congress may prescribe how the vessel shall be manned and navigated and equipped, and how many passengers she may'bring, and what provision shall be made for them, and what tonnage she shall pay. But the law of Massachusetts now in question does not in any respect attempt to regulate this trade or. impose burdens upon it. I do not speak of the duty enjoined upon the pilot, because that provision is not now before us, although I see no objection to it. But this law imposes no tonnage duty on the ship, dr any tax upon the captain or passengers for entering its waters. It merely refuses permission to the passengers to land until the security demanded by the State for the protection of its own people from the evils of pauperism has been given. If, however, the treaty of act of Congress above referred to had *474 attempted to compel the State to receive them without any security, the question would not be on any conflicting regulations of commerce, but upon one far more important to the States, that is, the power of deciding who should or should not be permitted to reside among its citizens. Upon that subject 1 have already stated my opinion. I cannot, believe that it was ever intended to vest in .Congress, by the general words in relation to the regulation of commerce, this. overwhelming power over the States. For if the treaty stipulation before referred to can receive the construction given to it in the argument, and has that commanding power claimed for it over the States, then the emancipated slaves of the West Indies have at this 'hour the absolute right to reside, hire houses, and traffic and trade throughout the Southern States, in spite of any State law to the contrary; inevitably producing the most serious discontent, and ultimately leading to the most painful consequences. It will hardly be said, that such a power was granted to the general government in the confidence that it would not be abused. The statesmen of that day were, too wise and too well read in the lessons of history and of their own times to confer unnecessary authority under any such delusion. And I cannot imagine any power more unnecessary to the general government, and at the same time more dangerous and full of peril to. the States.
But there is another clause in the Constitution which it is said confers the exclusive power over this subject upon the general government. The ninth section of the first article declares that the migration or importation of such persons as any of the States then existing should think proper to admit should not be prohibited by the Congress prior to the year 1808, but that a tax or duty might be imposed on such importation, not exceeding ten dollars for each importation. The word migration is supposed to apply to alien freemen voluntarily migrating to this country, and this clause to place their admission or migration entirely in the power of Congress.
At the time of the adoption of the Constitution, this clause was understood by its friends to apply -altogether to slaves. The Madison Papers will show that it was introduced and-adopted solely to prevent Congress, before the time specified, from prohibiting the introduction of slaves from Africa into such States as should think proper- to admit them. It was discussed on that ground in the debates upon it in the Convention ; and the same construction -is given to it in the forty-second number of the Federalist, which was written by Mr. Madison, and certainly nobody could háve understood the object and intention of this clause better than he did.
*475 It appears, from this number of the Federalist, that those who in that day. were opposed to the Constitution, and endeavouring to .prevent its adoption, represented the word “migration” as embracing freemen who ■ might desire to migrate from Europe /to this country, and objected to the clause' because it put it in the power of Congress to prevent it. But the objection made on that ground is dismissed in a few words, as being so evidently founded on misconstruction as to be unworthy of serious reply; arid it is proper to remark that the objection ■ then made was, that it was calculated to prevent voluntary and beneficial migration from' Europe, which all the States desired to encourage. Now the argument is, that it wás inserted to secure it, and to prevent it from being interrupted by the States. If the word can be applied to voluntary immigrants,, the construction put upon it by those who opposed the Constitution is certainly the just one; for it is difficult to irnagine why a power should be so explicitly and carefully conferred on Congress to prohibit immigration, unless the majority of the States desired to put an end to it, and to prevent any particular State from contravening this policy. But it is admitted on all hands, that it was then the policy of all the States to encourage immigration, as it was also the policy of the far greater-number of'them to discourage the African slave-trade. And with these opposite views upon these two subjects, the framers of the Constitution would never have bound them both together in the same clause, nor spoken of them as kindred subjects which ought. to be treated alike, and which it would be the probable policy of Congress to prohibit at the same time. No State could fear any evil fi;om the discouragement of immigration by other States, because it would have the power of opening • its own doors to the immigrant, and of securing to itself the advantages it desired. The refusal of other States could in no degree affect its interests or counteract its policy. It is only upon the ground that they considered it an evil, and desired to prevent it, that this word can be construed to méan freemen, and to class them in the same provision, and in the same words, with the importation of slaves. The limitation of the prohibition also shows that it does not apply to voluntary immigrants.. Congress could not prohibit the migration and importation of such persons during the time specified “in such States as might think proper to ádmit them.” This provision clearly implies that there was a well-known difference of policy among the States upon the subject to which this article relates. Now, in regard to voluntary immigrants, all the States, without exception, not only admitted them, but encouraged them to come ; and the words “ in such States as may think proper to admit- *476 them ” would have been useless and out of place if .applied to voluntary immigrants. But in relation to slaves it was known to be otherwise; for while the African slave-trade was still permitted in some of the more southern States, it had been prohibited many years before, not only in what are now called Free States, but also in States where slavery still exists. In Maryland, for example, it was prohibited as early as 1783. The qualification of the power of prohibition, therefore, by the words above mentioned, was entirely appropriate to the importation' of slaves, but inappropriate and useless in relation to freemen. They could not and would not have béen inserted if the clause in question embraced them.
I admit that the word migration in this clause of the Constitution has occasioned some difficulty in its construction; yet it was, in my judgment, inserted' to prevent doubts or. cavils upon its meaning; for as the words imports and importation in the English laws had always been applied to property and things, as contradistinguished from persons, it seems to have been apprehended that disputes might arise whether these words covered the introduction of men into the country, although these men were the property .of-the persons who brought them in. The framers of the Constitution were unwilling to use the word slaves in the instrument, and described them as persons; and so describing them, they employed a word that would describe them as persons, and which had uniformly been used when persons were spoken of, and also the word which was always applied to matters of property. The whole context of the sentence, and its provisions and limitations, and. the construction given to it by those whe-assisted in framing the clause in question, show that it was intended to embrace those persons only who were brought in as property.
But apart from these considerations, and- assuming that the word migration was intended to describe those who voluntarily came into the country, the power granted is merely a power to prohibit, not a power to compel the States to admit.
And it is carrying the powers of the general government by construction, and without express grant or necessary implication, much farther than has- ever heretofore been done, if the former is to be construed to carry with it thé latter. The powers are totally different in their nature, and totally different in their action on the States. The prohibition could merely retard the growth of population in the States. It could bring upon them no danger, nor any new evil, moral or physical.
But the power of compelling them to receive and to retain among them persons whom the State may deem dangerous to its peace, or who may be tainted with crimes or infectious *477 diseases, or who may be a burden upon its industrious citizens, would subject its domestic concerns and social relations to the power of the Federal government.
It would require very plain-and unambiguous words to convince me that', the States had consented • thus ,to place themselves at the feet of the general government; and if this power is granted in regard to voluntary immigrants, it is-equally granted in the case of slaves. The grant of power is the same, -and in the same words, with respect to migration and to .importation, with the exception of the right to impose a tax upon the latter; and.if the States have granted this great power in one case,' they have granted it in the o'ther; and-every State maybe, compelled to. receive' a cargo , of slaves from Africa,, whatever danger it may bring upon the State, and however earnestly it may desire to prevent it. If the word migration is supposed to include voluntary immigrants, it ought at least to be confined to the power granted, and not extended by construction to another power altogether unlike in its character and consequences, and far more formidable to the States.
But another clause is relied on by the plaintiff to show that this law-is unconstitutional. It is said that passengers are imports, and that-this charge is therefore an impost or duty on imports, and prohibited to the States by the second clause of the tenth section of the first article. This objection, as well as others which I have previously noticed, is in direct conflict with decisions heretofore made by this court. The point was directly presented in the case of Miln v. The City of New York, 11 Peters, 102, find was there deliberately considered, and the court decided that passengers clearly were not imports. This decision is perfectly in accordance with the definition of the word .previously given in the case of Brown, v. Maryland, 12 .Wheat. 419. Indeed, it- not only-accords with this definition, but with the long established and well settled meaning of the word. For I think it may be safely affirmed, that, both in England and this country, the words imports and importation, in statutes, in statistical tables, in official reports, and in public debates, have uniformly been applied to articles ,of property, and never to passengers voluntarily coming to the'country in ships; and in the debates of the Convention itself, the words are constantly so used.
The members of the Convention unquestionably used the words they inserted in the Constitution in the same sense in which they-used them in their debates. It was their object to-be understood, and not to mislead, and they ought not to be supposed to have used familiar words in a new or unusual sense. And there is no reason to suppose that they did not *478 use the word imports, when they inserted it in the Constitution, in the sense in which it had been.familiarly used for ages, and in which it was daily used by themselves. If in this court we are at liberty to give old words new meanings when we. find •them in ‘the Constitution, there is no power which may not, by this mode of construction, be conferred oh the general government and denied to the States.
But if the plaintiff could succeed in maintaining that passengers were imports, and that the money demanded was a duty on imports, he would át the same time prove that it belongs to the United States, and not to him, and, consequently, that he is not entitled to recover it. The tenth section of the first article prohibits a State from laying .any duty on imports or exports except what may be. absolutely necessary for the execution of its inspection laws. 'Whatever -is necessary for that purpose may therefore be laid by the State without the previous consent of Congress.
If passengers are imports, then their condition may be examined and inspected by an officer of the State like any other import, for.the purpose of ascertaining whether they may not when landed bring disease or pauperism into the State ; for if the State is bound to permit them to land; its citizens have yet the right to know if there is danger, that they may endeavour to avert it, or to escape from it. They have, therefore, under the clause of the Constitution above mentioned, the power to lay a duty on this import, as it is called, to pay the necessary expenses of the inspection. It is, however, said, that more than sufficient .to pay.the necessary expenses of the inspection was-collected,■'and that the duty was laid also for other purposes. This is true. But it does not follow that the party who paid the money- is entitled to recover it back from the State. On ■the contrary, it is expressly, provided in the clause above mentioned, that the-net' produce of all'"duties and imposts laid by any State on'imports- or- 'exports shall-be for the use of the treasury of the United States. - If, therefore, these passengers were imports, within the meaning of this clause of the Constitution, and the money in question,-a duty'on imports, then the net produce or surplus, after paying the necessary expenses of inspection, belongs to the treasury of the United States.' The plaintiff has no right to it, and cannot. maintain a shit for, it. It is appropriated by the express -words of the Cor ctitution to the United States, arid they/and .they alone, would have a right to claim it from the State. The argument-, however, that passengers. are imports,-is, in" my judgment, most evidently . without any reasonable foundation.
The only remaining topio which seems to require examina *479 tion is the objection, that the money demanded is a tax on the captain of the vessel, and therefore a regulation of commerce.
This argument,-1 think, is sufficiently answered by what I have already said as to the real and true character of the transaction, and the relative powers of the Union and the States. But I proceed to inquire whether, if the law of Massachusetts be a tax, it is-not a legitimate exercise of its taxing powér, putting aside for the present the other considerations herein before mentioned, and which I think amply sufficient to maintain its validity.
Undoubtedly the ship, although engaged in the transportation of passengers, is a vehicle of commerce, and within the power of regulation granted to the general government; and I assent fully to the doctrine upon that subject laid down in the case of Gibbons v. Ogden. But it has always been held that the power to regulate commerce does not give to Congress the power to tax it, nor prohibit the States from taxing'it in their own ports, and within their own jurisdiction. The authority of Congress to lay taxes upon it is derived from the express grant of power, in the eighth section of the first article, to lay and collect taxes, duties,' imposts, and excises, and the inability of the States to tax it arises from the express prohibition contained in the tenth section of the same article.
This was the construction of the Constitution at the time of its adoption, the construction under which the people of the States adopted it, and which has been affirmed in the clearest terms by the decisions of this court.
In the thirty-second number of the Federalist, before referred to, and several of the preceding numbers, the construction, of the Constitution as to the taxing'power of the general government- and of the States is very fully examined, and with all that clearness and ability which everywhere mark the labors of its distinguished authors; and in these numbers, and more especially in the one above mentioned, the construction above stated is given to the Constitution, and supported by the most conclusive arguments. It maintains that no right of taxation which the States had previously enjoyed was surrendered unless expressly prohibited; that it was not impaired by any affirmative grant of power to the general government; that duties on imports were a part of the taxing power, and that the States would have had a right, after the adoption of the Constitution, to lay duties on imports and exports, if they had not been expressly prohibited.
The grant of the power to regulate commerce, therefore, dia not, in the opinion of Mr. Hamilton, Mr. Madison, and Mr. Jay, prohibit the States from laying imposts and duties upon *480 imports brought into their own territories. It ffid not apply to the right of taxation in either sovereignty, the taxing power being a distinct and separate power from the regulation of commerce ; and the right of taxation in the States remaining over every subject where it before, existed, with the exception only of those expressly prohibited.
This construction, as given by the Federalist, was recognized as the true one, and affirmed by this court, in the case of Gibbons v. Ogden, 9 .Wheat. 201. The passage upon this subject is so clear and forcible, that I quote the words used in the opinion of the court, which was delivered by Chief Justice Marshall.
■ “In a separate clause,” he says, “ of the enumeration, the power to regulate commerce is given, as being.entirely distinct from the right to levy taxes and'imposts, and as being a new power not before conferred.. The Constitution then considers those powders as substantive and distinct from each other, and so places them in the enumeration it contains. The power of imposing duties on imports is classed with the power to levy taxes, and that seems to be its natural place. But the power to levy taxes could never be considered as abridging the right of the States on that subject;- and they, might, consequently, have exercised it by levying-duties on imports or exports, had the Constitution contained no -prohibition upon the subject. This prohibition, then, is an exception from the acknowledged power of the States to levy, taxes, not from "the questionable power to regulate commerce.”
With such authorities to support me, so clearly and explicitly stating the. doctrine, it cannot be necessary to pursue the argument further.
I may therefore safely assume, that, according to the true-construction of the Constitution, the power granted to Congress to regulate commerce did not in any degree abridge the power of taxation in the States; and that they would at this day have, the .right to tax the merchandise brought into their ports and harbours by the authority and under the regulations of' Con- ' gress, had they not been expressly prohibited.
They are expressly prohibited from laying any duty on imports-or exports, except.what may be absolutely necessary for executing their inspection laws, and also from laying any tonnage,duty. So far, their taxing power over commerce is re-, strained, but no farther. They retain all the rest; and if the money demanded is a tax upon commerce, or the instrument or vehicle of commerce, it furnishes no objection to it unless it is a duty on imports or a tonnage duty, for these aloné are forbidden. .
*481 And this brings me back to the question whether alien passengers from a foreign country are imports. I have already discussed that question, and need not’ repeat what'I have said. Most clearly, in my opinion, they are not imports ; and if they are not, then, according to the authorities referred to, the State has a right to tax them, — their authority to tax not being abridged in any respect by' the power in the general government to regulate commerce. I say nothing as to its being a tonnage duty, for, although mentioned in the argument, I do not suppose any reliance could be placed upon'it.
It is said that this is a tax upon the captain, and therefore a tax upon an instrument of commerce. According to the authorities before- referred to, if it were a tax on the captain it would be no objection to it, unless it were indirectly a duty on imports or tonnage.
Unquestionably a tax on the captain of a ship, bringing in merchandise, would be indirectly a tax on imports, and consequently unlawful; but his being an instrument of commerce and navigation does not make it so; for a tax upon the instrument of commerce is not forbidden. Indeed, taxes upon property in ships are continually laid, and their validity never yet doubted. And to maintain that a tax upon him 'is invalid,- it must first be shown that passengers are imports or merchandise, and that the tax was therefore indirectly a tax upon imports.
But although this money is demanded of the captain, and required to be paid by him or his owner before the passenger is landed, it is in no proper and legitimate sense of the word a tax on him. Goods and merchandise cannot be landed by the captain until the duties upon them are paid or secured. He may,, if he pleases, pay the duty without waiting for his owner or consignee. So here the captain, if he chose, might pay thfe money and obtain the privilege of landing his passengers without waiting for his owner or consignee. But he was under no obligation to do it. Like the case of a cargo, he could not land his passengers until it. was done. Yet the duties demanded in the former case have never been supposed to be a tax on the captain, but upon the goods imported. And it would be against all analogy, and against the ordinary construction of all statutes, to call this demand a tax on the captain. The amount demanded depends upon the number of passengers who desire to land. It is not a fixed amount on every captain or every ship engaged in the passenger trade; nor upon her amount of tonnage. It is no objection, then, to the Massachusetts law fo say, that the ship is a vehicle or the captain an instrument of commerce.
The taxing power of the State is restrained only where the *482 tax is directly or.indirectly a duty on imports or tonnage. And the case, before us is the first ifi which this power has been held to be still further abridged by.mere affirmative grants of power to the general government. ■ In my judgment, this restriction on the power of the States is a new doctrine, in opposition to the contemporaneous construction and the authority of adjudged cases. And if it. is hereafter to be the law of this court, that, the power to regulate commerce has abridged the taxing power of the States upon the vehicles or instruments of commerce, I cannot foresee to what it may lead; whether the same prohibition, upon the same principle, may not. be carried out in respect to ship-owners and merchandise in a way seriously to impair the powers of taxation which have heretofore been exercised by the States.
I conclude the subject by quoting the language of Chief Justice Marshall in the case- of Billings v. The Providence Bank, in 4 Peters,--561, where, speaking upon this subject, he says: — “ That the taxing power is of vital importance, that it is essential to the • existence of government, are truths which it cannot be necessary to reaffirm. They are acknowledged and assented to by all. It would seem that the relinquishment of such a power is never to be assumed.. We will not say that a State may not relinquish it, — that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining.it- undiinin-ished, that community has a right.to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandoiRit does not appear.”
Siich has heretofore been the .language of this court, and I can see nothing in the power granted to Congress to regulate 'commerce that shows a deliberate purpose on the part of the States who adopted the Constitution to abandon any right of taxation except what is directly prohibited. The contrary appears in the authentic publications of the time.
It cannot be necessary to' say any thing upon the article of the Constitution which gives to Congress the power to establish a uniform rule of naturalization. The motive and object of this provision are too plain to be misunderstood. Under the Constitution of the United States, citizens of each State are entitled to the privileges and immunities of citizens in the several States; and no State would be willing that another State should determine for it what foreigner should become one of its citizéns, and be entitled to hold lands and to vote at its elections. For, without this provision, any one State could have given the right of citizenship in every other State; and, as every citizen of a State is also a citizen of the United States, *483 a single State, without this provision, might have given to any number of foreigners it pleased the right to all the privileges of citizenship in, commerce, trade, and navigation, although they did not even reside amongst us.
The nature of our institutions under the Federal government made it a matter of absolute necessity that this power should be confided to the government of the Union, where all the States were represented, and where all had a voice; a necessity so obvious that no statesman could have overlooked it. The article has nothing to do with the admission or rejection of aliens, nor with immigration, but with the rights of citizenship. Its sole object was to prevent one State from forcing upon all the others, and upon the general government, persons as citizens whom they were unwilling to admit as such.
It is proper to add, that the State laws which were under examination in the License Cases applied altogether to merchandise of the description mentioned in those laws, which was imported into a State from foreign countries or from another State; and as the States have no power to lay a tax or duty on imports, the laws in question were subject to the control of Congress until the .articles had ceased to be imports, according to the legal meaning of the word. And it is with reference to such importations and regulations of Congress and the States concerning them, that the paramount power of Con-gross is spoken of - in some of the opinions then delivered.
The questions as to the power of a State to exclude from its territories such aliens as it may deem unfit to reside among its citizens, and to prescribe’the conditions on which they may enter it, and as to the power of a State to levy a tax for rever míe upon alien passengers arriving from foreign ports, were neither of them involved m those cases, and were not considered or discussed in the opinions.
I come now to the case from New York.
The object of this law is to guard its citizens, not only from the burdens and evils of foreign paupers, but also against the introduction of contagious diseases. It is not, therefore, like the law of Massachusetts, confined to aliens, but the money is required to be paid for every passenger arriving from a foreign. port. ' The tax is imposed on the passenger in this case clearly and distinctly; for although the captain who lands them is made liable for the collection, yet a right is expressly, secured to him. to recover' it from the passenger. There can be no objection to this law upon the ground that the burden is imposed upon citizens of other States, because citizens of New York are equally liable ; but embracing, as it does, its own citizens and citizens of other States, when they arrive from a *484 foreign port, the right of a State to determine whát person or class of persons shall reside among them does not arise, and what I have said upon that subject in the Boston case is inapplicable to this. In every other respect, however, it stands upon the same principles, involving also other and further considerations, which I proceed to notice, and which place it upon grounds equally firm with the case from Massachusetts.
” It will be admitted, I understand, that New York has the right to protect herself from contagious diseases, and possesses the right to inspect ships with cargoes, and to determine when it is safe to permit the vessel to come to the wharf, or the cargo to be discharged, in other words, it may establish quarantine laws. Consequently the State may tax the ship and cargo with the expenses of inspection, and with the costs and expenses of all measures deemed necessary by the State authorities. This is uniformly the case in quarantine regulations ; and although there is not the least appearance of disease in the crew, and the cargo is free from taint, yet if the ship comes from a port where a contagious disease is supposed to exist, she Is always placed under quarantine, and subjected to the delay and expenses incident to that condition, and neither the crew nor cargo suffered to land until the State authorities are satisfied that • it may be' done without danger. The power of deciding from what port or ports there is danger of disease, and what ship or crew shall be made subject to ■quarantine, on account of the-port from which she sailed, and what precautions and securities are required to guard against it, must Of necessity belong to the State authorities; for otherwise the power to direct the quarantine could not be executed. And this power of a State has been constantly maintained and affirmed in this court whenever the subject has been under consideration. And whén the State authorities have directed the quarantine, if proof should be offered showing that the foreign ports to which it applied were free from disease, and that there was no just ground for apprehension, this court would hardly, upon that ground, feel itself authorized to pronounce the expenses charged upon the vessel to be unconstitutional, and the law imposing them to be void.
Upon every principle of reason and justice, the same rule must be applied to passengers that us applied to ships and cargoes. If, for example, while rumors were recently prevailing that the cholera had shown’ itself in the principal seaport towns of Europe, New York had been injudicious enough to embarrass her own trade by placing at quarantine all vessels and persons coming from those ports, and burdened them with the heavy expenses and ruinous delays incident to that measure* — *485 or if she were to do so now, when apprehensions are felt that it may again suddenly make its appearance in the great marts of European trade, — this court certainly would not undertake to determine that these fears are groundless, and precautionary measures unnecessary, and the law therefore unconstitutional,- and. that every passenger might land at his own pleasure. • Nobody, I am sure, will "contend for such a power. And however groundless the apprehension, and however injurious and uncalled for such regulations may be, still, if adopted by the State, they must be obeyed, and the courts of the United States cannot treat them as nullities.
If the State has.the same right to guard itself from persons from whom infection is feared that it has? to. protect itself against the danger arising-from ships with cargoes, it follows that it may exerciser the same power in regard to the former that it exercises in relation to the latter, and' may tax them with the expense of the sanatory measures which' their arrival from a foreign port is supposed to render necessary or prudent.
For the expenses imposed on ships with cargoes, or on thé captain or owner, are as much a tax as the demand of a particular sum to be paid to the officer of the State; to be expended for the same purpose.- It is in truth always the demand of a sum of money to indemnify the State for the expense it incurs. And, as I have already said, these charges are not always made, and enforcéd against ships actually infected with disease, but frequently upon a- particular class of vessels; that is to say, upon all ships coming from ports from which danger • is apprehended, — upon the sound and healthy as well as the infected. The charge is not made, upon those ships alone which bring disease with them, but upon all that come from a port or ports from which it is feared disease may be brought. It is true. the expenses may and do differ in amount, according to the condition of the ship and cargo. Yet all aré subjected to the tax, to the amount of the charges incurred by the State.
Now, in the great commercial emporium of New York, hundreds are almost daily arriving from? different parts of the world, and that multitude of strangers (among whom are always many of the indigent and infirm) inevitably produces a mass of pauperism which, if not otherwise provided for, myst press heavily on the industry of its citizens ; and which, moreover, constantly subjects them to the danger of infectious diseases. It is to guard them against these dangers that the law in question was passed. The apprehensions which appear to have given rise to it may be without foundation as to some of the foreign ports from which passengers have arrived, but that *486 is not a subject of inquiry hére ; and it will hardly be denied .that there are sufficient grounds for apprehension and for measures of precaution as to many of the places from which passenger ships are frequently arriving. Indeed, it can hardly be said that there is any European port from- which emigrants usually come which can be regarded as an exception.
The danger arising from passenger ships cannot be provided against, with a .due regard to the interests and convenience of trade and' to.the calls of humanity, by precisely'the same means that are usually employed in .cases of ships with cargoes. In the latter case, you may act without difficulty upon the particular ship, and charge it with the expenses which are incident to the quarantine regulations. But how are you to provide for hundreds of sick and suffering passengers ? for infancy and age? for those who havepo means, — who are not objects of taxation, but of charity ? You must have an extensive hospital, suitable grounds about it, nurses and. physicians, and provide food and medicine for them: Arid it is but just that these expenses should be borne by the class of persons . who make them necessary; that is to say, the passengers from foreign ports. It is from them, as a class, that the danger is feared, and they 'occasion the expenditure. They are all entitled to share in the relief which is 'provided,, and the State cannot foresee which of them will require it and which will not. It is provided for all that need it, and all should therefore contribute. You must deal with, them as you do with ships with merchandise and crews arriving from ports where;infectious diseases are supposed to exist; when, although the crew are in perfect health, and the ship and cargo free from infection, yet the -ship-owner must bear the expense óf the sanatory precautions which are supposed to be necessary on account of the place from which the vessel comes.
The State, might, it is true, have adopted towards the passenger ships the quarantine regulations usually applied to ships with merchandise. It might have directed that the passenger ships from any foreign port should be anchored in the stream, and the passengers not permitted to land for the period of time deeiried prudent. And if this had been done, the ship-owner would have been burdened with the support of his numerous passengers, and his ship detained for days, or even weeks, after the voyage was ended. And if a contagious .disease had broken out on the passage, or appeared after the vessel arrived in port, the delay arid'expense to him would have been still more serious.
The sanatory measures prescribed by this law are far more favorable to the passengers' than the ancient regulations, and *487 incomparably more so to the feeble, the sick, and the poor. They are far more favorable, also, and less burdensome, to the ship-owner ; and no one, I think, can fail to see that the ancient quarantine regulations, when applied' to passenger ships, are altogether unsuited to the present condition of things, to the convenience of trade, and to the enlightened policy which governs our intercourse with foreign nations. The ancient quarantine regulations were introduced when the passenger trade, as a regular occupation, was unknown, and when the intercourse between nations was totally unlike what it is at the present day. And after all, these quarantine regulations are nothing more than the mode in which a nation exercises its power of guarding its citizens from the danger of disease. It was, no doubt, well suited to the state of the world at the time when it was generally adopted; but can there be any reason why a State may not adopt other sanatory regulations in the place of them, more suitable to the free, speedy, and extended intercourse of modern times? Can there be any reason why they should not be made less oppressive to the passenger, and to the ship-owner and mariner, and less embarrassing and injurious to commerce? This is evidently what the New York law intended to accomplish, and has accomplished, while the law has been permitted to stand. It is no more a regulation of commerce, and, indeed, is far less burdensome and occasions less interruption to commerce, than the ancient quarantine regulations. And I cannot see upon what ground it can be supposed that the Constitution of the United States permits a State to use the ancient means of guarding the health of its citizens, and at the same time denies to it the power of mitigating its hardships and of adapting its sanatory regulation to the extended and incessant intercourse with foreign nations, and the more enlightened philanthropy of modem times; nor why the State should be denied the privilege of providing for the sick and suffering on shore, instead of leaving them to perish on shipboard. Quarantine regulations are not specific and unalterable powers in a State; they are but the means of executing a power. And certainly other and. better means may be ■ adopted in place of them, if they are not prohibited by the Constitution of the United States. And if the old mode is constitutional, the one adopted by the, law of New York must be equally free from objection. Indeed, the case of The City of New York v. Miln, so often referred to in the argument, ought, in my judgment, to decide this. It seems to me that the present case is entirely within the-principles there ruled by the court.
I had not intended to say any thing further in relation to the case of New York v. Miln, but the remarks of one of my breth *488 ren have rendered it necessary for me to speak of it more particularly, since I have referred to it as the deliberate judgment of the court. It is eleven years since that decision was pronounced. After that lapse of time, I am sensible that I ought not to undertake to state every thing that passed in conference or in private conversations; because I may be mistaken in some particulars, although my impressions are strong that all the circumstances are yet in my memory. And I am the less disposed to enter upon such a statement, because, in my judgment, its judicial authority ought liot to rest on. any sueh circumstances depending on individual "memory. The court at that time consisted of seven members; four.of them- are dead, and among them the eminent jurist who delivered the opinion of-the court. All of the seven judges were present, and partook in the deliberations which preceded the decision. The opinion must have been read in conference, and assented to or acquiesced in by a majority of the court, precisely as it-stood, otherwise-it could not have been delivered as the court’s opinion. It was delivered from the bench in open court, as usual, and only one of the seven judges, Mr. Justice Story, dissented. Mr. Justice Thompson delivered his own opinion, which concurred in the opinion of the court, but which, at the same time,' added another ground, which the court declined taking and determined to leave open. ' This will be seen by referring to the opinions. And if an opinion thus prepared and delivered and promulgated in the official report may now be put aside, on the ground that it did not express what at that time was the opinion of the majority of the court, I do not see how the. decisions, when announced by a single judge, (as is usual when the majority concur,) can hereafter command the public confidence. What is said to have happened in this case may, for aught we know, have happened in others. In Gibbons v. Ogden, for example, or Brown v. The State of Maryland, which have been so often referred to. -
The question which the court determined to leave open was, whether regulátions of commerce, as such, by a State within its own territories, are prohibited by the grant of the power to Congress. This appears in the. opinion itself, and the law of New York was maintained on Avhat was called, the police power of the State. I ought to add, as Mr. Justice Baldwin has been particularly referred to, that the court adjourned on the day the opinion was. delivered, and on the next day he called on me and said there was a sentence, or a paragraph, I do not remember which, that had escaped his- attention, and which he was dissatisfied with, and wished altered. Of course nothing could be done, as the court had separated, and Mr. *489 Justice Barbour, as well as others, had left town. Mr. Justice Barbour and Mr. Justice Baldwin were both present at the next term, and for several terms after phut I never heard any further dissatisfaction expressed with the opinion by Mr. Justice Baldwin, and never at any .time, until this case came before us, heard any from any other member of the court who had assented to or acquiesced in the opinion, nor any proposition to correct it. I have no reason to suppose that Mr. Justice Barbour ever heard in his lifetime that the accuracy of his opinion had been questioned, or that any Alteration had been desired in it. And I have the strongest reason to suppose that Mr. Justice Baldwin had become satisfied, because, in his opinion in Groves v. Slaughter, he quotes the case of New York v. Miln with approbation, when speaking in that case of the difference between commercial and police power. The passage is in 15 Pet. 511, where he uses the following language: — “ The opinion of this court in the case of Miln v. New York, 11 Pet. 130, &c., draws-the true line between the two classes of regulations, and gives an easy solution to any doubt which may arise on the clause of the constitution of Mississippi which has been under consideration.” I quote his words as judicially spoken, and -forming a part of the official report.
I have deemed it my duty to say this much, as I am one of the three surviving judges who sat in that case. My silence would justly have, created the belief that I concurred in the statement which has been made in relation to the case of which I am speaking. But I do not concur. My recollections, on the contrary, differ from it in several particulars. But it would be out of place to enter on such a discussion here. All I desire to say is, that I know nothing that, -in my judgment, ought to deprive the case of-New York v. Miln of its full judicial weight as it stands in the official report. Mr. Justice Barbour delivered the opinion. Mr. Justice Thompson’s opinion maintains, in the main, the same principles; Mr. Justice Baldwin, four years afterwards, quoted it with approbation; and I certainly assented to it, —making a majority of the whole court. I speak of the opinion of my deceased brethren from their public acts. Of the opinions of those who sit beside me I have no right to speak, because they are yet here and have spoken for themselves. But it is due to myself to say, that certainly, at the time the opinion was delivered, I had no reason to suppose that they did not both fully concur in the reasoning and principles, as well as in the judgment. And if the decision now made is to come in conflict with the principles maintained in that case, those who follow us in these seats must hereafter decide between the two cases, and determine which of them best *490 accords with the true construction of the Constitution, and ought, therefore, to stand. The law now in question, like the law under consideration in the case of New York v. Miln, is, in all of its substantial objects and provisions, in strict analogy to the ordinary quarantine regulations in relation to ships with cargoes from places supposed to be dangerous; at least as much so as the nature of the danger brought by a passenger ship, and the means necessary to guard against it, will permit.
But if this law is held to' be invalid, either because it is a regulation of commerce, or because it comes in conflict with a law of Congress, in what mode can the State protect itself? How can it provide against the danger of pestilence and pauperism from passenger ships? It is admitted that it has a right to do so; that want and disease are not the subjects of commerce, and not within the power granted to Congress. They do not obey its laws. Yet, if the State has the right, there must be a remedy, in some form or other, in its own hands, as ■there is in the case of ships with cargoes. The State can scarcely be required to take upon itself, and impose upon the industry of its citizens, the duty of supporting- the immense mass of poverty and helplessness which is now pressing so heavily upon property in Europe, and which it-is endeavouring to throw off. It cannot be expected that it should take upon itself the burden of providing buildings, grounds, food, and all the necessary comforts for the multitude of helpless and poor passengers who are daily arriving from foreign ports. Neither, I presume, will it be(. expected that' the citizens of New York should disregard the calls of sympathy and charity, and repulse from their shores the needy and wretched who are seeking an asylum amongst them. Those who deny the legality of the mode adopted would seem .to be called upon to point out another consistent with .the rights and safety of the State, and with the interests of commerce in the present condition of the commercial world, and-not inconsistent with the obligations of humanity. I have heard none suggested, and I think it would be difficult to devise one on the principles on which this' case is decided, unless, the health and the lives of the citizens of every State are made altogether dependent upon the protection of the Federal government, and the reserved powers of the States over this subject, which were affirmed by this court in Gibbons v. Ogden and Brown v. The State of Maryland, are now to be denied.
With regard to the taxing power.in the State, the case of Brown v. The State of Maryland, referred to in the argument, does not apply to it. The rights of the ship-owner or the captain were in no degree involved in that suit: Nor was there *491 any question as to. when the voyage terminated, as to the ship, or when passengers were entitled to land. The case turned altogether upon the rights of the importer, the owner of imported goods ; and the inquiry was, how long and under what circumstances they continued, after they had been actually landed, to be imports or parts of foreign commerce, subject to the control of Congress and exempt therefore from taxation by the State. And even with regard to the importer, that case did not decide that he was not liable to be taxed for the amount of his capital employed in trade, although these imports were a part of that capital.
' But here there .is no owner. It is the case of passengers, — .freemen. It is admitted that they are not exempt from taxation after they are on shore. And the question is, When was the voyage or passage ended, and when did the captain and passengers pass from the jurisdiction and protection of the general government and enter into that ‘ of the. State. The act of 1819 regulated and prescribed the duties of the shipowner and captain during the voyage, and until the entry was made at the custom-house and the proper list delivered. It makes no further provision in relation to any.of the parties. The voyage was evidently regarded as then completed, and the captain and passengers as passing from the protection and regulations of Congress, into the protection and exclusive jurisdiction- of the State. The passengers were ho longer under the control of the captain. They might have landed where and when they' pleased, if the State law permitted it, and the captain had no right to prevent them. If he attempted to do so, there was no law of Congress to afford redress or to-grant relief. They must have looked for protection to the State law and the _ State authorities. If a murder had been committed, there was no law of Congress to pnmsh it. The personal safety of the passengers and the captain, and their rights- of property, were exclusively under the jurisdiction and protection of the State. If the right of taxation did not exist in this case in return for the protection afforded, it is, I think, a new exception to the general rule upon that subject. For all the parties, the captain as. well as the passengers, were as entirely dependent for the protection of their rights upon the State authorities, as if they were dwelling in a house in one of its cities; and I cannot, see why they should not be equally liable to be taxed, when no clause can be found in the Constitution of the United States which prohibits it.
The different provisions of the two laws, and the different circumstances of the two cases, made it necessary to say this much concerning the case from New York. In all other rfe- *492 specls, except those to which I have adverted, they stand upon the same principles, and what I have said of the Boston case is equally applicable to this.
In speaking of the taxing power in this case, I must, how-ever, be understood as speaking of it as it is presented in the record, — that is to say, ns the case of passengers from a foreign port. The provisions contained in that law relating to American citizens who are passengers from the ports of other States is a different, question, and involves very different, considerations. It is not now before us; yet, in order to avoid misunderstanding, it is proper to say, that, in my opinion, it cannot be maintained. Living as we do under a common government, charged with the great concerns of the whole Union, every citizen of the United States, from the most remote States or Territories, is entitled to free access, not only to the principal departments established at Washington, but also to its judicial tribunals and public offices in every State and Territory of the Union. And the various provisions in the Constitution of the United States — such, for example,'as the right to sue in a fedéral court sitting in another State, the right to pursue, and reclaim one who has escaped from service, the equal privileges and immunities secured to citizens of other States, and the provision that vessels bound to or from one State to another shall not be obliged to enter and clear or pay duties — all prove that it intended to secure the- freest intercourse between the citizens of the different States. For all the great purposes for which the Federal government was formed, we áre one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States. And a tax imposed by a State for entering its territories or harbours is inconsistent with the rights which belong to the citizens of other States as members of the Union, and with the objects which that Union was intended to attain. Such a power in the States could produce nothing but discord and mutual irritation, and they very clearly do not possess it.
But upon the question which the record brings up, the judgment in the New York case, as well as that from Massachusetts, ought, in my opinion, to be affirmed.
Note. —It has been said in the discussion of these cases, by those who maintain that the State laws are unconstitutional, that commerce means intercourse ; and that the power granted to regulate it ought to' be construed' to include intercourse. I have never been able to see that any argument which need *493 ed examination could be justly founded on this suggestion, and therefore omitted to notice it in the aforegoing opinion. But some stress was, perhaps, intended to be laid on the word intercourse thus introduced, and I therefore subjoin this brief note, in order to show that it has not been overlooked.
It has always been admitted, in the discussions upon this clause of the. Constitution, that the power to regulate commerce includes navigation, and ships, and crews, because they •are the ordinary means of commercial intercourse ; and if it is intended by the introduction of the word intercourse merely to say that the power to regulate commerce includes.in it navigation, and the vehicles and instruments of commerce, it leaves the question in dispute precisely where it stood before, and requires no further answer.
But if intercourse means something more than commerce, and would give to the general government a wider range of power over the States, no one, I am sure, will claim for this court -the power to interpolate it, or to construe the Constitution as if it was found there. And if, under the authority to regulate commerce, Congress cannot compel the States to admit or reject aliens or other persons coming from foreign ports, but would possess the- power if the word intercourse is, by construction, substituted in its place, every one will admit that a construction which substitutes a word of larger meaning than the word used,in the Constitution could not be justified or defended upon any principle of judicial authority.
The introduction of the word intercourse', therefore, comes to this: if it means nothing more than the. word commerce, it is" merely the addition of a word without changing the argument ; ‘but if it is a word of larger meaning, it is sufficient to say that then this court cannot substitute it for the word of more limited meaning contained in the Constitution. In either view, therefore, of the meaning to be attached to this word intercourse, it can form- no foundation for an argument to support the power now claimed for the general government.
And if commerce with foreign nations could be construed to include the intercourse of persons, and to embrace travellers and passengers, as well as merchandise and trade, Congresos would also have the power to regulate this intercourse between the several States, and to exercise this power of regulation over citizens passing from one State to another. It, of course, needs no argument to prove that such a power over the intercourse of persons passing from one State to another is not granted to the Federal government by the power to regulate commerce among the several States. Yet, if commerce does not mean the intercourse of persons between the several States, *494 and does not émbrace passengers or travellers from one State to another, it necessarily follows that the same word does not include passengers or travellers from foreign countries. And if Congress, under its power tó regulate commerce with foreign nations, possesses the power claimed for it in the decision of this case, the same course of reasoning and the same rule of construction (by substituting intercourse for commerce) would give the general government the same power over the intercourse of persons between different States.
Allusion has been made in the course of these discussions to the exclusive power of the Federal government in relation to intercourse with foreign nations, potentates, and public authorities. This exclusive power is derived from its power of peace and war, its treaty-making power, its exclusive right to send and receive ambassadors and other public functionaries ; and its intercourse in exercising this power is exclusively with governments and public authorities, and has no connection whatever with private persons, whether they be emigrants or passengers, or travellers by land or water from a foreign country. This power over intercourse with foreign governments and authorities has frequently been spoken of, in opinions delivered in this .court, as an exclusive- power. And I do not suppose that any of these opinions have been alluded to in this case, as furnishing any argument upon the question now before us. For an argument drawn from a mere similitude of words, which are used in relation to a subject entirely different, would- be a sophism too palpable to need serious reply.
Mr. Justice DANIEL, dissenting.
Norris v. City of Boston, and Smith v. Turner.
Of the decision of the court just given, a solemn sense of duty compels me to declare my disapproval. Impressed as I am with the mischiefs with which that decision is believed to be fraught, trampling down, as to me it seems to do, some of the strongest defences of the safety and independence of the States of this confederacy, it would be worse than a fault in me could I contemplate the invasion in silence. I am unable to suppress my alarm at the approach- of power claimed to be uncontrollable and unlimited. My objections to the decision of the court, and the grounds on which it is rested, both at the bar and by the court, will be exemplified in detail in considering the case of Smith v. Turner, arising under the statute of New York. The provision of the statute in question is in the following words: —
*495 “ The health-commissioner shall demand and be entitled to receive, and in case of neglect or refusal to pay shall sue for and recover, in his name of office, the following sums from the, master of every vessel that shall arrive in the port of New York, viz.: — 1. From the master of every vessel from a foreign port, for himself and each cabin.passenger, one dollar and fifty cents; for each steerage passenger, mate, sailor, or mariner, one dollar.” (Rev. Stat. of New York, 445.)
It is wholly irrelevant to the case before us to introduce any other provisions of this statute; such provisions have no connection with this cause, which originated in the single provision just cited ; the intrusion of other provisions of the. law of New York can tend only to confusion, and to the effect of diverting the mind from the only proper question for our decision.
Under this provision of the statute, an action was brought by the defendant, in error, as health-officer of New York, against the plaintiff in error, to recover the amount authorized by the statute to be demanded of him for bringing within the port of the city of New York, from a foreign country, two hundred and ninety-five alien passengers. It is deemed necessary particularly to state the character of the persons with respect to whose entrance the demand originated and was made, with' the view to anticipate objections which might be founded on a supposed invasion of the right of transit in American'citizens from one portion of the nation to another. Tc/raise such an objection would be the creation of a mere rnan of straw, for the quixotic parade of being tilted at and demolished. This case involves no right of transit in American citizens or their property ; it is a question raised simply and entirely upon the right of the State to impose conditions on which aliens, or persons from foreign countries, may be introduced within her territory. When a case of a different character, touching the right of transit in citizens, shall arise, it will then, and not till then, be proper to consider it. We cannot properly take cognizance of matters existing only in imagination. Whether this statute of New York and those which have preceded it in pari materia, be wise, or beneficent, or equitable, or otherwise, in their provisions,— whether,"Under color of those statutes, more may have been'collected than either justice or prudence, or the objects professed in those laws, would require, — whether the amounts collected have been diverted to purposes, different from those alleged in excuse for such collection, — are not questions adjourned hither for adjudication upon this record. The legitimate and only regular inquiry before the oourt is this,— whether the authority claimed and exerted by New York, and *496 the mode she has chosen for its exertion, be in conformity with the provisions of the Constitution ? I shall dismiss from my view of this cause every other question, as irrelevant and out of place.
The legislation of New York, and the proceedings adopted to enforce it, are assailed as violations of the Constitution, first, as being repugnant to, and an interference with, the power delegated to Congress to regulate foreign commerce. And this general proposition has been divided into two m'ore specific grounds of objection: —
1st. The-prohibition to the States to levy taxes or.imposts on imports.
2d. The alleged right of Congress- to regulate exclusively the admission of aliens, — a right insisted on as falling by construction within' the commercial power, or within some other implication in the Constitution.
As guides in the examination of these objections, I will take leave to propound certain rules or principles regarded by myself, at least, as postulates, and conceded to be such, perhaps, by every expositor of the Constitution and. of the powers of the State governments.
1st. Then, Congress have no powers save those which are expressly delegated by the Constitution, and such as are necessary to the exercise of powers expressly delegated: (Constitution, art.l, sec. 8, clause 18, and Amendments, art. 10.)
2d. The necessary adxiliary powers vested by art. 1, sec. 8, of the Constitution cannot be correctly interpreted as conferring powers which, in their own nature, are original, independa ent substantive powers; they must be incident to. original substantive grants, ancillary in their nature and -objects, and controlled by and limited to the original, grants themselves.
3d. The question, whether a law be void for its repugnancy to the Constitution, ought seldom, if ever, to be decided in the affirmative in a doubtful case. It is not on slight implication and vague conjecture, that a legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and. the law should be such, that the judgé feels a clear and strong- conviction of. their infeompátibility with each other. (6 Cranch, 128.) Various other cases might be adduced to the same effect. Governed by the above principles, whose soundness will scarcely be doubted, I proceed to inquire wherein the existing legislation of New York is in conflict with the Constitution, or with any regulation of Congress established under the authority' of that instrument. Whilst, with respect to the paramount authority in Congress to regulate commerce with for *497 eign nations and amongst the several States, (with the exceptions and qualifications of internal commerce and of regulations necessary for the health and security of society,) there appears to have been great unanimity everywhere amongst all persons, much diversity of opinion has existed amongst members of this tribunal as to another. characteristic of this grant to Congress; namely, as to whether it implies an exclusiveness which necessarily denies and forbids, apart from actual or practical collision or interference, every thing like the power of commercial regulation on the part of the States.
To collate or comment upon these various opinions would here be a work of detail and curiosity rather than of utility. .A reference to them is no further necessary than to remark, that their preponderance is against the position of exclusiveness in the sense above mentioned, or in any acceptation beyond an actual interference or an unavoidable and essential repugnance in the nature of the separate State, and Federal action.
And still more would an examination of these opinions be useless, if, indeed, it would not be irregular, since the decision at the last term but one of this court, upon the license laws'of Massachusetts, Rhode Island, and New. Hampshire, reported in 5 Howard, 504, in which decision the preceding cases upon this subject were reviewed, and the character-of exclusiveness in the power- delegated to Congress repelled and denied. It was my purpose, with this general reference to the decisions of this court, to pass from the. point of exclusiveness in the power of Congress over commercial regulations to other questions involved in the present cause'; but certain positions just confidently stated- from the bench seem to require- a pause in my progress, long enough to show the inconsistency of these posh tions with the Constitution, — their direct conflict, indeed, with themselves. Thus, in the argument to sustain the exclusiveness of the commercial power in Congress, it has been affirmed that, the powers of the Federal government being complete, and withiu the scope of their design and objects admitting of no partition, the State governments can exercise nó powers affecting subjects falling within the range of Federal authority, actual or potential, or in subordination to the Federal government ; yet it is remarkable that this assertion has been followed in the same breath by the concession, that the pilot laws are, to some extent, regulations of commerce, and that pilot laws, though enacted by the States, are constitutional, and are valid and operative until they shall be controlled by Federal legislation.
Again: the very language of the Constitution may be appealed to for the recognition of powers to be exercised by the *498 States, until they shall be superseded by a paramount authority vested in the Federal government. Instances of these are the powers' to train the militia, to lay duties or imposts on imports or exports, so far as this shall be necessary to execute the inspection laws; and the provision in the fourth section of the first article of the Constitution, declaring that the times, places, and manner of holding elections for senators and representatives shall be prescribed in each State by the legislature thereof, subject to the power of Congress at any time to alter such regulation. Here, then, are examples put by the Constitution itself, which wholly overthrow this idea of necessity for universal exclusiveness in the investiture of Federal power; examples surely not of minor importance to any which can be derived from the ordinary exigencies of trade. I must stop here, too, long enough to advert to a citation which has been made, in support of the idea of exclusive commercial power, from tjie opinion of the late Mr. Justice Baldwin, in the casé .of Groves v. Slaughter, 15 Peters, 51R With regard to this opinion, it would seem to be enough to deprive it of binding influence as authority, to remark that it was a dissent by a'single judge ; and this opinion should have still less weight here or elsewhere, when it shall be understood to have asserted the extraordinary doctrine that the States of this Union can have no power to prohibit the introduction of slaves within their territory when carried thither for sale or traffic, because the power to regulate commerce is there asserted to reside in Congress alone. It may safely be concluded, I think, that the justice who cites, with seeming approbation, the opinion of Mr. Justice Baldwin, will hesitate to follow it to the eccentric and startling, conclusion to which that opinion has attained.-
In opposition to the opinion of Mr. Justice Baldwin, I will place the sounder and more orthodox views of Mr. Justice Story upon this claim to exclusive power in Congress, as expressed in the case of Houston v. Moore, 5 Wheat. 48, with so much clearness and force as to warrant their insertion here, and which must strongly commend thém to e'rery constitutional lawyer. The remarks of Justice Story are these: — “ Questions of this nature are always of great importance and delicacy. They involve interests of so much magnitude, and of such deep and permanent public concern, that they cannot but be approached with uncommon anxiety. The sovereignty of a State in the. exercise of its legislation is not to be. impaired,. unless it be clear that it has' transcended its legitimate authority ; nor ought any power to be sought, much less id be adjudged, in favor of the'United States, unless it be clearly within the reach of its constitutional charter. Sitting here, we are *499 not at liberty to add one jot of power to the national government beyond what the people have granted by the Constitution ; and, on the other hand, we are bound to support the Constitution as it stands, and to give a fair and rational scope to all the powers which it clearly contains. The Constitution containing a grant of powers in many instances similar to those already existing in the State governments, and some of these being of vital importance to State authority and State legislation, it is not to be admitted that a mere grant of such powers in affirmative terms to Congress does, per se transfer an exclusive sovereignty on such subjects to the latter. On the contrary, a reasonable interpretation- of that instrument necessarily leads to the conclusion, that the powers so granted are never exclusive of similar-powers existing in the States, unless where the Constitution has expressly in terms given an exclusive power to Congress, or the exercise of a like power is prohibited to the States, dr there is a direct repugnancy or incompatibility in the exercise of it by the States. In all other cases not falling 'within the classes already mentioned, it seems unquestionable that the States retain concurrent authority with Congress, not only upon' the letter and spirit of the eleventh amendment of the Constitution, but upon the soundest principles of general reasoning. There is this reserve, however, that, in cases of concurrent authority, where the laws of the States and of the Union are in direct and manifest collision on the same subject, those of the Union, being the supreme law of the .land, are of paramount authority, and State laws so far, and so far only, as such incompatibility exists must necessarily yield. Such are the general principles by which my judgment is guided in every investigation on constitutional points. I do not know that they have ever been seriously doubted. They commend themselves by their intrinsic equity, and have been amply justified by the opinions of the great men under whose guidance the Constitution was framed, as well as by the practice of the government of the Union. To desert them would be to deliver ourselves over to endless doubts and difficulties, and probably to hazard the existence of the Constitution itself.” Here, indeed, is a commentary on the Constitution worthy of universal acceptation.
As the case of Gibbons v. Ogden has been much relied on in the argument of these cases, and is constantly appealed to as the authoritative assertion of the principle of exclusiveness in the power in Congress to regulate commerce, it is proper here to inquire how far the decision of Gibbons v. Ogden affirms this principle, so often and so confidently ascribed to it; and after all that has been said on this subject, it may be mat *500 ter of surprise to learn, that the court, in the decision above mentioned, so far from affirming that principle, emphatically disclaims all intention to pass upon it. It'is true that the court, in speaking of the power to regulate commerce vested in Congress by the Constitution; says, that, like all other powers vested in Congress, “ it is complete in itself, may be exercised to its' utmost extent, and acknowledges no limitations other than are comprised by the Constitution.” How fax- exclusiveness in its nature or in the modes of its exercise is indispensable to this completeness of the power itself, the court does not say; but, as has been already remarked, declares its intention not to speak on these topics. These are the words of the court: — “Indiscussing the question, whether this power is still in the States, in the case under consideration, we may dismiss from it the inquiry whether it is surrendered by the mere grant to Congress, or is retained until Congress shall exercise the power. We dismiss that inquiry, because it has been exercised, and the regulations which Congress deemed it proper to make are now in full operation. The sole question is,. Can a State, regulate commerce with foreign nations and' among the States, while Congress is regulating it ? ” And, in fine, upon this question of exclusiveness, the case of Wilson v. The Blackbird Creek Marsh Company affirms, -in language too explicit for misapprehension, that the States may, by their legislation, create what may be obstructions of the means of commercial intercourse, subject to the controlling and paramoixnt authority of Cpngress. The words of the court in the case last mentioned are these: — “If Congress had passed' anjr act which bore upon the case, any act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the Middle and Southern States, we should feel not much difficulty, in saying that a State lavl coming ih .conflict with such an act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution- is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power which has not been so exercised as to affect the question. The act is not in violation of this power in its dormant state.” (2 Peters, 252.)
I now proceed to inquire whether the exaction of one dollar by New York from aliens arriving within her limits from abroad by sea, can be denominated a regulation of commerce, either according to the etymological meaning of the.-word commerce, or according to its application in common parlance. *501 Commerce, from con and mereis, critically signifies a mutual selling or traffic, and in ordinary and practical acceptation it means trade, bargain, sale, exchange, barter ; embracing these both as its means' and its objects. Different and metaphorical significations of the term can doubtless be suggested by ingenious imaginations. Thus- w@ read in a great poet of “ looks commercing with the skies ” ; but this sublimated application of the term would badly accord with the views of commerce in a mercantile sense, or with, the utilitarian spirit of this calculating and prosaic age.*
Does the law of New York operate either directly or necessarily upon any one of these ingredients of commerce ? Does it look to them at all ? With regard to the emigrant, this law institutes no inquiry either as to his pursuits, or his intentioiis, or his property. He may be a philosopher, an agriculturist, a mechanic, a merchant, a traveller, or a man of pleasure; he may be opulent, or he may be poor; — none of these circumstances affect his admission. It is required, upon his entering the State, that there be paid by or for him a given sum, graduated upon a calculation of benefit to himself and to others similarly situated with himself, — or, if you choose, upon a calculation of advantage to the State ; but, under whatever aspect it is viewed, wholly irrespective of property or occupation. So far, then, as the emigrant himself is considered, this imposition steers entirely clear of regulating commerce, in any conceivable sense; it is literally a tax upon a person placing himself within the sphere of the taxing power, and the nature and character of the proceeding are in no wise changed where payment shall be made by the master of the vessel acting as the agent and on behalf, of the emigrant. It would still be purely an exercise of the great, indefeasible right of taxation, which, it has been explicitly said by this court, would extend to every subject but for the restriction as to imports and exports imposed by the Constitution; a right, too, expressly declared to belong to a branch of power wholly different from the power to regulate commerce, and forming no part of that power. Thus, in the case of Gibbons v. Ogden, 9 Wheaton, 201, this court, speaking of the power of laying duties or imposts on imports or exports, make use of the following language : — “ We think it yery clear, that it is considered as a branch of the taxing power. It is so treated in the first- clause *502 of the eighth section. Congress shall have power to lay and collect taxes, duties, imposts, and excises’; and before commerce is mentioned, the rule by which the exertion of this power must be governed is declared. It is that- all duties, imposts, and excises shall be uniform. In a separate clause of the enumeration, the power to regulate commerce is. given, as being entirely distinct from the right to levy taxes and imposts, and as being a new power not before conferred. The Constitution, then, considers these two powers as substantive and distinct from each other, and so places them in the enumeration it contains. The power of imposing duties .on imports is” classed with the power to levy taxes, and that seems to be its natural place. But the power to levy taxes could never be considered as abridging the right of the States on that subject, and they might consequently have exercised it by levying duties on imports or exports had the Constitution contained no prohibition on. this subject. This prohibition, then, is an exception to the acknowledged power of the States to levy taxes; not from the questionable power to regulate commerce.” Again, in the same case, p. 200, it is.declared that “ there is no analogy between the power of taxation and the power to regulate commerce ”; that the powers are not the same; that there is neither affinity nor resemblance between them (p. 198). It follows ex necessitate from this language, that the right to regulate commerce must mean something essentially distinct and separate from the power to impose duties or taxes upon imports; and that the latter might exist'independently of and without the former. ' The assertion of the court here is too clear and emphatic to be misapprehended; and it would seem to follow by regular induction therefrom, that a tax directly upon the master himself, in consideration, of the emigrants brought by him within the limits of the State, could not be within the prohibition of the Constitution, unless those emigrants could in legal or in ordinary acceptation be made to fall within the meaning of the term imports. This would be absolutely necessary, and by a different construction the authority of Gibbons v. Ogden would be wholly overthrown. It is said, upon the authority of Gibbons v. Ogden, that commerce includes navigation, as a necessary means or instrument. Let this, as a general proposition, be conceded, still it by no means follows that navigation always implies commerce, and much less does it follow that the instruments of commerce, simply because they may be instruments, either as agents or as property, are to be wholly exempted from burdens incident to all other subjects of social polity. I will not contend that the master, his vessel, and his mariners and passengers, are not *503 all subject to proper regulations of commerce enacted by Con-. gress; the proposition I maintain is this: that regulations of commerce do not embracé taxes on any or on all the subjects above named, exacted within the just sphere of the power imposing them. Thus, then, the assessment made by New York is purely a tax, ñet a regulation of commerce ;■ but it is not a tax on imports, unless passengers can be brought within this denomination; if they cannot, it is a tax simply on persons coming within the jurisdiction of thé taxing power. And who shall deny or' control this sovereign attribute, when operating within its legitimate sphere ? When and by whom shall any restriction be put upon it beyond the point to which it has been voluntarily and- expressly conceded by the Constitution ? And this point, it is said, by the decision of Gibbons v. Ogden, is established singly and determinately in the prohibition, to impose taxes on imports. With regard to this essential and sovereign power of taxation, it. may be proper here to advert to the caution with which it was granted, and the extreme jealousy which was manifested, towards any and every apprehended encroachment upon it by the Constitution when it was offered for adoption. Against such dreaded encroachment were pointed some of the most strenuous objections of the opponents of the new government. They insisted that revenue was as requisite to the purposes of the local administrations as to those of the Union, and that the former were at least of equal importance with the latter to the happiness of the people; that it was therefore as necessary that the State gov-ernménts should be able to command the means of supplying their wants, as that the national government should possess the like means in respect to the wants of the Union ; and they said that, as the laws of the Union were to become the supreme .law of the land, and as the national government was,to have power to pass all laws necessary for carrying into execution the authorities with which it was proposed to vest it, the national government might at any time abolish the taxes imposed for State objects, upon the "pretence of an interference with its own. The objections just stated, and the feeling of mistrust in which ■ they had their origin, the advocates of the Constitution found it indispensable to remove; hence it is that in the Federalist we find several numbers of that able work devoted particularly to the purpose of reconciling the existence of the power of taxation in the Federa government with its possession and exercise oh the part of the States, and nothing can be more explicit than is the admission contained in these papers of the independent and unqualified power in the States in reference to this subject. In the thirty-second number' *504 of the Federalist, tire writer thus expresses himself: — “I am willing here to allow, in its full extent, the justness of the reasoning -which requires that the individual. States should possess an independeht and uncontrollable authority to raise their own revenues for the supply of their own wants. And making this concession, I affirm (with the exception of duties on imports and exports) they would, under the plan of the Convention, retain that authority in the most absolute and unqualified sense; and that an attempt on the part of the national government to abridge them in the exercise of it would be a violent assumption of power, unwarranted by any article or clause of its .Constitution.” Again, in the same number, speaking with respect to the prohibition on the States from imposing duties on imports, it is said : — “ This restriction implies an admission, that, if it were not inserted, the States would possess the power it excludes; and it. implies a further admission, that' as to all other taxes the authority of the States remains undiminished.” Such were the principles and doctrines of the Constitution as admitted, nay, urged, by the advocates for. its adoption; ahd it is thought that there is no candid inquirer into the history of the times who will profess to believe that, had their admission not been thus made and earnestly pressed, the Constitution could have been accepted by the States. The contemporaneous interpretation thus given by the very fabricators of the instrument itself, confirmed, as has been shown, by the decision of Gibbons v. Ogden, is perhaps more emphatically declared in the later decision of this court in the ease of the Providence Bank v. Billings, 4 Peters, 561, where the court expresses itself in the following language : — “That the taxing power is of vital.importance, that it is essential to the existence of. government, are truths which it cannot be necessary to affirm. They are acknowledged and assented to by all. It would seem that the relinquishment of such a power is never to be assumed.. We will not say that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole .community are interested in maintaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear.” Can it be admitted, then. — can it be established by any correct reasoning, — that this high sovereign attribute, pronounced by this court to be of vital importance,- and essential to the existence' of a government, must be yielded, -upon mere implication, to a theory based on no express authority, but on construction alone, — not recommended by superior utility, but *505 greatly embarrassing in practice the theory of exclusive power .in Congress to regulate commerce ?
The inquiry next in order, and growing out of -the aforegoing views, is this: —Can the •' emigranh or passenger on whom the tax is assessed, on his arrival within the State be properly denominated an import? It has been contended that he may, bécause, according to the classical derivation of the term from importare, or in and porta, he has, like every thing else in the ship, been brought in. The advocates of this etymological interpretation should be cautious of adopting it, since it might imply too much, may lead to strange confusion, and ultimately to conclusions directly adverse to those they would deduce .from it. Thus, if the alien passenger is an import, simply from the fact of being brought into the State, will not ithe master and mariners also be imports, precisely for the same reason, although they may be natives and ^inhabitants of, and merely returning to, the country and port at which the. vessel arrives, and thus, if imported, must be imported home, having equally, sustained, a short time previously, when temporarily leaving; that home, the character also of exports ? Again: under this interpretation a dilemma might arise as to whether the ship, as she had been brought in, would not likewise be .an import, or whether the ship had imported the crew, or the crew, the ship; for although the latter would have been conducted into port-by the former, it would be literally true that they would have-been brought in by her. These departures from • the common and received acceptation of language may give, rise'to distinctions as astute as those in Scriblerius upon the famous bequest of Sir John Swale of all his black and white horses, and equally useful with those either in the development of truth or the-establishment of justice. But the strict etymologists have this, further difficulty to encounter. It is said by Livy, and by Tarro, in his book De Lingua Latina, that the'Romans when? they laid out a town, as a religious ceremony observed on such, occasions, delineated its boundaries with a plough; and that wherever they designed there should be á gate, they took up the plough and left a space. . Hence the word porta, a gate, a portando aratrum. Those, then, who will insist upon etymological acceptation, necessarily place themselves, as imported, within the gate; in other words, within the municipal authority of the State, and by consequence within the acknowledged operation of its laws. But such critical derivation cannot be admitted as accordant either with common acceptation or general experience; by these the term imports is justly applicable to articles of trade proper, —goods, chattels, property, subjects in their nature passive and having no volition, — not to *506 men whose emigration is the result of will,.and could not be accomplished without their cooperation, and is as-much their own act as it is the act 'of others ; nay, much more so. The conclusion, then, is undeniable, that alien passengers, rational beings, freemen carrying into execution their deliberate intentions, never can, without a singular perversion, be classed with the subjects of sale, barter, or traffic; or, in other words, with imports.
The láw of New York has been further assailed in argument, as being an infraction of the fourteenth article of the treaty of amity and commerce negotiated between Great.Britain and the United States in the year 1794, by which article it is provided that “ there shall be between all the dominions of his Majesty in Europe, and the territories of the United States, a reciprocal and perfect liberty of commerce and navigation. The people and the inhabitants of the two countries shall have liberty freely and securely, and without hindrance and molestation, to come with their- ships and cargoes to the' lands, countries, cities, ports, places, and rivers within the dominions and territories aforesaid, and to enter into the same; to resort there, and to remain and reside there without any limitation of time ; also to hire and possess houses and warehouses for the purposes of their commerce; and generally the merchants and traders on each side shall enjoy the most complete protection and security for their commerce, but subject always, as to what respects this article, to the laws and statutes of the two countries respectively.”
It has been insisted that the article of the treaty just cited, having stipulated that British subjects shall have liberty freely and securely, and without hindrance, to come with" their ships- and cargoes to the lands, countries, cities, ports, &c., and to remain and reside for the purposes of their commerce ; and the second clause of the sixth article of the Constitution having declared the Constitution and the laws of the United States, made in pursuance thereof, and treaties made under the authority of the United States, to be the supreme law of the land, the laws of New York, being in derogation of the fourteenth article of the treaty of .1794, are unconstitutional and void. The fourteenth article of the treaty of 1794, having expired by limitation of time anterior 'to the enactment of the statutes complained- of, it cannot in' terms, as a part of that compact, be brought'.tofbear upoh this case. The same-provision, however, with the single variation that British subjects are placed orí the same footing with, other foreigners who-.shall be admitted- to enter American-ports,, was renewed by the first article of the treaty of 1815, and by the third article of the same treaty was *507 continued for. four years. Subsequently, by the fourth article of the Convention with Great Britain of 1818, it was extended for ten years, and finally, by the first .’article of the Convention with the same power of the 6th of August, 1827, for an indefinite period, but liable to be terminated upon notice, from either of the contracting parties, of twelve months from and after the 20th day of October, 1828. The fourteenth article of the treaty of 1794, or rather its effect and meaning, with the variation above, engrafted on the treaty of 1815, may be considered as subsisting at the present, time. Before examining particularly the force of the objection founded upon this • stipulation, and of the effect sought to be imparted to it from the clause of the Constitution adduced in its support, I cannot forbear to recur to my opinion expressed on a former occasion, it being the view I still entertain as to what should be the interpretation of the second clause of the sixth article of the Constitution. The opinion referred to jis as follows: —
“ This provision of the Constitution, it is to be. feared, is sometimes expounded without those qualifications which the character of the parties' to that instrument, and its adaptation to the purposes for which it was created, necessarily imply. Every power delegated to the Federal government must be expounded in coincidence with a perfect right in the States to all that they have not delegated; in coincidence,- too, with the possession of every power and right necessary for their existence and preservation; for it is impossible to believe that these ever were, either in intention or in fact, ceded' to the general government. Laws of the United States, in order to be binding,, must be within the legitimate powers vested , by the Constitution. Treaties, in order to be valid, must be made within the scope of the same powers; for there can be no authority of the United States, save, what is derived mediately or immediately, and regularly and legitimately, from the Constitution. A treaty no more than an ordinary statute can arbitrarily cede away any one right of a State, or of any citizen of a State.” (5 Howard, 613:)
Admitting'this fourteenth article of the treaty to be in full force, and that it purported to taire from the State of New York the right to tax aliens coming and commorant within her territory, it would be. certainly incompetent for such a purpose, because there is not, and never could have been, any right in any other agent than her own government to bind her by such a stipulation. In the next place, the right of taxation claimed by New York can by no rational construction of it be made to conflict with a correct comprehension of the treaty stipulations in question. These neither express nor imply any thing more *508 than security for free, but regular, legitimate commercial intercourse, between the people of the .contracting nations, and exemption from burdens or restrictions inconsistent with such intercourse ; for this was the sole purpose either contemplated or professed. If these stipulations can be extended beyond this meaning, and, under the terms “ shall have liberty freely and securely to come and'enter the ports of the country, and to remain and reside and to hire and occupy houses for the purposes of -their commerce,” there can be claimed the right to withdraw, for an indefinite period, either the persons or the property of aliens from the power of taxation in the States, then there is asserted for Congress or the executive the power of exerting, through foreign governments, and foreign subjects, a control over the internal rights and polity of the States, which the framers of the Constitution and the decisions of this court, •already quoted,, have denied to the government in the exercise of its regular domestic functions. It would be difficult to limit, or even to imagine, the mischiefs comprised in such an interpretation of the treaty stipulations above mentioned. As one example of these, if it should suit the commercial speculations of-British subject^ to land within the territory of any of the States cargoes of negroes' from Jamaica, Hayti, or Africa; it would be difficult, according to the broad interpretation of the commercial privileges conferred by those stipulations, to designate any legitimate power in the States to prevent this invasion of their domestic security. According to the doctrines advanced, they could neither repulse nor tax the'nuisance.
The argument constructed by counsel and by some of the judges upon the provisions of the act of Congress authorizing the importation of the tools of mechanics, their clothing, &c., free from duties, presents itself to my mind as wanting in logical integrity, and as utterly destructive of positions which those \Vho urge- this argument elsewhere maintain. The exemption allowed by Gongress can correetly be made to signify nothing more'than this: that the general government will not levy duties on thé private effects of certain classes of persons who may be admitted into the country. But, by any rule of common sense, can this exemption be made to signify permission to those persons to land at all events in the States ? It asserts or implies no such thing; much less does it convey a command, or the power to issue a command, to the States to admit them. Must not this benefit of exemption from duties be always in enjoyment subordinate to and dependent upon the right of ..the owner of the property exempted to enter the cóun-try ? This is inevitable, unless, it be contended that a mere forbearance tó exact duties on the property is identical with *509 ordering the admission of its owner ; thus making the man the incident of the property, and not the property that of the man, —a reductio in absurdum, which cannot be ■ escaped from by those who deduce the right of admission from the act of Congress. But are those who assume this ground aware that it is destructive of other positions which they themselves have not only conceded, but even insist upon? They have admitted the power or right of self-preservation in the States, and, as a means of securing- this right, the power of excluding felons, convicts, paupers, and persons infected; but according to this argument, based upon the acts of Congress and on -the treaty stipulations' for free access and commorancy,- all must be permitted to land and to remain ; for these'acts, of Congress and treaty stipulations contain no exceptions in favor of the safety of the States; they are general, and in their terms ride over all such considerations as health, morals, or security amongst the people of the States. This, argument cannot be maintained! The true interpretation of the act of Congress referred to is this: tools, clothing, and personal property of mechan-' ics, .are goods, chattels, imports, in the known and proper sense of the .term imports ; Congress, having under the Constitution the power to impose duties on these, possess the correlative right of exempting them from duties; this they have done, and nothing beyond this. Congress.have not pretended to declare permission to the mechanic, or to any other description of person, directly, to come into the States, because they have' no such direct power under the Constitution, and cannot assume' or exercise .it indirectly.
I will now consider the' second head of objection to the legislation of New York, as - propounded in the division stated in the commencement of this opinion, namely, the alleged right of Congress to regulate exclusively the admission of aliens, as a right comprehended within the commercial power, or within •some other implication in the Constitution.
Over aliens, qua aliens, no direct authority has been delegated to Congress by. the Constitution. Congress have the right to declare war, and they are bound to the duty of repelling invasions. They have the power, too, to establish a uniform rule of naturalization. By an exercise of the former, power, Congress can place in the condition of alien enemies all who are under hllegiance to a nation in open war with -the United States; by an exercise of the second, they can extend to alien friends the common privileges of citizens. Beyond these predicaments put by the Constitution, and arising out of the law of nations, where is the power in Congress to deal with aliens, as a class, at all ? and much more the power, when falling with *510 in neither of the aforegoing predicaments, to invite them to or to repel them from our shores, or to prescribe the terms' on which, in the first instance, they shall have access to, and, if they choose, residence within, the several States, —and this, toó, regardless of'the considerations either of interest or safety deemed important by the States themselves ? The Constitution, confessedly, has delegated no such direct power to Congress, and it never can be claimed as auxiliary to. that which, in. a definite and tangible form, can nowhere be found within that instrument.
The power to regulate the admission, as implied in the right of banishment or deportation, of aliens, not the citizens or subjects of nations in actual war with the United States, was at one period of our history assumed by the Federal government; and a succinct review' of the arguments by which this pre--tension was sought to be sustained must expose its absolute fallacy.
Congress, it was insisted, could exert this power under the law of nations, to which aliens are properly amenable. To this it was answered, that, under the law of nations, aliens are responsible only for national offences,.— offences in which their nation bears a part; they are then alien enemies. That alien friends, on the other hand, owe a temporary allegiance to the government under which they reside, and for their., individual offences committed against the laws of that government they are responsible, as other members of the community, to the municipal laws. • ■
Again, it was asserted that the right was vested in Congress under the power to make war, and under the power and the duty to prevent invasion. The obvious refutation of this argument was furnished in the reply, that alien friends could not be the subjects of war (public national conflict), nor in any sense the instruments of hostile- invasion, such invasion being an operation of wax. Neither could they fall within the. power vested by the Constitution to grant letters of marque and reprisal, as an equivocal authority partaking of the characters of war and peace; “ reprisal being a seizure of foreign persons and property, with a view- to obtain that justice for injuries done by one state or its members,-for which-a refusal of the aggressors requires such a resort to force under the law of nations. It must be considered as an abuse of words to call the removal of persons from a. country a seizure or a reprisal on them; nor is the distinction to be overlooked between reprisal on persons within the country, and under the faith oF its laws, and on persons out of .,the country.” (Madison’s Report.) It may, then, be correctly-affirmed, that by no direct delegation of *511 power by the Constitution, — not by the power to declare war, not by the power to make reprisals, not by the more general power to. punish offences against the laws of nations,' nor by the power and duty of repelling invasion, — has the right been given to Congress to regulate either the admission or the expulsion of alien friends. l)oes such a right result from any rational ór necessary implication contained in the Constitution ? We find that, even anterior to the adoption of this instrument, s attempts were made to ascribe to it the. delegation of such a power by the ninth section of the first' article, and this ascription was strenuously urged as a reason against its adoption. The objection, whether fairly or uncandidly urged, was founded, no doubt, upon some ambiguity of language of the ninth section; an ambiguity perfectly explained by contemporaneous exposition, and by the written history of its progress and ultimate. adoption. Let us see how this section has been interpreted at its date by those who bore the chief part in the1 formation.of the Constitution,- and who, to commend it when' completed to their countrymen, undertook and accomplished an ■ able and critical exposition of its every term. We shall see, by the almost unanimous declaration of these sages, that the clause and article in question was intended to apply to the African slave-trade, and to no other matter whatever. Thus, in the forty-second number of the Federalist, it is said by Mr. Madison, speaking of the section and article in question: — “ It . were doubtless to be wished that the power of prohibiting the importation of slaves had not been postponed until the year 1808, or rather that it had been suffered to have immediate operation. But it is not difficult to account, either for this restriction on the general government, or for the manner in which the whole clause' is expressed." It ought to be con- . sidered as a great point gained ’ in favor of humanity, that a period of twenty years may terminate for ever, within these States a traffic which has so long and so loudly upbraided the barbarism of modern policy.” Again he says, — “ Attempts have been made to pervert this clause into an objection against the Constitution, by representing it on one side as a criminal toleration of an illicit practice, and on another, as calculated to prevent voluntary and beneficial emigrations from Europe to America. I mention these misconstructions, not with a view to give them an answer, —.for they deserve none, — but as specimens of the mariner and Spirit in which some have thought fit to conduct their opposition to the. proposed government.”
Before proceeding farther with the history of this article, it will be well to contrast the view of its scope and objects, as given in the quotation’ just made from'the Federalist, ’with the *512 arguments of the counsel who press this article as evidence of an intention to vest in Congress the sole power of controlling the, admission of aliens; subsequently, at least, to the year 1808. It is strenuously urged by them,- that the introduction of aliens has always been accordant with the policy of the government, and so highly promotive of advantage to the country in clearing and cultivating its forests, and increasing its physical strength, that the power of interfering with these important objects should not be subjected to the hazard of State abuses, but that they should be intrusted to the Federal government alone. Yet the learned counsel will be somewhat surprised to hear that the migration or importation he so zealously advocates is proved (by contemporaneous authority, on which he rests his argument) to be “ an unnatural traffic, which has so long and so loudly upbraided the barbarism of modern policy and that “ it ought to be regarded as a great point gained in favor of humanity, that a period of twenty years might terminate it for ever in these States.” For such, and such only, is the migration limited to the States for twenty years, by the ninth section of the fourth article, on which counsel found themselves; such only the migration over-which the Constitution has given power to Congress, as the natural meaning of the section signifies, and which alone 'it .was intended to convey, as we are told by those who framed it.*
If the history of the ninth section of article fourth be traced, in the proceedings of the Convention, from its introduction into that body until finally moulded and engrafted upon the Constitution (3 Madison Papers, from p. 1388 to p. 1673), it will be found that not one member of the Convention ever treated this section in other terms, or as designed for any other purpose, than as a power specially given to Congress by that section alone to abolish the foreign slave-trade from the period limited by that section, with the exception of a single observation of Colonel Mason of Virginia, that the provision as it stood might be necessary in order to prevent the introduction of convicts; but not pretending to extend the power of Congress beyond these and the foreign slave-trade.
*513 The migration or importation embraced in it is in the debates uniformly and 'plainly called the slave-trade by certain Southern States, which the Convention would have abolished by the Constitution itself, but for the avowed necessity of propitiating those States by its toleration for twenty years. There, too, it will be seen that Mr. Gouvernehr Morris, with a frankness and sagacity highly creditable, objected to the .ambiguous languáge in which the section was proposed and adopted. . He said “ he was for making the clause read at once, ‘ the importation of slaves ’ into North Carolina, South Carolina, and Georgia shall not be prohibited, &c. "'This, he said, was most fair, and would avoid the ambiguity by which, under-the power with regard to naturalization, the liberty'reserved to the States might be defeated. He wished it to be known, also, that this part of the Constitution was a compliance with those States.”- (3 Madison Papers, 1427 and 1478.) A portion of the Convention objected to an open sanction of the slave-trade upon the very face of the Constitution, whilst the Southern States would not yield their views of their own interests or necessities; hence, in the spirit, of compromise, the section was unfortunately permitted, to retain-the ambiguity objected to .by Mr. Morris; and hence, too, the color given for those misconstructions of the restriction on the general government, and the manner in which it is expressed, so decidedly reprehended in the number of the Federalist- already quoted. This ninth section of the fourth article of the Constitution has, on a former occasion, been invoked in support of the power claimed for the Federal government over alien friends. The supporters in Congress of the alien law, passed in 1798, endeavoured to draw from this very section a justification of that extraordinary enactment; and as their argument deduced from it is, perhaps, as cogent as any likely to be propounded at this day, it .may be properly adverted to as a fair sample of the pretension''advanced in. this case, and of -the foundation on which it seeks to plant itself. The argument alluded to was by a committee of the House of Representatives, and is in these words: — “ That as the Constitution has given to the States no power to remove aliens during the period of the limitation under consideration, in the mean time, on the. construction assumed, there would be no authority in the country to send away dangerous aliens, which cannot be admitted.” Let the comment of a truly great man on these startling heresies expose their true character. “ It is not,” says Mr. Madison, “ the inconclusiveness of the general reasoning on this passage which chiefly calls the attention to it. It. is the principle assumed by its that the powers held by the States *514 are given to them by the Constitution of the United States, and the inference from this principle, that. the powers supposed to be necessary, which are not so given to the State governments, must reside-in the government of the United States. The respect which is felt for every portion of the constituted authorities forbids some reflections which this singular paragraph might excite; and they are the more readily suppressed, as it may be presumed with justice, perhaps, as well as candor, that inadvertence may have had its share in the error. It would be unjustifiable delicacy, nevertheless, to pass by so portentous a claim without a monitory notice of die.fatal tendency with which it would be pregnant.” (Madison’s Report.) The assertion of a general necessity for permission to the States from' the general government, either to expel from., their confines those who are mischievous or dangerous, or to admit to hospitality and settlement whomsoever they may deem it advantageous to receive, carries with it either a denial to the former, as perfect original sovereignties, of the .right of self-preservation, or presumes a concession to the latter,' the creature of the States, wholly incompatible with its exercise.
This authority over alien friends belongs not, then, to the general government, by any express delegation of power, nor by necessary or proper implication from express grants. . The claim to it is essentially a revival of what public sentiment so generally and decisively condemned as a usurpation in the alien law of 1798 ; and however this revival may at this time be freed from former imputations of foreign antipathies or par-tialities, it must, nevertheless, be inseparable from — nay, it must be the inevitable cause of far greater evils — jealousy, ill-feeling, and dangerous conflict between the members of this fconfederacy and their common agent.
Thus far I have preferred to consider this case as depending rather Upon great fundamental ■ principles, inseparable from-the systems of government under which this country is placed,' than' as dependent upon forms of pleading, and. conclusions deducible from those forms. But judging of the case in the latter aspect as moulded by those forms,.it seems to fall directly within the operation of a precedent settled by this court, which must, if regarded, decide the law to be with the defendant in error. By the}'-second'.count in the declaration, 'it is averred that the defendant below (the plaintiff in error), being the master of the ship Hen’ry Bliss, in violation of the -laws of New York, brought into the port of New York, and.there actually landed the same, two hundred and ninetyTfive passengers; the demurrer to the declaration, admitting the truth of these aver-ments^ places the locale of the origin, as well as the infraction *515 of the obligation declared on, within the municipal authority of the State, and without the pale of the authority of Congress to regulate commerce with foreign nations. In this view, this case is brought, not only within the reasoning, but within the literal terms, of the decision of The City of New York v. Miln, and must be sustained upon.the authority of that decision, were there no other grounds on which it could be supported. But as it is manifest that this case involves the highland what this court has .asserted (with the single exception of taxes on imports') to be the perfect and undiminished and indispensable, power-of taxation irr-a sovereign State, it would have seemed to me a species of delinquency not to make that right the prominent and controlling subject of investigation and decision, or to have forborne to vindicate it in its full integrity.
Between this case .and that of Norris v. The City of Boston, there are some shades of difference ; they are such, however, as by me are not regarded as essential; both the cases rest in reality upon the right of taxation m the States, and as the latter case has been examined with so much more of learning and ability than I could haye brought to its investigation, by his Honor the Chief Justice, I shall content myself with de daring my entire concurrence in his reasonings and conclusions upon it.
It is my opinion that the judgment' of the Court for the Trial of Impeachments and Correction of Errors in New York, and the judgment of the Supreme Judicial Court of Massachusetts, should be affirmed.
Note. — In'the opinions placed on file by some of the justices constituting the majority in the decision of this casé, there appearing to be positions and arguments which" are not recollected as having been propounded from the bench, and which are regarded as scarcely reconcilable with the former then examined and replied to by the minority, it becomes an act of justice to the minority that those positions and arguments, now for the first time encountered, should not pass with-otit comment. Such comment is. called for, in order to vindicate the dissenting justices, first, from the folly of combating reasonings and positions which do not appear upon the record and, secondly,.from the. delinquency of seéming to recoil from exigencies, with which, however they may be supposed to have existed, the dissenting justices never were in fact confronted. It is called for by this further and- obvious consideration, that, should the modification or retraction of opinions delivered in court obtain in practice, it would result in this palpable irregularity; namely, that opinions, which, as those of the *516 court, should have been premeditated and solemnly pronounced from the bench antecedently to the opinions of the minority, may in reality be nothing more than criticisms on opinions delivered subsequently in the order of business to those of the majority, or they may be mere afterthoughts, changing entirely the true aspect of causes as they stood in the court, and presenting through the published reports what, would not be a true history of the causes decided.
Examples of diversity between the opinions in this cause, comprehended as they were delivered in court, and as subsequently modified,' will now be adverted to. The first is found in the solecism, never propounded, perhaps, from any tribunal, — one, indeed, which it might have been supposed no human imagination, not the most fruitful in anomalies, could ever conceive, — “that the action of the Federal government by legislation and treaties is the action of the States and their inhabitants.” If this extraordinary proposition can be taken as universally or as generally true, then State sovereignty, State' rights, or State existence even, must be less than empty names, and the Constitution of the United States, with all its limitations on Federal power, and as it has been heretofore generally understood to be .a special delegation of power, is a falsehood or an absurdity. It must be viewed as the creation of a power transcending that which called it into existence ; a power single, universal,- engrossing, absolute. Every thing in the nature of civil or political right is thus ingulfed in Federal legislation, and in the power of negotiating treaties. History tells us of an absolute monarch who characterized himself and his authority by the declaration,- “ I am the State.” This revolting assertion of despotism was, even in. the seventeenth century, deemed worthy of being handed down for the reprobation of the friends of civil and political liberty. What, them must be thought in our day, and in future time, of a doctrine, which, under a government professedly one of charter exclusively, claims beyond the terms of that charter, not merely th£ absolute control of civil and political rights, but the pow^r to descend to and regulate ad libitum the private and personal concerns of life. Thus the ground now- assumed in terms for the Federal government is, that the power to regulate commerce means still “ more especially ” the power to regulate “ personal intercourse.” Again, it is asserted that the Federal government, in the regulation of commerce, “ may admit or may refuse foreign intercourse partially or entirely.” If those who resort to this term intercourse mean merely commercial transactions as generally understood, their argument is an unmeaning variation of words, and is worth nothing. They obtain by the attempt *517 ed substitution nó new power. They have the power to regulate commerce, and nothing beyond this. Commercial intercourse is simply commerce. But if they adopt the word intercourse singly, in its extended and general acceptation, and without the proper qualifying adjunct, they violate the text and the meaning of the Constitution, and grasp at powers greatly beypnd the scope of any authority legitimately connected with commerce as well understood. The term commerce, -found in the text' of the Constitution, has a received,, established, and adjudged acceptation. The wise’ men who framed the Constitution designed it for practical application. They preferred, therefore, to convey its meaning in language which was plain and familiar, and avoided words and phrases which were equivocal, unusual, or reeonditp, as apt sources of future perplexity. They well understood the signification of the word intercourse, and knew it was by no means synonymous with the word commerce-, they shunned, therefore, the ambiguity and seeming aíféctation of adopting it, in order-to express their meaning when speaking of commerce. This word intercourse, nowhere found in the Constitution, implies infinitely more than the word commerce Intercourse “ with foreign nations, amongst .the States; and with the Indian tribes.” Under this language, not only might national', commercial, or political intercourse be comprehended, but every conceivable intercourse between the individuals of 3ur own country and foreigners, and amongst the citizens of the different States, might be transferred to the Federal government. And thus we see that, with-respect_to interccfurse with aliens, in time of peace, too, it is now broadly asserted: that all power has been vested exclusively in the Federal government. The investiture’of power in Congress under this term would not be limited by this construction to this point. It would extend, not only to the right of going abroad to foreign countries, and of requiring licenses and passports for that purpose; it would embrace also the right of transit for persons and property between the different States- of the Union, and the power of regulating highways and vehicles of transportation. We have here a few examples of the mischiefs incident to the doctrine which first interpolates into the Constitution .the term intercourse in lieu of the word commerce contained in that instrument, and which then, by an arbitrary acceptation given to this term, claims for Congress whatsoever it may be thought desirable to comprise within its meaning. By permitting such an abuse, every limit may be removed from the power of the Federal government, and no engine of usurpation could be more conveniently-devised than the introduction of a favorite word which the inter- *518 polator would surely have as much right to interpret as to introduce. This would be fulfilling almost to the letter the account in th.e Tale of a Tub, of Jack, Peter, and Martin engaged “ in the interpretation of their father’s will. Once let the barriers of the Constitution, be removed, and the march of abuse will be onward and without bounds.
Mr. Justice NELSON, dissenting.
Norris v. City of Boston, and Smith v. Turner.
I have examined particularly the opinion of the Chief Justice delivered in these cases of Smith v. Turner, and Norris v. The City of Boston, and have concurred, not only in its conclusions, but in the grounds and principles upon whiclf it is arrived at; and am in favor of affirming the judgments in both cases.
■ Mr. Justice WOODBURY, dissenting!
Norris v. City of Boston, and Smith v. Turner.
In relation to the case-df Turner v.- Smith, from New York, I wish merely to express my non-concurrence with the opinions pronounced by the' majority of this court. But standing more intimately connected, with the case of Norris v. Boston, by my official duties in the First Circuit, I feel more obliged to state, in some detail, the reasons for my opinion, though otherwise content to acquiesce silently in the views expressed by the Chief .Justice ; and though not flattering myself with being able, after the elaborate discussions we have just heard, to present much that is either novel or interesting., ■ '
The portion of the statute of Massachusetts which in this case is assailéd, as most questionable in respect to its conformity with the Constitution, is the third section. The object of that is to forbid alien passengers to land in any port in the State, until the master or owner of the vessel pays “ two dollars for each passenger so landing.” The provisions in the other sections, and especially the second one, requiring indemnity for the support of lunatics, idiots, and infirm persons on board of vessels before they are landed, if they have been or are paupers, seetn admitted by most persons to be a fair exercise of the police powers of a State.
This claim of indemnity is likewise excused or conceded as a power which has long been exercised by several of the Atlantic States in. self-defence against the ruinous burdens, which would otherwise be flung upon them by the incursions of paupers from abroad, and their laws are often as stringent against the introduction of that class of persons from adjoining *519 States as from -foreign countries. (Revised Statutes of New Hampshire, ch. 67, <§> 5; 5 Howard, 629.)
Such legislation commenced in Massachusetts early after our ancestors arrived at Plymouth. It first empowered the removal of foreign paupers. (See Colonial Charters and. Laws, 1639, p. 173, and 1692, p. 252.) It extended next to the requisition of indemnity from the master, as early as the year 1701. '(See Statute of 13 ffm. III., Ibid. 363.) But while it embraced removals of paupers not settled in the Colony, and ihdemnity required from the master for the support of foreigners iñtro-duced by sea, I do not think it assumed the special form used in the third section of this statute, until the year 1837, after the decision in the case of The City of New York v. Miln, 11 Peters, 107. .1 shall not, therefore, discuss further the provisions in the second section of the statute * for, at all' events, the requisitions of that section, if not by all admitted to be constitutional, are less objectionable than those of the third ; and if the last can be vindicated, the first must be, and hence the last has constituted the burden of the arguments on both sides.
■ It will be remembered that this third section imposes a condition on landing alien passengers, or, in' 'pther words, levies a toll or fee on the master for landing them, whether then. paupers or not, and that the present action is to recover back the money which has been collected from the master for landing such passengers.
■ After'providing, in the following words, that, “when any vessel shall arrive at any port or harbour within the State, from any port. or. place without the same, with alien passengers on board, the officer or officers whom .the mayor and aldermen of. the city; or the selectmen of the town, where it is proposed to •land such passengers, are hereby authorized and required- to appoint, shall go on board such vessel and examine into the' condition of said passengers.” . The third section of the statute declares that “ no alien passenger, other than those spoken of' in the preceding section, shall be permitted to land, until the master, owner, consignee, or agent of such vessel shall pay to the regularly appointed boarding officer the sum of two dollars for each passenger so landing; and the. money so collected shall be paid into the treasury of the city or town, to be appropriated as the city or town may direct for the support of foreign paupers.” -
It is conceded that the sum paid here on account of “ alien passengers ” was demanded of them, when coming in some “ vessel,”, and was collected after she arrived at a “ port or har-bour within the State.” Then, and not till then, the master was required to. pay two dollars for each before landing, “ to be. *520 paid into the treasury of the city or town, to be appropriated as the city or town may direct for the support of foreign paupers.”
. By a subsequent law, as the foreign paupers had been made chargeable to the State treasury, the balances' of this fund in the different towns were required to be transferred to that treasury.
After careful examination, JLam not satisfied that this exercise of power by a State is incapable of being sustained as a matter of right, under one or all of three positions.
1st. That it is a lawful exercise of the police power of the State to help to maintain its foreign paupers.
2d. If not, that it may be regarded as justified by the sovereign power which ever]’- State possesses to prescribe the conditions on which aliens may enjoy a residence within, and the protection of, the State. .
3d. Or it may be justified under the municipal power of the State to impose taxes within its limits for State purposes. I think, too, that this power has never been ceded to the general government, either expressly or by implication, in any of the grants relied on for that purpose, such as to lay duties on •imports, or to.prohibit the importation of certain persons after the year 1808, or to regulate commerce.
Under the first ground of vindication for the State, the whole statute was most probably enacted with the laudable design to obtain some assistance in maintaining humanely the large number of paupers, and persons likely soon to become paupers, coming to our shores by means furnished by the municipal authorities in various parts of Europe. (See 3 Ex. Doc. of 29th Congress, 2d Session, No. 54.) Convicts were likewise sent, or preparing to be sent, hither from some cities on the Continent. (Ibid.)
A natural desire, then, would exist, and would appear by some law, to obtain, first, indemnity against the support of emigrants actually paupers, and likely at once to become chargeable ; and, secondly,-funds to maintain such as, though not actually paupers, would probably become so, from this class of aliens.
It is due to the cause of humanity, as well as the public economy of the State, that-..the maintenance of. paupers, whether of foreign or domestic origin, should be well provided for. Instead of being whipped or carted back to their places of abode or settlement, as was- once the practice in England and this -country in respect to them; or, if aliens, instead of being reshipped over a desolate waste of ocean, they axe to be treated with kindness and relieved or maintained. But still, if feasible, it should, in justice, , be at the *521 expense of those introducing them, and introducing the evils which may attend on them. This seems to. have been the attempt in this statute, and as such was a matter of legitimate police in relation to paupers.
, But those persons affected by the third section not being at the time actual paupers, but merely alien passengers, the expediency or right to tax the master for landing them does not seem so clear, in a police view, as it is to exact indemnity against the support of those already paupers. Yet it is "hot whollyAvithout good reasons, so far as regards the master or owner who makes a profit by-bringing into a State persons having no prior rights there, and likely in time to add something to its fiscal burdens and the number of its unproductive inhabitants.. He who causes this danger, and is the willing instrument in it, and profits by it, cannot, in these views, object to the condition or tax imposed by the State, who may not consider the benefits likely to arise from such a population a full counterbalance to all the anticipated disadvantages and contingencies. But the aspect of the case is somewhat different, looking at the tax as falling wholly on the passenger. It may not be untrue) generally, that some portion of a burden like this rests eventually on the passenger, rather than the master or owner. (Neil v. State of Ohio, 3 Howard, 741-743.) Yet it does not always; and it is the master, and the owners through him, who complain in the present action, and not the passengers; jf it fell on the latter alone, they would be likely, not only to complain, but to go in vessels to other States where onerous conditions had not been imposed. Supposing, however, the burden in fact to light on them, it is in some, though a less degree, and in a different-view, as a matter of, right, to be vindicated.
Were its expediency álone the question before us, some, and among them myself, would be inclined to doubt as to the expediency of such a tax on alien passengers in general, not paupers or convicts. Whatever may be their religion, whether Gatholic or Protestant, or their occupation, whether laborers, mechanics, or farmers, the majority of them are believed to be useful additions to the population of the New World, and since, as weii as before our Revolution, have deserved encouragement in their immigration by easy terms of naturalization, of voting, of holding office, and all the political and civil privileges which their industry and patriotism have in so many instances shown to be usefully bestowed. (See Declaration of Independence ; Naturalization Law; 1 Lloyd’s Debates, Gales and Seaton’s ed., p. 1147; Taylor v. Carpenter, 2 Woodbury & Minot.) If a design existed in any statute to thwart this policy, or if *522 such were its necessary consequence, the measure would be of very questionable expediency. But the makers of this law. may have' had no such design, and such does- not seem .to be ■the necessary, consequence of it, as large numbers of emigrants still continue to arrive in Massachusetts when they would be likely to ship for ports in other States where no such law exists, if this operated on them as a discouragement, and like (Jther taxes when felt, of when high, had become in some degree prohibitory.
. The conduct of the State, too, in this measure, as a matter of rightr is the oply question to he decided by us, and may be a’ very different one from its expediency. Every sovereign State possesses the right .to decide this matter of expediency for itself, provided it has the power to control or govern the subject. Our inquiry, therefore, relates merely to that power or right in a State ; and the grbdnd now under consideration to support the exercise of it is her authority to prescribe terms, in a police view, to the entry into'her boundaries of persons who are likely to become .chargeable as paupers, and who are aliens.
In this view, as connected with hér police over pauperism, and as a question of mere right, it may be fairly.done by imposing terms which,, though incidentally making .it more expensive for aliens to come here, are designed to maintain such of them and. of their class as are likely, iri many instances,, ere long to become paupers in a strange country, and usually without- sufficient means for support in case either of sickness, or áccident, or reverses in business. So it is not without justification that a class of passengers from whom much expense arises in supporting paupers should, though not at that moment chargeable, advance something for this purpose- at a time when they are, able to contribute, and when alone it can with certainty be collected. (See New York v. Miln, 11 Peters, 156.) When this is done in a .law providing against the increase of pauperism, and seems legitimately to be connected with the' ' subject, and when the sum required of the master- or passenger is not disproportionate to' the ordinary charge, there appears no reason to regard it as any measure except what it professes to be,.— one connected with the State police as to alien passengers, one connected with the .support of paupers, and- one designed neither to regulate commerce nor be a source of revr enue for general purposes. (5 Howard, 626.)
The tax is now transferred to the State treasury, when.collected, for the reason that the support of foreign paupers is transferred there; and this accords with an honest design to collect the money only lor that object.'
*523 ■ The last year, so fruitful in immigration and its contagions diseases of ship-fever arid the terrific cholera, and the death of so many from the. former, as well as the. extraordinary expense consequent from these causes, furnish a strong illustration that the terms required are neither excessive nor inappropriate.
There are many other reasons showing , that this is legitimately a police measure, and, as such,-competent for the State to adopt. It respects the' character of those pérsons to come within the limits of the.. State, —- it looks to the benefits and burdens deemed likely to be connected with their presence, — it regards the privileges they .may rightfully claim of relief, whenever sick or infirm, though on shipboard, if within the boundaries of the State, — it has an eye to the protection they will humanely receive if merely in transitu through the State to other governments, and the burdens which, in case of disease or accidents, without much means, they may thus throw upon the State. And the fund collected is expressly and wholly applied, after deducting the expenses óf its collection, to “ the support of foreign paupers.”
A police measure, in common parlance, ofteh relates to something connected with public morals; and in that limited view would still embrace the subject of pauperism, as this court held in 16 Peters, 625. But in law, the word police is much broader, and includes all legislation for' the internal policy of a. State. (4 BL Coin., ch. 13.)
The police of the ocean belongs to .Congress and the admiralty powers of the general government; but not the police of the land or. of harbours. (Waring v. Clarke, 5 Howard, 471.)
Nor is it any less a police measure because money, rather than a bond of indemnity, is required as a condition of admission to protection and privileges. ’The payment of money is sometimes imposed in the nature of a toll or license fee, but it is still a matter of police. It is sometimes demanded in the nature of charges to cover actual or anticipated expenses. Such is the case with, all quarantine charges. Substantially, too, it is demanded under the indemnity given by the second section, if the person becomes chargeable; and if that be justifiable, so must be this ; the fact that one is contingent and the other absolute cannot affect their constitutionality. Neither is it of consequence that the charge might be defrayed- otherwise, if the State pleased, as from other taxes or other sources. This is a matter entirely discretionary with the State. This might - be done with respect to quarantine expenses or pilotage of vessels ; yet the State, being the sole judge of what is most expedient in respect to this, can legally impose it on the vessel, or *524 master, or passengers, rather than on others, unless clearly forbidden by the Federal Constitution. And it can he none the less a police measure than is a quarantine charge, because the master or owner is required to pay it, or even the passengers, rather than the other people of the State by a general tax. ■
Even to exclude paupers entirely has been held to be a police measure, justifiable in a State. (Prigg v. Pennsylvania, 16 Peters, 625; 5 Howard, 629.) Why, then, is not the milder measure of a fee or tax justifiable in respect to those alien passengers considered likely to become paupers, and to be applied solely to the support of those who do become chargeable from that class ? And why is not this as much a police ‘measure as the other ? If such measures must be admitted to be local, are . of State cognizance, belong to State interests,, they clearly are among State rights.
Viewed as a mere police regulation, then, this statute does not conflict with any constitutional provision. Measures which are legitimately of a police character are not pretended to be ceded anywhere iii the Constitution to the general government in express terms; and as little can it be argued that they are impliedly to be considered as ceded, if they be honestly and truly police measures. Hence,, in all the decisions of this tribunal on the powers granted to the general government, either expressly or by implication, measures of that character have been regarded as 'not properly to be included. (License Cases, 5 Howard, 624; Baldwin’s Views, 184, 188; cases cited in The United States v. New Bedford Bridge, 1 Woodb. & Min. 423.)
Thus viewed, the case also comes clearly within the principles settled in New York v. Miln, 11 Peters, 102, and is fortified by the views in the License Cases, 5 Howard, 504. The fact that the police regulation in the case of Miln was enforced by a penalty instead of a toll, and in the License Cases by a prohibition' at times, as well as a fee, does not alter the principle, unless the mode of doing it in the present case should be found, on further examination, before closing, to be forbidden to the States.
But if this justification should fail, there is anottier favorable view of legislation such as that of the third section of the statute of Massachusetts, which has already been suggested, and which is so important as to deserve a separate consideration. It presents a vindication for it different from that of a-'mere police regulation, connected with the introduction or support of aliens, who are or may afterwards become paupers, and-results from the po.wer of every sovereign State to impose such' terms as she pleases on the admission or continuance of for *525 eigners within her borders. If this power can be shown to exist, and it is in its nature and character a police power also, then we have already demonstrated that the States can rightfully*continue to exercise, it. But if it be not such a power, and hence cannot be ranked under that title and enjoy the benefit of the decisions exémpting police powers from control by the general government, yet if it exists as a municipal rather than a police power, and has been constantly exercised by the States, they cannot be considered as not entitled to it, unless they have clearly ceded it to Congress in some form or other.
First, then, as to its existence. The best writers on national law, as well as our own decisions, show that this power of excluding emigrants exists in all states which are sovereign. (Vattel, B. 1, ch. 19, §. 231; 5 Howard, 525, 629; New York v. Miln, 11 Peters, 142; Prigg v. Pennsylvania, 16 Peters, 625; and Holmes v. Jennison, 14 Peters, 565.)
Those coming may be voluntary emigrants from other nations, or. travelling absentees, or refugees in revolutions, party exiles, compulsory victims of power, or they may consist of cargoes of shackled slaves, or large bands of convicts, or brigands, or persons with incendiary purposes, or imbecile paupers, or those suffering from infectious diseases, or fanatics with principles and designs more dangerous than either, or under circumstances of great ignorance, as liberated serfs, likely at once, or soon, to make them a serious burden in their support as paupers,' and a contamination of public morals. There can be no doubt, on principles of national law, of the right to prevent the entry of these, either absolutely or on such conditions as the State may deem it prudent to impose. In this view, a condition of' the kind here imposed, on admission to land and enjoy various privileges, is not so unreasonable, and finds vindication in the principles of public law the world over, (Vattel, B. 1, ch. 19, §§ 219, 231, and B. 2, ch. 7, §§ 93, 94.)
In this aspect it may be justified as to the passengers, on the ground of protection and privileges sought by them in the State, either permanently or transiently, and the power of the State to impose conditions before and while yielding it. Wheu we speak here or elsewhere of the right of a State to decide and regulate who shall be its citizens, and on what terms, we mean, of course, subject to airy restraint on her power which she herself has granted to the general government, and which, instead of overlooking, we intend to examine with care before closing.'
It having been, then, both in Europe and America, a matter of municipal regulation whether aliens shall or shall not 'reside in any particular state, or even cross its borders, it follows *526 that, if a sovereign' state pleases,, it may, as a matter of clear right, exclude them entirely, or only, when paupers or convicts, (Baldwin’s Views, 193, 194,) or only when slaves, or, what is still-more common in America, in Free States as well as Slave States, exclude colored emigrants, though free. As further proof and illustration that this power exists in the States, and has never been parted with, it was early exercised by Virginia as to others than paupers, (1 Bl. Com., by Tucker, pt. 2, App., p. 33,) and it is now exercised, in one form or another, as to various persons, by more than half the States of the Union. (11 Peters, 142; 15 ib. 516; 16 ib. 625; 1 Brockenbrough, 434; 14 Peters, 568 ; 5 Howard, 629.)
Even the old Congress, September 16th, 1788, recommended to the States to pass laws excluding convicts; and they did this, though after the new Constitution was adopted, and that .fact announced to the country. “Resolved, That it. be, and it is hereby, recommended to the several States to pass proper laws, for preventing the transportation of convicted malefactors from foreign countries into the United States.” (Journal of Congress for 1788,’p. 867.)
. But the principle goes further, and extends to the right to exclude paupers, as well as convicts, by the States (Baldwin’s Views, 188, 193, 194); and. Mr. Justice Story, in the case of New York v. Miln, 11 Peters, 56, says as to the States,— “ I admit that they have a right to pass poor-laws, and laws to prevent the introduction of paupers into the States, under like qualifications.”
Many of the States also exercised this power, not only during the Revolution; but after peace ; and Massachusetts especially did, forbidding the return of refugees, by a law in 1783, ch. 69. Several of the States had done the same as to refugees. (See Federalist, No. 42.)
The first naturalization laws by Congress recognized this old right in the States, and expressly provided that such persons could not become naturalized without the. special consent of those States which had prohibited their return. Thus in the first act: — “ Provided, also, that no person heretofore proscribed by any State shall.be admitted a citizen as aforesaid, except by an act of the' legislature of the State in which such person was proscribed.” .(March 26, 1790, 1 Stat. at Large, 104. See a similar proviso to the third section of' the act of 29th January, 1795, I Stat. at Large, 415.)
The power given to Congress, as to naturalization generally, does not conflict with this question of taxing or excluding alien passengers, as acts of náturalization apply to those aliens only who have already resided here from two to five years, and not *527 to aliens not resident here at all, or not so long. (See acts of 1790, 1795, and 1800.)
And it is not a little remarkable, in proof that this power of exclusion still remains in the States rightfully, that while, as before stated, it has been exercised by various. States in the Union, — some as to paupers, some as to convicts, some as to refugees, some as to slaves, and some as to free blacks, — it never has been exercised by the general government as to mere aliens, not enemies, except so far as included in wbat are called the Alien and Sedition Laws of 1798. By the former, being “ An act concerning aliens,” passed June 15th, 1798, (1 Stat. at Large, 571,) power was assumed by the general government, in time of peace, to remove or expel them from the country ; and that act, no less than the latter,-passed about a month after, (Ibid. 596,) was .generally denounced as unconstitutional, and suffered to expire without renewal; on the ground, among others assigned for it, that, if such a power existed at' all, it was,in the States, and not in the general government, nnless under the war power, and then against alien enemies alone. (4 Elliot’s Deb. 581, 582., 586 ; Virginia Resolutions of 1798.)
It deserves special notice, too, that, when it was exercised on- another occasion by the general government, not against aliens as such, but slaves imported from abroad, it was in aid of State laws passed before 1808, and in subordination to them, The only act óf.Congress on this subject before 1808 expressly recognized the power of the State alone then to prohibit the introduction or importation “ of any negro, mulatto,, or other person of color,” and punished it only where the States had. (See act of Feb. 28, 1803, 2 Stat. at Large, 205.) In further illustration of this recognition and cooperation with the States, it provided, in the third section, that all officers of the United States should “ notice and be governed by the provisions of the laws now existing in the several States, prohibiting the admission or importation of any negro, mulatto, or other person of color as aforesaid; and they are hereby enjoined vigilantly to-carry into effect said laws,” i. e. the laws of the States. (See 1 Broekenbrough, 432.)
The act of March 2d, 1S07, forbidding the bringing in of slaves, (2 Stat. at Large, 426,) was to take effect on the 1st of . January, 1808, and was thus manifestly intended to carry into operation the admitted power of prohibition by Congress, after that date, of certain persons contemplated in the ninth section of the first article, and as a branch of trade or commerce which Congress, in other parts of the Constitution, was empowered to regulate. That act was aimed solely at the foreign slave- *528 trade, and not at the bringing in of any other persons than slaves, and not as if Congress supposed that, under the ninth section, it was contemplated to give it power, or recognize its power, over any thing, but the foreign slave-trade. But of this more hereafter.
' It will be seen also in. this, that the power of each State to forbid the foreign slave-trade was expressly recognized as existing since, no less than before, 1808, being regarded as a concurrent power, and that by this section no authority was conferred on Congress over the domestic slave-trade, either before or since 1808,
If the old Congress did not suppose it was right and proper for the States to act in this way on the introduction of aliens, after the new Constitution went into operation, why did they, by their resolution of 1787, recommend to the States to forbid the introduction of convicts from abroad, rather than recommend it to be done by Congress under the new Constitution ?
It is on this principle that a State has a right, if it pleases, to remove foreign criminals from within its limits, or allow them to be removed by others. (Holmes v. Jennison, 14 Peters, 568.) Though the obligation to do so is, to be sure, an imperfect one, of the performance of which she is judge, and sole judge, till Congress make some stipulation with foreign powers as to their surrender (11 Peters, 391); and if States do not surrender this right of affixing conditions to their ingress, the police authorities of Europe will proceed still further to inundate them with actual convicts and paupers, however mitigated the evil may be at times by the voluntary immigration with the rest of many of the enterprising, industrious, and talented. But if the right be carried beyond this, and be exercised with a view to exclude rival artisans, or laborers, or to shut out all foreigners, though persecuted and unfortunate, from mere naked prejudice, or with a view to thwart any conjectural policy of the general government, this course, as before suggested, would be open to much just criticism.
Again : considering the power to forbid as existing absolutely in a State, it is for the State where the power resides to decide on what is sufficient, cause for it, — whether municipal or economical, sickness or crime ; as, for example,"danger of pauperism, danger to health, danger to morals, danger to property, danger to public principles by revolutions and change of government, or danger to religion. This power over the person is much less than that exercised over ships and merchandise under State quarantine laws, though the general government regulates, for duties and commerce, the ships and their *529 ■ cargoes. If the power be clear, however others may differ as to the’ expediency of the exercise of it as to particular classes or in a particular form, this cannot impair the power.
It is well considered, also, that if the power to forbid or expel exists, the power to impose conditions of admission is included as an incident or subordinate. Yattel (B. 2, ch. 8, <§, 99) observes, that, “ since the lord of the territory may, whenever he thinks proper, forbid its being entered, he has, no doubt, a power to annex what conditions he pleases to the permission to enter.” (Holmes v. Jennison, 14 Peters, 569, 615, Appendix.)
The usage in several States supports this view. Thus the State of Maryland now, of Delaware since 1787, of Pennsylvania since 1818, if not before, and of Louisiana since 1842, besides New York and Massachusetts, pursue this policy in this form. (7 Smith’s Laws of Pennsylvania, 21; 2. Laws of Delaware, 167, 995; 1 Dorsey’s Laws of Maryland, 6, 10.) And though it is conceded that laws like this in' Massachusetts are likely, in excited tinges, to become of a dangerous character, if perverted to illegitimate purposes, and though it' is manifestly injudicious to push all the powers possessed by the States to a harsh extent against foreigners any more than citizens, yet, in my.view, it is essential to sovereignty to be able to prescribe the conditions or terms on which aliens or their property shall be allowed to remain under its protection, and enjoy its municipal privileges. (Vattel, B. 1; ch. 19, §§ 219, 231.)
As a question of international law, also, they could do the same as to the citizens of other States, if not prevented by other clauses in the Constitution reserving to them certain rights over the whole Union, and which probably protect them from any legislation which does not at least press as hard on their own citizens as on those of other States. Thus, in article fourth, section second: — “ The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States.” And the old Confederation (article fourth) protected the ingress and egress of the citizens of each State with others, and made' the duties imposed on them the same. • -
Such is th'e case of Turner v. Smith, considered in connection with this, collecting the same of its own citizens as of others ; and to argue that States may abuse the power, by taxing citizens of other States different from their own, is a fallacy, because Congress would also be quite as likely to abuse’ the power, because an abr.se would react on the State itself, and lessen or destroy this business through it, and because the abuse, instead of being successful, would probably *530 be pronounced unconstitutional by this court, whenever appealed to.-
With such exceptions, I am aware of no limitations-on the powers of the. States, as a matter, of right, to go to the extent indicated in imposing terms of admission within their own limits, unless they be so conducted as to interfere, with some other power, express or implied, which has been clearly granted ito Congress, and which will be considered hereafter.
The last ground of vindication of this power, as exercised by Massachusetts in the third section, is under its aspect.as imposing a tax ,
Considering this, the inquiry may be broad enough to ascertain whether the measure is not constitutional, under the taxing power of the State generally, independent of its authority, already examined, as to a police, over" the support of paupers, and, as to municipal regulations, over the admission of travellers and non-residents.
It deserves remark, in the outset, that such a. tax, under the name of a toll or passport fee, is not uncommon in foreign countries, on alien travellers when passing their frontiers. In that view it would be vindicated under long usage and numerous precedents abroad, and several in this country,, already referred to.
It requires notice, also, that this provision, considered as a license fee, is. not open to the objection of not being assessed beforehand.at stated periods, and collected,at the time of other taxes. When fees of a specific sum are exacted for licenses to sell certain goods, or exercise certain trades, or exhibit something rare, or for admissions to certain privileges, they are not regarded so much in the light of common taxes as of fees or tolls. They resemble this payment required here more than a tax on property, as they are not always annual, or collected at stated seasons ; they are not imposed on citizens only, or permanent residents, but frequently are derpanded as often as an event happens, or a certain act is done, and at any period, and from any visitor or transient resident. But fees or tolls thus collected are still legitimate taxes.
Another view of it as a tax is its imposition on the master of the vessel himself, on account of his capital or "business in trade, carrying' passengers, and not a tax on the passengers themselves. The master is often a. citizen of the State where he arrives with a cargo and passengers. In such a' case, he might be taxed on account of his business, like other citizens; and so, on other general principles, might masters of vessels who are not citizens, but who come within the limits and jurisdiction and protection of the State, and are hence, on that account, *531 rightfully subjected to its taxation, and made to bear a share of its burdens. • It is customary in most countries, as before named, to impose taxes on particular professions and trades or businesses, as well as on property; and whether in the shape of a license or fee, or an excise or poll-tax, or any other form, it is of little consequence when the object of the tax iá legitimate, as here, and its amount reasonable.
States, generally, have the right also to impose poll-taxes, as well as those on property, though they should be proportionate and moderate in amount. This one is not much above the usual amount of poll-taxes in New England. Nor need they require any length of residence before a person. is subject to such a tax; and sometimes none is required, though it is usual to have it imposed only on a fixed day.
The power, of taxation, generally, in all independent states, is unlimited as to persons and things, except as they may have been pleased, by contract or otherwise, to restrict themselves. Such a power, likewise, is one of the most’ indispensable to their welfare, and even their, existence.
On the extent'of the cession of taxation to the general government,. and its restriction on the States, more will be presented, hereafter.: but in all cases of doubt, the leaning may well be towards the States, as the general government has ample means ordinarily by taxing imports, and the States limited means, after parting with that great and vastly increased source of revenue connected with imposts. The States may, therefore, and do frequently, tax every thing but exports, imports, and tonnage, as such. . They daily tax things connected with foreign commerce as well as domestic trade. .They cap. .tax the timber, cordage, and iron of which the 'vessels for foreign trade are made; tax their cargoes to the owners as stock in trade; tax the vessels as "property, and tax the owners’and crew per head for their polls. Their power in this respect travels over water as well as land, if only within their territorial' limits.
It seems conceded, that, if this tax, as a tax, had not been imposed till the passenger had reached the shore, the present objection must fail. But the power of the State is manifestly as great in a harbour within her .limits to tax men and property as it is oh shore, and can no more be abused there than on shore, and can no more conflict there than on shore with any authority of Gongress as a taxing power not on imports As imports. . Thus', ’ after emigrants have landed, and are on the wharves, or on public roads, or in the public hotels, or in" private dwelling-houses, they could all be taxed, though with less ease; and they could all, if the State felt so .disposed to abuse the power, be taxed out of their limits as quickly and efleetu *532 ally as have been the Jews in former times in several of the most enlightened nations'of modern Europe.
To argue, likewise, that the State thus undertakes to assess taxes on persons not liable, and to control what it has not got, is begging the question, either that these passengers were not within its limits^ or that all persons actually within its limits are not liable, to' its laws and not within its control. To contend, also, thát this payment cannot be exacted, on the ground that the great Correction of excessive taxation is its oppression on thé constituent, which causes a reaction to reduce it (4 Wheat/316,, 428), and in this case the tax does not operate on a constituent; is another fallacy, to some extent. For most taxes operate on some classes of people who are not voters, as, /or example, women, and especially'resident aliens ;■ and if this reasoning would exempt these passengers, when within the limits of the State, it would also exempt all aliens, and others not voters, however long resident there, or however much property they possess.
It seems likewise well settled, that, by the laws of national intercourse and as a consequence of the protection and hospitality yielded to aliens, they are subject to ordinary reasonable taxation in their persons and property, by the government where they reside, as fully as citizens. (Vattel, B. 2, ch. 10, § 132, p. 235; Taylor v. Carpenter, 2 Woodbury & Minot.) But I am not aware of the imposition of such a tax in this form, except as a toll or a passport; it being; when a poll-tax, placed on those who have before acquired a domicile in the State, or have come to obtain one animo manendi. Yet, whatever its form, it would not answer hastily to denounce it as without competent authority, when imposed within the usual territorial limits of the State.
In short, the States evidently meant still to retain all power of: this kind, except where, for special reasons at home, neither government was to tax. exports, and, for strong reasons both at home and abroad, only the general government was to tax imports and tonnage.
Having explained what seem to me the principal reasons in favor of a power so vital to the States as that exercised by Massachusetts in this statute, whether it be. police or municipal, regulating its residents or taxing them, I shall proceed to the last general consideration, which is whether this power has in any way been parted with to Congress entirely, or as to certain objects, including aliens.
Jt is not pretended that there is eo nomine any express delegation of this power to Congress, or any express prohibition of it' to the States. And yet, by the tenth amendment of the *533 Constitution, it is provided, in so many words, that “ the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.” If, in the face of this, Congress is to be regarded as having obtained a power of restriction over the States on this subject, it must be by mere implication, and this either from the grant' to impose taxes and duties, or that .which is usually considered a clause only to prohibit and tax the slave-trade, or that to regulate commerce. And this statute of Massachusetts, in order to be unconstitutional, must be equivalent to one of these, or conflicting with one of them.
In relation, first, to the most important of- these objections, regarding the statute in the light of a tax, and as such supposed to conflict with the general power of taxation conferred on Congress, as well as the exclusive power to tax imports, I would remark, that the very prohibition to the States, in express terms, to tax imports, furnishes'additional proof that other taxation by the States was not meant to be forbidden in other cases and as to other matters. Expressio unius, exclusio est alterius.. It would be very extraordinary, also, that, when expressly ceding powers of taxation to the general government, the States should refrain from making them exclusive in terms, except as to imports and tonnage, and yet should be considered as having intended, by mere implication, there or elsewhere in the instrument, to grant away all their, great birthright over rill other taxation, or at least some most important branches of it. Such has not been the construction or practical action of the two governments for the last half-century, but the States have continued to tax all the sources of revenue ceded to Congress, when not in terms forbidden. This was the only safe course. (Federalist, No. 32.)
One of the best tests that this kind of tax or. fee for admission to the privileges of a State is permissible, if not expressly forbidden, is the construction in two great cases of direct taxes on land imposed by Congress, in 1798 and 1813. The States, on both of those occasions, still continued to impose and collect their taxes on lands, because not forbidden expressly by the Constitution to do it. And can any one doubt, that, so far as regards taxation even of ordinary imports, the States could still exercise it if they had not been expressly forbidden by this clause? (Collet v. Collet, 2 Dallas, 296; Gibbons v. Ogden, 9 Wheat. 201.) If they could not, why was the express prohibition made ? Why was it deemed necessary ? (Federalist, No. 32.)
This furnishes a striking illustration of the true general rule of construction, that, notwithstanding a grant to Congress is *534 express, if the States are not directly forbidden to:act, it does not give to Congress exclusive authority over the matter, but the States may exercise a power in several respects relating to it, unless, from the nature of the subject and' théir relations to the general government, a prohibition is fairly or necessarily implied. This power in some instances seems to be concurrent or coordinate, and in others subordinate. On this rule 6f construction there has been much Jess' doubt in this particular case as to taxation, than as a general principle on. some other matters, which will hereafter be noticed under, another head. The argument for it is unanswerable, that, though the States have, as to ordinary taxation of common subjects, granted a power to Congress, it is merely an additional powér to their own, and not inconsistent with it.
It has been conceded by most American jurists, and, indeed, may be regarded as settled by this court, that this concurrent power of taxation, except on imports and exports and tonnage, (the last two specially and exclusively resigned to the general government,) is vital to the States, and still clearly exis.ts in them. In support of this may be seen the following authorities:— McCulloch v. State of Maryland, 4 Wheat. 316, 425; Gibbons v. Ogden, 9 Wheat. 1, by Chief Justice Marshall; Providence Bank v. Billings, 4 Peters, 561; Brown v. State of Maryland, 12 Wheat. 441; 4 Gill & Johhs. 132; 2 Story’s Com. on Const., § 437; 5 Howard, 588; Weston v. City of Charleston, 2 Peters, 449; Federalist, No. 42.
Nor is the case, of Brown v. Maryland, so often referred to, opposed to this view. It seems to have been a question of taxation, but the decision was not that, by the grant fr> the general government of the power to lay taxes and imposts, it must be considered, from “the nature of the power,” “that it [taxation generally] should be exercised exclusively by Congress.” On the contrary, all the cases before and hereafter cited, bearing on this question, concede that the general power of taxation still remains in the States ; but in that instance it was considered to be used so as to amount to a tax on imports, and, such a tax being expressly prohibited to -the States, it was adjudged there that for this reason it was unconstitutional. Under this head, then, as to taxation, it only remains to ascertain whether the toll or tax here imposed on alien passengers can be justly considered a tax on imports, as it was in the case of Brown v. Maryland, when laid on foreign goods. If so considered, it is conceded that this tax has been expressly forbid-den to be .imposed by a State, unless with the consent of Congress, or to aid in enforcing the inspection laws of the State. Clearly it does not come within either of those last exceptions, *535 and therefore the right to impose it must depend upon the question, whether- it is an l< impost,” and whether passengers are “ imports,” within the meaning of the. Constitution. An impbst is usually an ad valorem or specific duty, and not a fee like this for allowing a particular- act, or a poll-tax like this, —- a fixed sum per head. An import is also an article' of merchandise, goods of some kind, —property, “commodities.” (Brown v. Maryland, 12 Wheat. 437. See McCulloch’s Dict., Imports; 5 Howard, 594, 614.) It does not include persons unless they are brought in as property,— as slaves, unwilling or passive emigrants, like -the importation referred to in the ninth section of the first article of the Constitution. (New York v. Miln, 11 Peters, 136; Case of the Brig Wilson, 1 Brock. 423.)
‘ Now there is no pretence that mere passengers in vessels' are of this character, or are property; otherwise they must be valued, and pay the general ad valorem duty now imposed orb non-enumerated articles. They are brought in by no owner, like property generally, or like slaves. They are not the subject of entry or sale. The great objection to the tax in Brown v. Maryland was, that -it clogged the sale of the goods. They are not like merchandise, too, because that may be warehoused, and reexported or-branded, or valued by an invoice. They may go oh shore anywhere, but goods cannot. A tax on them is not, then, in any sense, a tax on imports, even in the purview of Brown v. Maryland. There it was held not to be permitted until .the import in the original package or cask is broken up, which it is difficult to predicate of a man or passenger. The definition there, also, is.“imports are things imported,” not persons, not passengers; or they are “ articles brought in,” and not freemen coming of their own accord. (12 Wheat. 437.) And when “imports ” or “ importation ” is applied to men, as is the case in some acts of Congress, and in the ninth section of the first article of the Constitution, it iS to .men or “persons” who are property and passive, and brought in against their will or for sale as slaves, — brought as an article of commerce, like other merchandise. (New York v. Miln, 11 Peters, 136; 15 Peters, 505; 1 Bl. Com., by Tucker, pt. 2, App. 50.)
But, so- far from this being the view as to free passengers taxed in this statute, —that they are merchandise or articles of commerce, and so considered in any act since 1808, or before, — it happens that, while the foreign import or trade as to slaves is ábolished, and is made a capital offence, free.passengers are not prohibited, nor their introduction punished as a crime. (4'El-liot’s Deb. 119.) If “ importation ”- in the ninth section applied to one class of persons; and “ migration ” to another, as has been argued, then allowing a tax by Congress on. the “ impor *536 tation ” of any person was meant to be confined to slaves, and is not allowed on “ migration,” either in words or spirit, and hence it confers no power op Congress to tax other persons (see Iredell’s remarks, 4 Elliot’s Deb. 119); and a special clause was thought necessary to give the power to tax even the “ importation ” of slaves, because “ a duty or impost ” was usually a tax on • things, and not persons. (1 Bl. Com., by Tucker, Ápp. 231.)
Indeed, if passengers were “imports” for the .purpose of revenue by the general government, then, as was never pretended, they should and can now be taxed by our collectors, because they are not enumerated in the tariff acts to be admitted “ free ” of duty, and all v on-enumerated imports have a general duty imposed on them at the end of the tariff; as, for instance, in the act of July 30, 1846, section third,, “ a duty of twenty per cent, ad valorem ” is laid “ on all goods, wares, and merchandise imported, from foreign countries, and not specially provided, for in this act.”
To come within the scope of a tariff, and within the principle of retaliation by or towards foreign powers, which was the cause.of the policy of making imposts on imports exclusive in Congress, the import must still be merchandise or produce, some rival fruit of industry, an article of trade, a subject, or at least an instrument, of commerce. Passengers, being neither, come not within the letter or spirit or object of this provision in the Constitution.
It is, however, argued, that, though passengers may not be imports, yet the-carrying of them is a branch of commercial business, and a legitimate and usual employment of navigation.
Grant this, and still a tax on the passenger would not be laying a duty on “ imports ” or on “ tonnage ”; but It might be supposed to affect foreign commerce at times, and in some forms and places, and thus interfere with the power to regulate that, though not with the prohibition to tax imports and tonnage. Consequently, .when hereafter considering the meaning of the grant “ to regulate commerce,” this view of the objection will be examined.
But there seems to be another exception to this measure, as conflicting with the powers of-the general government, which partly affects the question as a tax, and partly as a regulation of commerce. It is, that the tax was imposed on a vessel before the'passengers were landed, and while under the control of' the general government. So far as it relates to the measure as a tax, the exception" must be regarded as applying to the particular place where it is collected, "in a vessel on the water, *537 though after her arrival within a port, or harbour. It would seem to be argued, that, by some constitutional provision, a State possesses no, power in such a place. But there is nothing in the taxing part of the Constitution which forbids her action in such places on matters like this. If forbidden.at all, it must be by general principles of the common'and of national law, that no State can assess or levy a tax on what is without the limits of its jurisdiction, or that, if within its territorial limits, the subject-matter is vested exclusively by the Constitution in the general government.
It will be sfeen, that, if the first.exception be valid,'it is not one connected with the Constitution of the United States, and hence not revisable here. It was not, and could not properly be, set up as a defence in the court .of a State, except under its own constitution, and hence not revisable in this court by this writ of error. But as it may be supposed to have some' influences on the other and commercial aspect of the objection,, it may be well to ascertain whether, as a general principle, a vessel in a port, or its occupants, crew, or passengers,, are in fact without the limits and jurisdiction of a State, and thus beyond its taxing power, .and are exclusively for all purposes under the government of the United States. One of the errors in the argument of this part of the cause has been an apparent as-' sumption that this tax — considered as a tax — was collected at sea, before the .voyage ended,"and was not collected within the limits and jurisdiction of the State. ’ But, ex concesso, this vessel then was in the harbour of Boston, some miles within the limits of the State, and where this court itself has repeatedly decided that Massachusetts, and not the general government, has jurisdiction. First, jurisdiction to punish crimes. (See in Waring v. Clarke, 5 Howard, 441; Ibid. 628; Coolidge’s case, 1 Wheat. 415; Bevans’s case, 3 Wheat. 336; 1 Woodbury & Minot, 401, 455, 481, 483.) Next, the State would have jurisdiction there to enforce contracts. So must she have to collect taxes, for the like reason (5 Howard, 441); because it was a place within the territorial limits and jurisdiction' of the State. Chief Justice Marshall, in 12 Wheat. 441, speaks of “ their (the States’] acknowledged power to tax persons and property within their territory.”' (Ibid. 444.)
The tax in this case does not touch the passenger in transitu on the ocean, or abroad, — never till the actual arrival of the vessel with him in port. An arrival in port, in other acts of Congress using the term, is coming in, or anchoring within, its limits, with a view to discharge the cargo. (2 Sumner, 419; 5 Mason, 445; 4 Taunton, 662, 722; Toler v. White, Ware, 277.)
*538 For aught that appears, this vessel, before visited, had come in and ivas at anchor in the port. The person so going into port abroad, is considered to have “ arrived,” so as to be amenable to his consul, and must deposit his papers. He has come under or into the control of shore power, and shore authority, and shore laws, and shore writs, and shore juries ; at least concurrently with other authorities, if not exclusively. In common parlance, the voyagé for this purpose at least is not interrupted ; for then it has ended, and the State liabilities and powers begin, or the State becomes utterly imbecile. Hence, speaking of a country as distinguished from the sea, and of a nation as a state, Vattel (B. 1, ch. 23, § 290) says; — “Ports and harbours are manifestly an- appendage to, and even a part of the ■ country, and consequently are the property of the na.tion. Whatever is said of the land itself will equally apply to them, so far as respects the consequences of the domain and of the empire.” If the ports and harbours of a State are.intra fauces terree, within the body of a country, the power of taxation is as complete in them as it is on land, a hundred, miles in the interior. Though on tide waters, the vessels are there subject for many purposes to State authority rather than Federal, are taxed as stock in trade, or ships owned, if by residents ; the cargó may he there taxed; the officers and crew may be there taxed for their polls, as well as estate; and, on the same principle, may be the master for the passengers, or the passengers themselves. Persons there, poor and sick, are also entitled to public relief from the city or State. (4 Metcalf, 290, 291.) No matter where may be the place, if only Within the territorial boundaries of the State, or, in other words, within its geographical limits. The- last is the test, and not whether it be a merchant-vessel or a dwelling-house, or something .in either, as property or persons. Unless beyond the borders of the State, or granted, as a fort or navy-yard within them, to a separate and exclusive jurisdiction, or used as an authorized instrument of the general government, the State laws control and can tax it. (United States v. Ames, 1 Woodb. & Minot, 76, and cases there cited.)
It is true there are exceptions as to taxation which do not affect this question; 'as where something is taxed which is held under the grants to the United-States, and the grants'might be defeated if taxed by the State. That was the point in McCulloch v. Maryland, 4 Wheat. 316; Weston v. City of Charleston, 2 Peters, 449; Dobbins v. Commissioners of Erie County, 16 Peters, 435; Osborn v. Bank of the United State's, 9 Wheat. 738. But that is not the question herer as neither passengers nor the master of the vessel can be considered as official instruments of the government.
*539 in point of fact, too, in an instance like this,, it is well known that the general jurisdiction of the States for most municipal purposes within their territory, including taxation, has never been ceded to the United States nor claimed by. them; but they may anchor their navies there, prevent smuggling, and collect duties there, as they may do the last on land. . But this is not inconsistent with the other, and this brings us to the. second consideration under this head, — how far such a concurrent power in that government, for a particular object, can, with any propriety whatever, impair the general rights of the States there on other matters.
These powers exist in the two governments for different purposes, and are not at all inconsistent or conflicting. The general government may collect its' duties, either on the water or the land, and still the State enforce its own laws without any collision, whether they are made for local taxation, or military duty, or the collection of debts, or the punishment of crimes. There being no inconsistency or collisión, no. reason exists to hold either, by mere construction, void. This is the cardinal test.
So the master may not always deliver merchandise rightfully, except on a wharf; 'nor be always entitled to freight till the goods are on shore ; .yet this depends on the usage, or contract, or nature of the port, and does not affect the question of .jurisdiction. (Abbott on Shipping, 249; 4 Bos. & Pul. 16.) On the contrary; some .offences may be completed entirely oh the water, and yet the State jurisdiction on land is conceded. (United States v. Coombs, 12 Peters, 72.)
So a contract with the passenger may or may not be completed on arriving in port, without landing, according as the parties may have been pleased to stipulate. (Brig Lavinia, 1 Peters; Adm. 126.)
So the insurance on a cargo of a ship may not in some cases terminate till it is-landed, though in others it may, depending on the language used. (Reyner v. Pearson, 4 Taunton, 662, and Levin v. Newnham, Ib. 722.) But none of these show that the passengers may not quit the vessel outside the harbour in boats or other vessels, and thus go. to the land, or go to other ports. Or that, if not doing this, and coming in the same vessel within. the State limits, they may not be subject to arrests, punishments, and taxation or police fees, or other regulations of the State, though still on board the vessel. Nor do any of them show that the vessel and cargo, after within the State limits, though not on the shore, aré not within the jurisdiction of the State, and liable, as property of the owner, to be taxed in common with other stock in trade.
*540 I will not waste, a moment in combating the novel idea, that taxes by the States must be uniform, or they are void by the Constitution on thát account; because clearly that provision relates only to taxes imposed by the general government. It is a fallacy, also, to argue that the vessels, crews, and passengers, wh'éñ within the territory of a State, are not amenable to the' State laws in these respects, because • they are enrolled as belonging' to the United States, and their flag is the flag of the United , States. For though they do belong to the United States, in respect to foreign nations and our statistical returns and tables, this does not prevent the vessels at the same time from being owned by citizens of the State of Massachusetts, and.the crew belonging there, and all, with the passengers, after within her limits, from being amenable generally to. her laws.
If taking another objection to it as a tax, and arguing against the tax imposed on the vessel, because .it may be abused to injure emigration and thwart the general government-, it would still conflict with no particular clause in the Constitution or acts of Congress. It should also.#**» remembered that this was one objection to the license law's in 5 Howard, and'that the court held unanimously they were constitutional, though they evidently tended to diminish importations of spirituous liquor and lessen the revenue of the general government from that source. But that being only an incident to them,- and not their chief design, and the chief design being within the jurisdiction of the 'States, the laws. Were upheld.
It is the purpose which Mr.' Justice Johnson thinks may show that -no collision was intended or effected. “.Their different purposes mark the distinction between the powers brought into action, and while frankly exercised they can produce no serious collision.” (Gibbons v. Ogden, 9 Wheat. 235.) “Collision mustbe sought'to be produced-.” “Wherever the powers of the respective governments are frankly exercised, with a distinct view to the end ef such powers,-they may act on the s'ame subject, or use the" same means," and yet the powers be kept perfectly distinct.” (p. 239.) See 1 Woodbury &. Minot, 423, 433.
The next delegation' of .powér to Congress, supposed by some to b'e inconsistent with' this statute, is argued.to be involved in the ninth, section of the first article of the Constitution. This they consider as a grant of power to Congress to prohibit the migration from-abroad of all persons, bond or freé, after the year 1808, and to tax their importation at once and for ever, not exceeding ten dollars' per head. (See 9 Wheat. 230, by Mr. Justice Johnson; 15 Peters, 514.) The words are: — *541 “ The migration or importation of such persons as any of the. States now existing shall think proper to admit shall not be prohibited by the Congress prior to the. year 1808 ; but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person.” But it deserves special notice, that this section is one entirely of limitation on power, rather than a grant of it; and the power of prohibition being nowhere else in the Constitution expressly granted to Congress, the section seems introduced rather to prevent it from being-implied except as to slaves, after 1808, than to confer it in- all cases. (1 Brockenbrough, 432.).
If to be implied elsewhere, it is from the grant to regulate commerce, and by the idea that slaves are subjects of commerce, as they often are. Hence, it can go no further than to imply it as to them, and not as to free passengers.
Or if to “regulate commerce ” extends also to the regulation of mere navigation, .and hence to the business of carrying passengers, in which it may be employed, it is confined to a forfeiture of the vessel, and does not legitimately involve a prohibition of persons, except when articles of commerce, like slaves. (1 Brockenbrough, 432.) Or finally, however far the power may extend under either view, it is still a power concurrent in the States, like most taxation and much local legislation as to matters connected somewhat'with commerce, and is well exercised by them when Congress does not, as here, legislate upon the matter either of prohibition or of taxation of passengers. It is hence that, if this ninth section is a grant of the power to prevent the migration or importation of other persons than slaves, it is not an exclusive one, any more than that to regulate commerce, to which it refers; nor has it ever been exercised so as to donflict with State laws, or with the statute, of Massachusetts now under consideration. This clause itself recognizes an exclusive power of prohibition in the States until the year 1808. And a concurrent and subordinate power on this by the States, after that, is nowhere expressly forbidden in the Constitution, nor is it denied by any reason or necessity for such exclusiveness. The States can often use it more wisely- than Congress in respect to their own interests and' policy. They cannot protect their police, or health, ór public morals without the exercise of-such a power at times and under certain exigencies, as forbidding the admission of slaves and certain other persons within their borders. One Stats, also, may require its exercise, from its exposures and dangers, when .another may not. So it may be said, as to the power to tax importation, if limited to slaves, the .States could continue to do the same when they pleased if men are not deemed “ imports.”
*542 But to see for a moment how dangerous it would be to consider a prohibitory power over all aliens as vested exclusively in Congress, look to some of the consequences. The States must be mute and powerless.
If Congress, without a coordinate- or concurrent power in the States, can prohibit other persons as well as slaves from coming into States, they can of course allow it, and hence can permit and demand the admission of slaves, as well as any kind of free person, convicts or. paupers, into any State, and enforce the demand by all the overwhelming powers of the Union, however obnoxious to the habits and wishes of the people of a •particular State. In view of an inference like this, it has therefore been said that., under this section, Congress cannot admit persons whom a State pleases to exclude. (9 Wheaton, 230; Justice Johnson.) This rather strengthens the propriety of the independent action of the State, here excluding conditionally, than the idea that it is under the control of Congress.
Besides this, the ten dollars per head' allowed here specially to be collected by Congress on imported slaves is not an exclusive power to tax, and would not have been necessary or inserted, if Congress could clearly already- impose such a tax on them as •“ imports,” and by a “ duty ” -on imports. It would be not a little extraordinary to imply by construction a power in Congress to prohibit the coming into' the States of others than slaves, or of mere aliens, on the principle of the alien part of the Alien and Sedition Laws, though it never has been exercised as, to others permanently; but the States recommended to exercise it, and seventeen of them nqw actually doing it. And equally extraordinary to imply, at this late day, not only that Congress possesses the power, but that;' though not exercising it, the States are incapable of exercising it concurrently, or even in subordination to Congress'. . But beyond this, the States have exercised it concurrently as to slaves, no Less than exclusively in respect to certain free- persons, since as well “as before 1808,. and this as to their admission from neighbouring States no less'than from abroad. (See cases before cited, and Butler v. Hopper, 1 Wash. C. C. 500.)
" The word “ fnigration ” was probably added to “ importation ” to cover slaves when' regarded as persons rather than property, as-they are for some purposes.. Or if to .cover others, such as convicts and redemptioners, it was those only who caine against their will, or in a quasi servitude. And though the expression maybe broad-enough to cover emigrants, generally, (3 Madison State Papers, 1429; 9 Wheat. 216, 230; 1 Brockenbrough, 431,) and some thought it might cover con *543 victs, (5 Elliot’s Deb. 477; 3 Madison State Papers, 1430,) yet it was not so considered by the mass of the Convention, but as intended for “ slaves,” and calling them “ persons ” out of delicacy. (5 Elliot’s Deb. 457, 477; 3 ib. 251, 541; 4 ib. 119; 15 Peters, 113, 506; 11 ib. 136; 1 Bl. Com., by Tucker, App. 290.) It was so considered in the Federalist soon after, and that view regarded as a “ misconstruction ” which extended, it to “emigration” generally. (Federalist, No. 42.) So after-' wards thought Mr. Madison himself, the great' expounder and framer of most of the Constitution. (3 Elliot’s Deb. 422.) So it has been held by several members of this court (15 Peters, 508); and so it has be.en considered by Congress, judging from its uniform acts, except the unfortunate Alien Law of 1798, before cited, and which, bn account of its unconstitutional features, had so brief and troubled an existence. f4 Elliot’s Deb. 451.)
In the Constitution, in other parts as in this, the word “per-sons ” is used, not to embrace others as well as slaves, but slaves alone. Thus, in the second section of the tirst article, “ three fifths of all other persons ” manifestly means slaves; and in the third section of the fourth article, “ no person held to service or labor in one State,” &c., refers to slaves. The word slave was avoided, from a sensitive feeling; but clearly no others were intended in the ninth section. Congress so considered it, also, when it took up the subject of this section in 1807, just before the limitation expired, or it would then probably have acted as to others, and regulated the migration and importation of others as well as of slaves. . By forbidding merely “ to import'or bring into the United States, or territories thereof, from any foreign kingdom, place, or country, any negro, mulatto, or person-of color, with intent to hold, sell, or dispose of such negro, mulatto, or person of color as a slave, or to be held to service or labor,” it is manifest that Congress then considered this clause in. the Constitution as referring to slaves alone, and then as a matter of commerce; and it strengthens this idea, that Congress has never since attempted to extend this clause to any other persons, while the States have been in the constant habit of prohibiting the introduction of paupers, convicts, free blacks, and persons, sick with contagious diseases; no less than slaves; and this from ■ neighbour-ing States as well as from abroad.
There, was no occasion for that express grant, or rather recognition, of the power to forbid the entry of slaves by the general government, if Congress could, by other clauses of the Constitution, for what seemed to it good cause, forbid the entry of évery body, as of aliens generally; - and if Congress could *544 not do this generally, it is a decisive argument that the State might dp it, as the power must exist somewhere in every independent country.
Again, if the States had not such power under the Constitution, at least concurrently, by what authority did most of them forbid the importation of slaves from abroad into their limits between 1789 and 1808 ?- Congress has no power to transfer such rights to States. And how came Congress tp recognize their right to do it virtually by the first article and ninth section, and also by the act of 1803 ? It was becáusé.the States originally had it as sovereign States, and had never parted with it exclusively to Congress. This court, in Groves v. Slaughter, 15 Peters, 511, is generally understood as sustaining the right of States since 1808, no less than before, to prohibit the bringing into their limits of slaves for sale, even from other States, no less than from foreign countries.
■From the very nature of State sovereignty over what is not granted to Congress, and the power of prohibition, either as to persons or things, except slaves after the year 1808, not being anywhere conferred .on, or- recognized as in, the general government, no good, reason seems to exist against the present exercise of it by the'States', unless where it may clearly conflict with other clauses in the Constitution. In fact, every Slave State in the Union, long before 1808, is believed to have pro-nibited the further importation of slaves into her territories from abroad (Libby’s Case, 1 Woodb. & Min. 235; Butler v. Hopper, 1 Wash. C. C. 499); and several, as before stated, have since prohibited virtually the import of them from contiguous States.. Among them may be named Kentucky, Missouri, and Alabama, as wéll as Mississippi, using, for instance, as in the constitution of the last, such language as the following: — “ The introduction of slaves into this State as merchandise, or for sale, shall be prohibited from and after the first day .of May, 1833.” (See Constitutions of the States, and 15 Peters, 50.0.)
Coming by land or sea to be sold, slaves are equally articles of commerce,-and thus bringing them in is an “importation or migration of persons and if the power over that is now exclusive in Congress, more than half the States in the Union have violated it. If a State can do this as to slaves from abroad or. a contiguous State, why not, as has often been-the casé, do it in respect to any other person deemed dangerous or hostile to the stability and prosperity of her institutions ? They can, because they act on these persons when within their limits, and for objects not commercial, and doing this is not disturbing the voyage, which brings them in as passengers, nor *545 taxing the instrument used in it, as the vessel, nor even the master and crew, for acts done abroad, or any thing"without her own limits. The power of the State in prohibiting rests'on a sovereign right to regulate who shall be her inhabitants, — a right more vital than that to regulate commerce by the general government, and which,- as independent -or concurrent, the latter has not disturbed, and should not disturb. (15 Peters, 507, 508.)
But the.,final objection'made to the collection'of this money, by a State is a leading and difficult one. It.consists in this view, that, though called either a police regulation, or a municipal condition to admission into a State, or a tax on an alien visitor, it is in substance and in truth a regulation of foreign commerce, and, the power to make that being exclusively vested in Congress, no State can- properly exercise it.
If - both the points involved in this position could be sustained, this proceeding of the State might he obliged to yield. But there are two. answers to it. One of them is, that this statute is not a regulation of commerce ; and the other is, that the power to regulate foreign commerce is not made exclusive in Congress.
As te the first, this statute does not eo -nomine undertake “ to regulate Commer.ee,” and its design, motive, and object were entirely different.
At'the formation of the Constitution, the power to. regulate commerce attracted but little attention, compared with that to impose duties on imports and tonnage ; and this last had caused so much difficulty, both at home and abroad, that it was expressly and entirely taken away from .the States, but the former was not .attempted to be., The former, too, occupies scarce a page in ' the Federalist, while the latter engrosses several numbers. A like disparity existed in the debates -in the Convention, and; in the early legislation, of Congress. Nor did the former receive much notice of the profession in construing the Constitution ■ till after a quarter of a century; and then, though considered in the case of Gibbons v. Ogden (9 Wheaton, 1) as a power clearly conferred on Congress, and to be sustained on all appropriate matters, yet it does not appear' to have been held that nothing connected in any degree with commerce, or'resembling it, could be regulated by State legislation ; but only that this last must not be so exercised as to conflict.directly with an existing act of Congress. (See the text, and-especially the mandate in 9 Wheat. 239, 240.) On the contrary, many subjects of legislation are of such a doubtful class, and even of such an amphibious character, that one person would arrange and define them as matters of police, *546 another as matters of taxation, and another as matters of commerce. But all familiar with these topics must know, that laws on these by States for local purposes, and to operate only within State limits, are not usually intended, and should no.t be considered, as laws “ to regulate commerce.” They are made entirely diverso intuitu. Hence, much connected with the local power of .taxation, and with the police of the States as to paupers, quarantine laws, the introduction of criminals or dangerous, persons, or of obscene and immoral prints and books, or of destructive poisons and liquors, belongs to the States at home. It varies with their different home policies and habits, and is not either in its locality or operation a matter of exterior policy, though at times connected with, or resulting from, foreign corhmerce, and over which, within their own borders, the States have never acted as if they had parted with the power, and never could with so much advantage to their people as to retain it among themselves. (9 Wheaton, 203.) Its interests and influences are nearer to each State, are often peculiar to each, better understood by and for each, and, if prudently watched over, will never involve them in conflicts with the general government or with foreign nations.
The regulation and support of paupers and convicts, as well as their introduction into a State through foreign intercourse, by vessels, are matters of this character. (New York v. Miln, 11 Peters, 141; License Cases, 5 Howard; Baldwin’s Views, 184.) Some States are much exposed to large burdens and fatal diseases and moral pollution from this source, while others are almost entirely exempt. Some, therefore, need no legislation, State or national, while others do and must protect themselves when Congress cannot or will not. This matter, for instance, may be vital to Massachusetts, New York, Louisiana, or Maryland ; but it is a subject of indifference to a large portion of the rest of the Union, not much resorted to from abroad ; and this circumstance indicates, not only why those first-named States, as States, should, by local legislation, protect themselves from supposed evils from it where deemed necessary or expedient, but that it is not one of these incidents to our foreign commerce in most of the Union which, like duties, or imposts, or taxes on tonnage, require a uniform and universal rule to be applied by the general government.
A uniform rule by Congress not being needed on this particular point, nor being just, is a strong proof that it .was not. intended Congress should exercise power over it; .especially when paupers, or aliens likely to become paupers, enter a State that .has not room or business for them, but they merely pass through to other places, the tax would. not be needed to *547 support them or help to exclude them; and hence such a State would not he likely to impose one for those purposes. But considering the power to be in Congress, and some States needing legislation, and that- being required to be uniform, if Congress were <to impose a tax for such purposes, and pay a . ratable proportion of it over to such a State, it would be unjust. If, to avoid this, Congress were to collect such a tax, and itself undertake to support foreign paupers out of it, Congress- would transcend the powers granted to her, as none extend to the maintenance of paupers, and it might as well repair roads for local use and make .laws to settle intestate estates, or, at .least, estates of' foreigners.- And if it can do this because passengers are aliens and connected with foreign commerce, and, this power being exclusive in if, State taxes on them are therefore void, it must follow that State laws are void also in respect to foreign bills of exchange, a great instrument of foreign commerce, and in respect to bankrupt laws, another topic connected with foreign commerce, — neither of which, but directly the reverse,, is the law,
“ To regulate ” is to prescribe rules, to control. But the State by this statute prescribes no rules for the- “ commerce with foreign nations.” It does not regulate the vessel or the. voyage while in progress. On the contrary, it prescribes rules for a local matter, one in which she, as a State,"has the deepest interest, and one arising -after the voyage fes ended, and not a matter of commerce, or navigation, but rather of police, or municipal, or taxing supervision.
Again, it is believed that in Europe, in several instances-of. border states,'so far from the introduction of foreigners who are paupers, or likely soon to be so, being regarded as a question of commerce, it is deemed one qf police merely; and the expenses of alien paupers áre made a subject of reclamation from the contiguous government to-which they belong;
This view, showing that the regulation of this matter is not in substance more than in words to regulate foreign commerce, is strengthened by various other matters, which have never been regarded as regulating commerce, though nearer connected in some respects with that commerce than this is. But like -this, they are all, when provided for. by the States,'regulated only witnin their own limits, and for themselves, and not without their-limits, as of a foreign matter, nor for other States, Such are the laws of the States which have ever continued to regulate several matters in harbours and ports where foreign vessels enter and unload. (Vanderbilt v. Adams, 7 Wendell, 349.) The whole jurisdiction over them when within the headlands on the ocean, though filled with salt watér and *548 stróng'tides, is in the Státes. We have under año ther head already shown that it exists there exclusively for most criminal prosecutions, and also for all civil proceedings to prosecuté trespasses and recover debts of the owners of the ship or cargo, or of the crew.or passengers, and whether aliens or citizens; And though the. general government is- allowed to collect its duties and enforce its specific requirements about them there, as it is authorized to do, and does, under acts of Congress, even on land, (Gibbons v. Ogden, 9 Wheat.; United States v. Coombs, 12 Peters, 72,) yet it can exercise no power there, criminal or civil, under implication, or under a construction that its authority to regulate commerce there is exclusive as to matters like these. ,No exclusive jurisdiction has been expressly ceded to it there, as- in. some forts, navy-yards, and arsenals. Nor is any necessary. Not one of its officers, fiscal or judicial; can exert the smallest authority there in opposition to the State jurisdiction, and State laws, and State officers, but only in public vessels of war, or over forts and navy-yards ceded, or as to duties on imports, and other cases, to the extent specifically bestowed' on them by constitutional acts of Congress. And to regulate these local concerns in this way by the States is not’to regulate foreign commerce, but home concerns'. The design is local; the object a State object,- and not a foreign, or commercial one; and the exercise of the power is not conflicting with any existing actual enactment by Congress.
The States also h^tve and can exercise there, not only their just .territorial jurisdiction over persons and-things, but make special officers and special laws for regulating there in their limits -various matters of a local interest and bearing, in connection with all the commerce, foreign as well as domestic, which is there gathered. They -appoint and pay harbour-masters, and officers' to regulate .the deposit' of ballast, and anchorage of vessels, (7 Wendell, 349,) and the building of wharves; and are often at great expense in removing obstructions. (1 Bl. Com., by Tucker, 249.)
These State officers have the power to direct where vessels shall anchor, and the precautions to be Used ¡against fires on board; and all State laws in regard to such matters -must doubtless continue in force till conflicting with some express legislation" by Congress. (1 Bl. Com., by Tucker, 252.) I allude to these with the greater particularity, because they are so directly connected "with foreign commerce, and are not justified more, perhaps, under police, or sanatory, , or moral considerations, than under the general principle of concurrent authority in the States on many matters granted to Congress, — *549 taking care not to attempt to regulate the foreign commerce, and not to conflict directly and materially with any provision actually made by Congress, — nor to do it in a case Where the grant is accompanied by an express prohibition to the States, or is in its nature and character such as to imply clearly a total prohibition to the States of every exercise of power connected with it. To remove doubts as to the design to have the power of the States remain to legislate on such matters within their own limits, the old Confederation, in article ninth, where granting the power of regulating “ the trade and managing all affairs with the Indians, not members of any of the States,” provided that “ the legislative right of any State, within its own limits, be not infringed or violated.” The same end was meant to be effected in the new Constitution, though in a different way; and this was, by not granting any power to Congress over the internal commerce, or police, or municipal affairs of the States, and declaring expressly, in the tenth amendment, that all powers not so granted were reserved to the people of the States.
It follows from what has been said, that this statute of Massachusetts, if regarded as a police measure, or a municipal regulation as to residents or visitors within its borders, or -as a tax •or any local provision for her own affairs, ought not to be considered as a regulation of commerce ; but it .is one of those other measures still author od in the States, and still useful and appropriate to them. Such measures, too, are usually-not conflicting with that commerce, but adopted entirely diverso in-tuitu, and so operating.
Conceding, then, that the power to regulate foreign commerce may include the regulation of the vessel as well as the cargo, and the manner of’using the vessel in that commerce, yet the statute of Massachusetts does neither. It merely affects the master or passengers after' their arrival, and for some further act than’ proposed to be done. And though vessels are instruments. of commerce, passengers are not. And though regulating the mode of carrying them on the ocean may be to regulate commerce and. navigation, yet to tax them after their arrival here is not. Indeed,' the regulation of any thing is not naturally or generally to tax it, as that usually depends on another power. It has been- well held m this court, that under the Constitution the taxing of imports is not a regulation of commerce, nor to be sustained under that grant, but under the grant as to taxation. (Gibbons v. Ogden, 9 Wheat. 201.) Duties may, to be sure, be imposed at times to regulate commerce, but oftener are imposed with a view to revenue ; and therefore, under that heád, .dutiés as taxes were prohibited to the States. (9 Wheat. 202, 203.)
*550 It is a mistaken view to say; that the power of a State to exclude slaves, or free blacks, or. convicts, or paupers, or to make pecuniary terms for their admission, may be one not conflicting with commerce, while the- same power, if applied to alien' passengers coming in vessels, does conflict. Slaves now excepted, though once not entirely,- they are all equally and frequently passengers, and all oftener come in by water in the business and channels of ocean commerce than by land. But if the transit of persons coming into the States as passengers, by water, is a branch of commerce, so is their coming in by land; and this, whether from other nations on our. land frontier, or from other States. And if Mississippi and Ohio can rightfully impose, prohibitions, taxes, or any terms to such coming by land or water from other States, so may Massachusetts and New York, if thus coming from foreign nations by water. Congress, also, has like power to regulate commerce between the States, as between this country and other nations, and if persons coming in by water as passengérs belong to the subject of commerce and navigation on the Atlantic, so do they on the Lakes and large rivers ; and if excluding or. requir- . ing terms of them in one place interferes with commerce, so it does in the other.
Again, if any decisive indication, independent of general - principles, exists as • to which government shall exercise the taxing power in respect to the support of paupers, it is that the States, rather than the general government, shall exercise it (9 Wheat. 206, 216); and exercise it as such a power, and pot, by a forced construction, as a power “ to regulate commerce.” The States have always continued to exercise the various powers of local taxation and police, and not Congress ; and have maintained all paupers. And this, though the general authority to regulate commerce, no less than to lay taxes,was granted to Gongress. • But police powers and powers over •the internal commerce and municipal affairs of States were not granted away ; and' under them, and the general power of taxation, States continued to. control this subject, and not under the power to regulate commerce. Nor did Congress, though possessing this last power, ever attempt to interfere, as if to do so was a branch of that power or justifiable under it, because in terms using language connected with commerce. Thus, in the-Kentucky constitution, and substantially in several others, it is provided that the legislature “ shall have full power to prevent slaves from being brought into this State as-merchandise,” and Congress sanctioned that Constitution, and the rest, with such provisions in them.
These affairs are a part of the domestic economy of States, *551 belong to their interior policy, and operate on matters affecting the fireside, the hearth, and the altar. The States háve nó foreign relations, and néed none, as to this. (1 Bl. Com., by Tucker, App. 249.)
The fair exercise of such powers rightfully belonging to a State, though connected often with foreign commerce and indirectly or slightly affecting it, cannot therefore be considered, in any point of view, hostile, by their intent or origin, as regulations of such commerce. See in point, Gibbons v. Ogden, 9 Wheat. 203; 11 Peters, 102.
' In this view, it is immaterial whether this tax is imposed on the passenger while in the ship, in port, or when he touches the wharf, or reaches his hotel. All these places, being within the territory, are equally within the jurisdiction of the State for municipal purposes such as these’, and not with a view to regulate foreign commerce; it being conceded that a tax may f>e imposed on a passenger after quitting the vessel and on the land, why may it not before, when he is then within the limits of the State ? In either instance, the tax has no concern with the foreign voyage, and does not regulate the foreign commerce ; whereas, if otherwise, it might be as invalid when imposed on land as on water.
Much of the difficulty in this case arises, I apprehend, from a misconception, as if this tax was imposed on the passenger at sea and before within the territorial limits of the State. But. this, as before suggested, is an entire misapprehension of the extent of those limits, or of the words and meaning of the law.
If, then, as is argued, intercourse by merchants in person, and by officers in their vessels, boats, and wagons, is a part of commerce, and the carrying of passengers is also a branch of navigation or commerce, still the taxing of these after the arrival in port, though Congress there has power to collect its duties as it has on land, is not vested at all in Congress; or, if at all, not exclusively.
Who can point to the cession to the United States of the jurisdiction, by Massachusetts or New York, of their own ports and harbours for purposes of taxation, or ány other local and municipal purpose ?
So far from interfering at all here with the foreign voyage, the State power begins when that ends and the vessel has entered the jurisdictional limits of the State. Her laws reach the consequences and results of foreign commerce, rather than the commerce itself, They touch not the tonnage of the vessel, nor her merchandise, nor the baggage or tools of the aliens; nor do they forbid the vessels carrying passengers. *552 But as a condition to their landing and remaining within the jurisdiction of the State, enough is required by way of condition or terms for that privilege, arid the risk of their becoming chargeable, when aliens, (though not chargeable at the time,) to cover in some degree 'the. éxpenses happening under such contingency. This has nothing to, do with the regulation of commerce, itself, — the right to carry passengers to and fro over the Atlantic Ocean, — but merely with their inhabitancy or residence within a State so as to be entitled to its .charity, its privileges, and protection. Such laws do not conflict directly with- any provision by the general government as to foreign commerce, because none has been- made on this point, and they áre not in clear collision with any made by that government ■ on any other point, When, as here, they purport to be for a different purpose from touching the concerns of the general government, — when they are, as here, adapted to another local and legitimate object, — it is unjust to a sovereign State, and derogatory to the character of her people and legislature, to impute a sinister and illegitimate design to them concerning foreign commerce, different from that avowed, and from that which the amount of the tax and the evil to be guarded against clearly indicate as the true design. Hence, as before remarked, Mr. Justice Johnson, in the same opinion which was cited by the original defendants, says the purpose is the test; and if that be different, and does not clash, the law is not unconstitutional.
So Chief, Justice Marshall, in 9 Wheat. 204, says, that Congress for one purpose and a State for another may use like means and both be vindicated. And though Congress obtains its power from a special grant, like that of the power “ to regulate commerce,” the State may obtain it from a reserved power over internal commerce or over, its police.. Hence, while Congress regulates the number of passengers to the size of the vessel, as a matter of foreign commerce, and may exempt their baggage and -tools from duties as a matter of imposts on imports, yet this is not inconsistent with the power of a State, after passengers arrive within her limits, to impose térms on their landing, with a view to benefit her pauper police, or her fiscal resources, or her municipal safety and welfare. And the two powers, thus exercised separately by the two governments, may, as Mr. Justice Johnson says, “be perfectly distinct.” So, in the language of Chief Justice Marshall, “ if executed by the same means,” “ this does not prove that the powers themselves are identical.”
The measures of the general government amount to a regulation of the traffic, or trade, or business, of carrying passen *553 gers, and of the imposts on imports; .but those of the States amount to neither, and merely aifect the passengers or master of the vessel after their arrival within the limits of a State, and for State purposes, State security, and State pjolicy.
As we have before explained, then, if granting that the bringing of passengers. is a great branch of the business of navigation, and that to regulate commerce is to regulate navigation, yet this' statute of Massachusetts neither regulates that navigation employed in carrying passengers, nor the passengers themselves, either while abroad in foreign ports, or while. on the Atlantic Ocean, but merely taxes them, or imposes conditions on them, after within- the State. These things are done, as Mr. Justice Johnson said in another case, “with-a distinct view.” And it is no objection that they “act on the same subject ” (9 Wheat. 235); or, in the words of Chief Justice-Marshall, “although the means used in their execution may sometimes approach each other so nearly as to .be confounded ” (p.. 204). But where any doubt arises, it should operate against the uncertain and loose, or what' the late chief justice called “ questionable- power to regulate commerce,” (9 Wheat. 202,) rather than ■ the more fixed and distinct police or taxing-power.
In cases like this, if, amidst the great complexity of human affairs, and in the sh,adowy line between the two governments over the same people, it is impossible for their mutual rights and powers -not to infringe occasionally upon each other, or cross a little the dividing line, it constitutes no cause for denouncing the acts on either side as being exercised under the same power or for the same purpose, and therefore unconstitutional and void. When, as is seldom likely, their laws come in direct and’ material collision, both being in the exercise of distinct powers,, which belofig to them, it is wisely provided, by the Constitution itself, and consequently by the States and the people themselves, as they framed it, that the States, being the granting power, must recede. (9 Wheat. 203; License Cases, 5 Howard; United States v. New Bedford Bridge, 1 Woodb. & Minot, 423.) Here we see no such collision.
There are'other cases of seeming opposition which are reconcilable, and not conflicting, as to the powers exercised both by the States and the general government, but for different purposes. Thus hides may be imported under the acts of • Congress taxing imports and regulating commerce; but this does not deprive a State of the right, in guarding the public health, to have them destroyed if putrefied, whether béfore they reach the land or after. So as to the import of gunpowder by the authority of one government, and the prohibition' *554 by the other, for the public safety, to keep it in large quantities. (4 Metcalf, 294.) Neither of these acts by the State attempts to. intérfere with the commerce abroad, but after its arrival here, and for other purposes," local and-sanatory, or municipal.
In short, it has been deliberately held by this court, that the laying a duty on imports, if this was of that character, is .an exercise of the taxing power, and not of that to regulate commerce. (Gibbons v. Ogden, 9 Wheat. 201, by Chief Justice Marshall.) And if, in Brown v. Maryland, 12 Wheat. 447, the tax or duty imposed there can be considered as held to violate both, it was because it was not only a tax on imports, but provided for the treatment of goods themselves, or regulated them as imported in foreign commerce, and while in bulk.
But if the power exercised in this law by Massachusetts could, by a. forced construction, be tortured into a regulation of foreign commerce, the next requisite to make the law void is not believed to exist in the fact that the States (Jo not retain some concurrent or subordinate powers, such as were here exercised, though connected jn certain respects with foreign commerce. • Beside the ■ reasons already assigned for this opinion, it is not opposed to either the languagé or the spirit of the Constitution in connection with this particular grant. Accompanying it are no exclusive words, nor is the further ¿ction of the States, or any thing concerning commerce, expressly forbidden in any other way .in the Constitution. But both of these are done in several other cases, such as “no State shall coin money,” or no State “ engage in war,” and these are ordinary modes adopted in' the Constitution to indicate that a power granted is exclusive, when it was meant to be so.
If this reasoning be not correct, why was express prohibition to the States used on any subject where authority was granted to Congress ? The only other mode to ascertain whether a power thus granted is exclusive “ is to look at the nature of each grant, and jf that does not clearly show the power to be exclusive, not to hold it to be so.” We have' seen that was the rulé laid down by one .of the makers and great expounders of the instrument. (Federalist, No. 82. See also 14 Peters, 575.)
It held out this as an inducement to the States to adopt the Constitution, and was urged by all.'the logic and eloquence of Hamilton. It was, that a grant of power to Congress, so far from being ipso facto exclusive, never ousted the power' of the Stateá previously existing, unless “where an exclusive authority is in express terms granted to the Union, or where, a particular authority is granted'to the Union and the exercise *555 of a like authority is prohibited to the States; or where an authority is granted to the Union, with which a similar authority in the States would be utterly incompatible.”
This rule has been recognized in various decisions on constitutional -questions by many of-the judges of this court. 2Cranch, 397; 3 Wheat. 386; 5 Wheat. 49; Wilson v. Blackbird Creek Marsh Company, 2 Peters, 245; Prigg v. Pennsylvania, 16 Peters, 627, 655, 664; New York v. Miln, 11 Peters, 103, 132; Groves v. Slaughter, 15 Peters, 509; Holmes v. Jennisoh, 14 Peters, 579. So by this court itself, in Sturges v. Crowninshield, 4 Wheat. 193. And also by other authorities entitled to much respect. 4 Elliot’s Deb. 567; 3 Jefferson’s Life, 425-429; 3 Serg. & Rawle, 79; Peck’s Trial, 86, 87, 291-293, 329, 404, 434, 435; Calder v. Bull, 3 Dall. 386; 1 Kent’s Com. 364; 9 Johns. 568.
In other cases it is apparently contravened. 9 Wheat. 209; 15 Peters, 504, by Mr. Justice McLean, and 511, by Mr. Justice Baldwin; Prigg v. Pennsylvania, 16 Peters, 543; New York v. Miln, 11 Peters, 158, by Mr. Justice Story; The Chusan, 2 Story, 465; Golden v. Prince, 3 Wash. C. C. 325.
But this is often in appearance only, and not in reality.- It is not a difference as to what should be the true rule, but in deciding what cases fall within it, and especially the branch of it as to what is exclusive by implication and reasoning from the nature of the particular grant or case ; or in the words of Hamilton, “where an authority is granted to the Union, with which a similar authority in the States would be utterly incompatible.”
Thus, in the celebrated case of Sturges v. Crowninshield, the rule itself is laid down in the same way substantially as in the Federalist; namely, that the power is to be taken from the State only when expressly forbidden, or where “the terms - in which a power is granted to Congress, or the nature of the power, require that it should be exercised exclusively by Congress.” (4 Wheat. 122, 193, by Chief Justice Marshall; Prigg v. Commonwealth of Pennsylvania, 16 Peters, 626, by Chief Justice Taney, and 650, by Mr. Justice Daniel.)
And Chief Justice Marshall on another occasion considered this to be the true rule. .That was in the case of Wilson v. Blackbird Creek Marsh Company, 2 Peters, 245, though a commercial question. And Judge Story did the same in Houston v. Moore, 5 Wheat. 49, - a militia question. So, many of the other grants in • this same section of the Constitution, under like forms -of expression, have been virtually held not to be exclusive; such as that over weights and measures; that over bankruptcy (Sturges v. Crowninshield, 4 Wheat. 122); *556 that over taxation (see cases already cited); that to regulate the.-value of foreign coins; that to discipline „the militia (Houston v. Moore, 5 Wheat. 1; 3 Stor. Com. on Constitution, § 1202; 15 Peters, 499; Rawle on the Constitution, ch. 9, p. 111); that “to provide for the punishment of counterfeiting coin ” (Fox v. State of Ohio, 5 How. 410); and robbing the mail when punished as highway robbery (5 Wheat. 34). Why, then, hold this to be otherwise than concurrent?
There are still other grants, in language like this, which never have been considered exclusive. Even the power to -pass uniform naturalization laws was once considered by this court as not exclusive (Collet v. Collet, 2 Dallas, 296); and though doubt has been flung on this since by the United States v. Villato, 2 Dall. 372, Chirac v, Chirac, 2 Wheat. 269, and by some of the court in 5 Howard, 585, and Golden v. Prince, 3 Wash. C. C. 314; and though these doubts may be well founded unless the State naturalization be for local purposes only in the State, as* intimated in Collet v. Collet, and more favorable than the law of the United States, and not to give rights of citizenship out of the State, (1 Bl. Com., by Tucker, App. 3, 4, 255, 296,) which were the chief objections in 3 Wash. C. Cr 314; yet this change of opinion does not impugn in principle the ground for considering the local measure in their case as not conflicting with foreign commerce. The reasoning for a change there does not apply here.
So, it is well settled that no grant of power to Congress is exclusive, unless expressly so, merely because it may be broad enough in terms to cover a power which cleárly belongs to the State; e. g. police, quarantine, and license laws. They may relate to a like place and subject, and by means somewhat alike, yet, if the purposes of the State and of 'Congress are different and legitimate for each, they are both permissible and neither exclusive. (See cases before cited, 4 Wheat. 196; 3 Ell. Deb. 259; Baldwin’s Views, 193, 194.)
This very grant of the power “ to regulate commerce ” has also been held by this court not to prevent bridges or ferries by the States where waters are navigable. (Wilson v. Blackbird Creek Marsh Company, 2 Peters, 245.) So elsewhere. (Corfield v. Coryell, 4 Wash. C. C. 371; 1 Woodb. & Mm. 417, 424, 425; 9 Wheat. 203. See also Warren Bridge Case, 11 Peters, 420; 17 Conn. 64; 8 Cowen, 146; 1 Pick. 180; 7 N. Hamp. 35.) And it has been considered elsewhere not to confer, though in navigable waters, any right or control over the fisheries therein, within the limits of a State. (4 Wash. C. C. 383. See also Martin v. Waddell, 16 Peters, 367; 3 Wheat. 383 ; Angell on Tide Waters, 105.) So the *557 States have been accustomed to legislate as to pilots, and Congress has concurred in it., But if the acts of the States alone as to pilots are not valid, on the ground of a concurrent power in them, it is difficult to see hoyr Congress can transfer or cede to the States an authority on this which the Constitution has not given to them. (Chief Justice Taney, in 5 Howard, 580.) The real truth is, that, each possessing the power in some views and places, though not exclusively, Congress may declare it will not exercise the power on its part, either by an express law or by actual - omission, and thus leaye the field open to the States, on their reserved or concurrent rights, and not on any rights ceded to them by Congress. This reconciles the whole matter, and tends strongly to sustain the same view in the case now under consideration.
Nor has it ever been seriously contended, that, where Congress has chosen to legislate about commerce and navigation on our navigable waters as well- as the'sea-coast, and to introduce guards against steam explosions and dangers, in steam vessels, the law is not to be enforced as proper under thé power to regulate commerce, and when not in conflict with any State legislation. . This power in Congress .is at least concurrent, and extends to commerce on rivers, and even on land, as well as at sea, when between our own States or with foreign countries. Whether this could be done as to vessels on waters entirely within any one State is a .different question, which need not be here considered. (See Waring v. Clark, 5 Howard, 441.)
As a general rule of construction, then, the grants to Congress should never be considered as exclusive, unless so indicated expressly in the Constitution by the nature or place of the thing granted, or by the positive prohibition usually resorted to when that end is contemplated, as that “ no State shall enter int'o any treaty,” or “ coin money,” &c.; “no State shall, without the consent of Congress, lay any imposts or duties on imports,” &c. (Art. 1, § 9. United States v. New Bedford Bridge, 1 Woodb. & Min. 432.)
It is also a strong argument, after using this- express- prohibition in some cases, that, when not used in others, as it is not here, it is not intended. Looking at the nature of this grant, likewise, in order to see if it can or should be entirely exclusive, we are forced to the same conclusions.
There is nothing in the nature of much which is here connected with foreign commerce that is in its character foreign, or appropriate for the action of a central and single government; on the contrary, there, is matter 'which is entirely local,— something which is seldom universal, or required to be *558 either general or uniform: For though Congress is empowered to regulate commerce, and ought to legislate for foreign commerce as for all its leading incidents and uniform and universal wants, 3ret “ to regulate commerce ” could never have been supposed by the framers of the Constitution to devolve on the general government the care of any thing except exterior intercourse with foreign nations, with other States, and the Indian tribes. Every thing else within State limits was, of course, to be left to each State, as too different in so large a country to be subjected to uniform rules; too multifarious for the attention of the central government, and toó local for its cognizance over Only general matters.
It was a difference between the States as to imposts or. duties on imports and tonnage which embarrassed their intercourse with each other and Avith foreign nations, and Avhich mainly led to the new Constitution, and not the mere regulation of commerce. (9 Wheat. 225.) It was hence'that the States in respect to duties and imposts were not left to exercise concurrent powers, and this Avas prevented, -not by merely empowering Congress to tax imports, but by expressly forbidding the States to dp the same ; and this express prohibition would not have been resorted to, or been necessary,'if a mere grant to Congress of the power to impose duties or to “ regulate commerce ” was alone deemed exclusive, and Avas to prevent taxation of imports by the States,: or assessing money by them on any kind of business or traffic by navigation, such as carrying passengers.
Congress, in this way, resorted to a special ¿prohibition where they meant one (as to taxes on * imports); but where they did nc t, as, for' example, in other taxation or regulating commerce, they introduced no such special prohibition, and left the States to act also on local and appropriate matters, though connected in some degree Avith commerce. Where, at any time, Congress had' not legislated or preoccupied that particular field, the States acted freely and beneficially, yielding-, hoAvever, to Congress when it does act on the same particular matter, unless both act for different and. consistent objects. (Gibbons v. Ogden, 9 Wheat. 204, 239.) In this way much was meant to be left in the States, and much ever has been left, which partially related to commerce, and an expansive, arid roving, and absorbing construction has since been attempted to -be given to the grant of the. poAver to regulate commerce, apparently never thought of at the time it was introduced into the Constitution. When I say much was'left, and meant to be left, to the States in connection with commerce, I mean, concerning details and local matters, inseparable in *559 some respects from foreign commerce, but not belonging to its exterior or general character, and not conflicting with any thing Congress has already done. (Vanderbilt v. Adams, 7 Wendell, 349; New Bedford Bridge Case, 1 Woodb. & Min. 429.) Such is this very matter as to taxation to support foreign paupers, with many other police matters, quarantine, inspections, <fcc. (See them enumerated in the License Cases, 5 Howard.)
■ The. provisions in the State laws in 1789, on these and kindred matters, did not therefore drop dead on the adoption of the Constitution, but only those relating to duties expressly prohibited to the States, and to foreign and general matters which were then acted on by Congress. Chief Justice Marshall, in Sturges v. Crowninshield, (4 Wheat. 195,) considered “ the power of the States as existing over such cases as the laws of the Union may not reach.”
So far as reasons exist to make the exercise of the commercial power exclusive, as on matters of exterior, general, and uniform cognizance, the construction may be proper to render it exclusive, but no further, as the exclusiveness depends in this case .wholly on the reasons, and not on any express prohibition, and hence cannot extend beyond the reasons themselves. Where they disappear, the exclusiveness should halt. In such case, emphatically, cessante ratione, cessat et ipsa lex.
It nowhere seems to have been settled that this power is exclusive in Congress, so. that the States can enact no laws on any branch of the subject, whether conflicting or not with any acts of Congress. But, ca the contrary, the majority of the court in the License Cases (5 Howard, 504) appear to have held that it is not exclusive as . to several matters connected in some degree with commerce. The case of New York v. Miln (11 Peters, 141) seems chiefly to rest on a like principle, and likewise to hold that measures of the character now under consideration are not regulations of commerce.
Indeed, besides these cases, and on this very subject of commerce, a construction has at times been placed, that it is not exclusive in all respects, as will soon be shown, and- if truly placed, it is not competent to hold that the State legislation on such incidental, subordinate, and local-matters is utterly void when it does not conflict with some actual legislation by Congress. For the silence of Congress, which some seem to regard "as more formidable than its action, is, whether in full-' or in part, to be respected and obeyed only where its power is exclusive, and the States are deprived of all authority over the matter. The power must first be shown to be exclusive before any inference can be drawn that the silence of Congress *560 speaks, and a different course of reaspning begs the question attempted to be proved. In other cases, when the power of Congress is not exclusive and that of the States-is concurrent, the silence of Congress to legislate on any mere local or subordinate matter within the limits of a State; though connected in some respects with foreign commerce, is rather an invitation for the' States to legislate upon it, — is rather leaving it to them for the present, and assenting to their action in the matter, — than a circumstance nullifying and destroying every useful and ameliorating provision made by them.
Such, in my view, is the true rule in respect to the commercial grant of power over: matters not yet regulated by Congress, and which are obviously local. In the case of Wilson v. The Blackbird Creek Marsh Co., Chief Justice Marshall not only treated this as the true rule generally, but held it applicable to the grant to Congress of the power “to regulate commerce,” and, that this • grant ■ was not exclusive nor prohibitory on the action of the States, except so far as it was actually exercised by Congress, aqd thus came in conflict with the laws of the States. These are some of his words: — “ The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations, and among the several States, a power which has not been so exercised as to affect the question.” . (2 Peters, 252.)
The Chief Justice in -another case held that a power being vested in Congress was not enough to bar State action entirely, and that it did not forbid by silence as much as by action. He says, — “ It is not the mere existence-of the power, but its exercise, which is incompatible with the exercise of the same power by the States. It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the States.” (Sturges v. Crowninshield, 4 Wheaton, 195, 196.) And in 16 Peters, 610, Justice Story admits “that no uniform rule of interpretation can be applied to it [the Constitution], which may not allow, even if it does not positively demand, many modifications in its actual application to particular clauses.”
Hence, if the power “ to regulate commerce ” be regarded by us as exclusive, so far as respects its operations abroad, or without the limits of the country, because the nature of the grant requires it- to be exclusive there, and not exclusive so far as. regards, matters consequent on it which are within the limits o-f a State, and not expressly prohibited to it nor conflicting with any thing done by Congress, because the nature of the grant does not require it to be so there, we exercise *561 then what appears to he the spirit of a wise conciliation, and are able to reconcile several opinions elsewhere expressed, some as to the concurrent and some as to the exclusive character of the power “ to regulate commerce.” It may thus be exclusive as to some matters and not as to others, and every thing can in that aspect be reconciled and harmonious, and accord, as I have before explained, with the nature and reason of each case, the only constitutional limits where no express restrictions are imposed. I. am unable to see any other practical mode of administering the complicated, and sometimes conflicting, relations of the Federal and State governments, but on a rule like this. And thus deciding the cases as they arise under it,- according to the nature and character of each case and each grant, some indicating one to be exclusive, and some indicating another not to be exclusive; and this, also, at times, as to different kinds of exercise of power under one and the same, grant. (See Justice Johnson, 9 Wheat, 235-239.) There is another view of this question which leads to like results. If the opposite opinions mean only that the States cannot, after express grants to the general government, legislate on them for and in behalf of the general government, and1 not simply for themselves in local matters,—cannot legislate for other States without their own limits, extra territor.ium, or as to general uniformity, general conduct, or the subject-matter over the whole country, like naturalization and bankruptcy, — then there is no difference between the spirit of those opinions and . my own. But if they are construed to mean, that after sucbí a grant, with no express prohibition on a State to act for itself alone on the matter, and none implied from their relations to the general government and the nature of the subject, a State cannot make such regulations'and laws for itself, and its own people, and local necessities, as do not violate any act of Congress in relation -to the matter, I do not think they are supported either by sound principle or precedents.
Necessities for a different course have existed, and ever must exist, in the complex movements of a double set of legislators for one and the same people.
They -may crowd .against éach other, in their measures slightly and doubtingly, but that, as before shown, is ■ not sufficient to annul and override those of the States, as there must be for that disagreeable consequence a direct conflict, á plain incompatibility. (3 Stor. Com. on Const. 434; New Bedford Bridge Case, 1 Woodb. & Min. 417, 418; 9 Wheaton, 238.)
_ ' -This. circumstance shows, also, that the argument to avoid State legislation is not sufficient when it discovers some differ *562 ent spirit or policy in the' general measures of the States from that in-the general government.' The States have a right to diifer in opinion, — some are very likely often to differ. But what clause in the Constitution makes such an instance, of independence a nullity, or makes a different object an illegitimate one ? To be a nullity, it must oppose what' has been actually done or prescribed by Congress, and in a case where it has no reserved power to act differently from Congress. We have already seen that an indirect reduction of the revenue of the general government ■ by the "license laws, when passed under a legitimate power, and with a different legitimate view, did not render them unconstitutional, nor does this, under like circumstances, though it may indirectly operate in . some measure against emigration.
If it did, a law by a State to favor the consumption of its own products would be pronounced void, and so would be a high tax by a State on wharves or stores, as all these would somewhat ■ embarrass and render more expensive the business connected with foreign commerce. So this condition imposed on passengers after their arrival might in some degree affect the business and' commerce of carrying them to that State,' when the alien passengers are taxed before they are permitted to land.
There are -two classes of grants to which this rule now under consideration is applicable, and the force of it will be .more striking when they are examined separately. One includes grants where Congress has acted, and continues to act, in relation to them; and the other, where it. has never acted, or, if it has once acted, has ceased to do so.
Now, the vindication for the States to act in the last class is, that, unless each State is considered authorized still to legislate for itself, the subject-matter- will be without any regulation ■ whatever, and a lawless condition of things will exist within the heart of the community, and on a matter vital to its interests. Such is now the case as to weights and measures, Congress never having legislated to produce uniformity concerning thpm, though the power is expressly granted to it in the Constitution.
Now, on the construction that such a grant of power is exclusive, and, whether' exercised or not, it is unconstitutional for any State to legislate on the subject for itself; and, moreover, that Congress does in truth regulate by its silence as mutib as. by its action, and when doing nothing about it virtually enacts that nothing shall be' done about it by any of the States, it will follow that not only all the legislation by the States on weights and measures since 1789 is illegal and void, but all *563 their legislation now existing on matters of bankruptcy, and in respect to the disciplining of the militia, and imposing taxes on land, is also void. For the powers over all these ■ are expressly ceded to Congress, and are not now regulated by any .existing acts of Congress, though all except weights and measures once have been. The argument alluded to, if sound, would thus be strong, that Congress, having once acted- on these and ceased to, means that nothing more shall be done.
On this exclusive principle, though the action of the States on them i§ not forbidden expressly in the Constitution, nor impliedly beyond what grows out of any express grant, all the States in the Union are disarmed from any action whatever on such matters, and all their laws on these topics, so essential to their domestic industry and trade, their public security and political existence by means of revenue, are to be considered null and void.
The catastrophe which would follow on such a construction has led this court, as heretofore explained, to hold that the States still possess a concurrent power to act on matters of bankruptcy, the discipline of the militia, taxation of land, and some subjects of commerce; and like considerations would undoubtedly lead them, when the cases arise, to hold, that, notwithstanding such grants, the laws of the States, not conflicting with any passed by the general government on many other such topics, must be considered valid. Indeed, it seems conceded by some of the members of the court in this case, that the States are, by some power coordinate or subordinate, rightfully legislating on weights and measures, pilots, bankruptcy, the militia, &c. But if they have not this power without any grant or license by Congress, they cannot have it"by any such grant, because Congress is not empowered by the Constitution to grant away powers vested in it by the people and the States; and how can it hereafter, by legislation, give any power to them over this subject if not having it now ?
Again, in the other class of cases, where Congress has already legislated," and still legislates, some time elapsed before it passed laws on any subject, and years before it acted at all on . some of them; and in almost the whole, its first legislation was only a beginning and in part, doing more and more from time to time, as experience and the exigencies of the country seemed to require. It is not necessary to repeat here several detailed illustrations and cases on this collected in the case of the United States v. New Bedford Bridge, 1 Woodb. & Min. 430. In the mean time, the States continued to exercise their accustomed powers, and have ever since dope it on all matters not forbidden expressly.in the Constitution, not exclusive in *564 their nature, and not conflicting with actual provisions in relation to them already made under the general government. (14 Peters, 594.)
To-show, further, that these grants of power are not always and necessarily exclusive, and that legislation on them by Congress to any extent is not as prohibitory on • the States where it is silent as where it enacts, the States have not only continued to punish crimes which Congress could punish; but they have, in numerous instances, regulated matters connected, locally at least, with commerce abroad, and bétween the States, and with the Indians.
In so large a territory as the jurisdiction, of the general government embraces, in so many and so diversified topics as come before it, and in the nature of its supervisory powers on certain subjects, requiring action only on what is general and foreign, and to produce uniformity merely as to that, it becomes- almost inevitable that many local matters and details roust be left to be regulated by some local .authorities. Yet, as explained in the License Case;, like the by-laws of corporations, made by them and not the. legislature, they must not conflict with the general regulations or laws prescribed by the paramount power. But,, so far from being exclusive, even while it is exercised., and much less while it is dormant or unexercised, the paramount power summons to its aid, in order to be effective, the contemporaneous and continued action of others. Thus not only moneyed corporations, but towns and cities, must make numerous by-laws- in order to enforce the general provisions laid • down by the legislation of the State. Thus, too, this court must make numerous rules to carry into effect the legislation of Congress in respect to it; and the War and the Navy Departments must compile and enforce volumes of regulations of a like kind and for a like purpose, taking care, as all subordinate power in such cases- must) not to violate any general law prescribed on the subject. (See 1 Woodb. & Min. 423.)
The condition of this whole country when colonies of England furnishes another illustration of the. relation and character of such powers. The parent government at home was sovereign, and provided general regulations, either in acts of Parliament or charters, but 'still left the several colonies (and surely our States have as much power as they) to legislate as to details, and introduce any regulations'suited to their own condition and interests, not conflicting with the general provisions made by the paramount power at home. .(1 Bl. Com., by Tucker, App.109, 110.
Indeed, what becomes of the whole doctrine of concurrent ’ powers on this hypothesis of exclusiveness in all mere grants, *565 and of the usage that the States may act in such concurrent cases or local matters till their measures conflict directly Avith those of Congress? (Ibid. 179.) Where is the line of distinction between a measure by the State which is void, whether it conflict or not, and one which is not void till it comes into actual collision with some law passed by the general government ? . What becomes of the idea, that the power to regulate foreign commerce is exclusive, and Congress may prohibit the introduction’ of obscene prints under it, and yet the States unay do the latter also, but touch nothing connected with commerce ? Is not the introduction of these connected Avith it? Cannot the States, too, patronize science and the arts in various Avays, though a like potver is conferred on Congress by means of patents and copyrights. (Livingston v. Van Ingen, 9 Johns. 572.)
Nor do I understand the words of Mr. Justice Johnson, in the case of Gibbons v. Ogden, in the sense attributed to them by some. “ The practice of our government,” says he, “ has been, on many subjects, to occupy so much only of the field open to them as .they think the public interests require.” (9 Wheat. 234.) ' It is argued that this means to exclude State action, Avhere Congress' has not occupied the field, as well as Avhere it has.’ Yet it seems plainly to be inferred, from other words connected, that- he considers the power of the States niust be at an end so far as the United States have by their legislative act taken the subject under their immediate superintendence.” This means the subject then under consideration. But Avhere have they so .taken the subject of the admission of alien passengers into States, and the terms of it, “ under then-immediate • superin ten dence ”'? They may have regulated the manner of their coming here, but. where their maintenance here when sick br poor, or likely to be poor ? where their taxa- ’ tion here ? '
They have regulated also their naturalization in this country, but not under the grant of the power “ to regulate commerce,” or impose imposts on imports; but, knowing it was not involved in either, a separate and express grant-was wisely inserted in the Constitution to empower Congress to make uniform rules on this subject.
It will be seen, that, where Congress legislates about foreign commerce or passengers as connected with it, that legislation need not,, and does not, forbid the States to legislate on other matters not conflicting. Thus all will harmonize, unless we interpolate, by mere-construction, a prohibitory clause either in the law or in the Constitution. You may, if you please, call the power so exercised by Congress exclusive in one sense or *566 . to orle extent, but it is not in others. It may be considered as exclusive so far as it goes, and still leave the rest of the held concerning them open to the States. Thus the right to regulate the number of passengers in vessels from abroad in proportion to the tonnage has been exercised by Congress, and majr be deemed the use of a legitimate authority. (3 Statutes at Large, 448; 9 Wheat. 216..) So has it been exercised to exempt their personal “baggage”, and “tools” from imposts, not, as some seem to suppose, their goods or merchandise. (1 Statutes at Large, 661.) But this statute of Massachusetts conflicts with neither. So Congress provides for uniform naturalization of aliens, but this statute does not interfere with that. So Congress does not forbid passengers to come from abroad; neither does this statute. ■
Again, Congress nowhere stipulates or enacts, or by the Constitution can do it, probably, as before suggested, that passengers shall. not in their persons be .taxed on their arrival within a State, nor terms be made as to their residence within-them. Again,-the objection to this view'involves another apparent absurdity, — that, though the regulation of commerce extends to passengers, it is not entirely exclusive in the general government if they come with yellow-fever and the cholera, and that they are then subject to State, control and its quarantine expenses and fees ; but are not, if they come with what the State deems equally perilous. That is, if they .endanger the health of the body, the power over them is not exclusive in Congress, but if they endanger only the police of the State, its pauper securities, and its economy, morals, and public peace., the power is exclusive in Congress, and goes to strip the State of all authority to resist the introduction of either convicts, slaves, paupers, or refugees. If -these last only come in the tracks of commerce in vessels from abroad, and are enrolled as passengers, the. States cannot touch them, but may seize on them at once if their bodies are. diseased. It would be useful to have that clause in the Constitutiori pointed out which draws such a novel line of discrimination.
In holding this measure to be a regulation of commerce, and exclusive, and hence void, wherever the power of Congress over commerce extends, a most perilous principle is adopted in some other respects; for that power extends over the land as well as water, and to commerce among the States and-with the Indian tribes, no less than to foreign commerce. (See art. 1, § 8.) And if. it can abrogate a tax or terms imposed by States in harbours over persons there, it may do so whenever the power over commerce goes into the interior, and as tó matters connected with it, and also between States..
*567 Oh this reasoning, passengers there in vessels, boats, wagons stages, or on horseback, are as much connected with commerce as if they, come in by sea; and they may consist of paupers, slaves, or convicts, as well as of merchants .or travel-lers for pleasure and personal improvement; and- thus all the laws of Ohio, Mississippi, and many .other States, either forbidding or taxing the entrance of slaves or liberated blacks, will be'. nullified, as well as those of almost every Atlantic State, excluding paupers coming in from without their limits...
Congress has sanctioned at least five constitutions of States exercising a power to exelude slaves, and the. introduction of them as merchandise and for' commerce. And how can this be reconciled by those who would, reverse the judgments below, on the ground that the commercial power is exclusive in Congress, and not'either concurreñt in one view or independa ent in another, in some particulars, in the States.
Another consequence from the opposite doctrine is, that, if Congress by regulating commerce acts exclusively upon'it, and can admit whom it pleases as passengers, independent of State. wishes,' it can forcé upon the States slaves or criminals, or political incendiaries of the most dangerous character.' And furthermore, that it can do this only by admitting their personal baggage free, as doing that, it is arguéd here by some, shows the owner must come" in free, and neither be excluded nor taxed by the State after within her limits.
This makes the owner of thé personal baggage a mere incident or appurtenant to the baggage itself, and renders, by analogy, any legislation as to taxing property more important than taxing the person, and, indeed, overruling- and governing the person as subordinate and inferior. So, if Congress by. making baggage free exonerates passengers from a State tax, it exonerates all the officers and crews of vessels from State taxes; for their personal baggage is as free as that of passengers. They, too, are as directly connected with commerce as the passengers; and by a parity of reasoning, the absurdity follows, that, by admitting American vessels free of tonnage duties, the owners of them are also made free from State taxes.
Every person acquainted with the tariff of the general government knows that specially declaring a box or chest of apparel “ free ” does not exonerate any thing else or any other article, much less can it any person, if taxed by a State law. On the contrary, all things' not. specially taxed, nor specially declared “free,” have a duty imposed, on them by-Congress as non-enumerated articles, and- so would passengers, if imports, and if Congress had a right to tax them. ■ And if saying, nothing about passengers would imply .that they' were free from. *568 taxes of the United States, much more of the States, why is it necessary to declare in terms any article “free,” when Silence would make it so ? The real truth rather is, that Congress has no right to tax alien friends, or exclude them, and' hence the silence. ■ This statute,' then, contravenes no act of Congress on this matter of passengers.
An<i while all the legislation of Congress as to passengers operates on thenuat sea during the voyage, except imposts being forbidden on their baggage, which is solely within the jurisdiction of Congress, all the legislation of Massachusetts operates on them after their arrival in port, and without any attempt then to. impose any duty on their baggage. The for- ■ mer legislation by Congress, regulating their number in proportion to the tonnage, is, as it should be, extra territorium'; the latter, as it should be, infra territorium; and thus both are proper, and the jurisdiction over either is not exclúsfve of that exercised by the other, or.conflicting materially with it.
Having considered the different general grounds which can be urged in support of this statute, and the objections made in opposition to them, I shall procéed, before closing, to submit a few remarks on some miscellaneous topics relied on to impeach its provisions. One is a supposed conflict between this statute and some treaties of the general government.
. I am aware .that a tax or fee on alien passengers, if large, might possibly lead to collision with those foreign governments,- such as Great Britain and Prussia, with whom We have ’ treaties allowing free ingress and egress to our ports. (See 8 Stat. at Large, 116, 228, 378.) But neither-of them complains in this instance, and I do not consider this law as conflicting with .any such provisions in treaties, since none of them profess to exempt their people or their properly from State taxation after they arrive here.
If such a stipulation were made by the general government, it would be difficult to maintain the doctrine, that, by an ordinary treaty, it has power to restrict the rights and powers of the several States any further than the States have by the Constitution authorized, and that, this has ever been authorized, But it has not here been attempted-; and these particular treaties are subject to the ordinary laws of the States, as well as of the general government, and enable the citizens of those countries merely to have free ingress-and egress here for trade, (see Treaty of 1794, art. 3; 8 Stat. at Large, 117,) having no relation to their, coming' here as passengers to reside or for'pleasure. Nor can they apply in the present case at all, as the record now stands, finding only that the mastet was a British -subject or his vessel British, but not-that-his passengers belonged to Great. Britain.
*569 The Prussian treaty does not appear to contemplate any thing beyond the establishment of reciprocal .duties, and a treatment, in other respects like “the most favored nations.” (8 Stat. at Large, 164.)
And who ever thought that these treaties were meant tó ■ empower, or could in any moral or political view empower, Great Britain to ship her paupers to Massachusetts, or send her free blacks from the West Indies, into the Southern States or into Ohio, in contravention of their local laws, or force on the ■ States, so. as to enjoy their protection and privileges, any persons from abroad deemed dangerous,"such as her . felon convicts and the refuse of her jails? 'Again, so far, as regards the liberty of commerce secured to. British subjects in Europe-by the fourteenth article of the treaty of 1794, it .does not apply to those coming from the British Provinces in America, as did this vessel, (8 Stat. at Large, 124,) and by the eighteenth article of that treaty was to last only ten years (p. 125). And while it did last, it was expressly mada “ subject always, as to what respects this article, to the laws and statutes of the two countries respectively ” (p. 124).
Besides this, the whole of the treaty of 1794, including the. third article, probably was suspended by the war of 1812, and exists now. only as modified in that of 1815, which gives to British subjects no higher rights -than “other foreigners.”' (Art. 1, 8 Stat. at Large, 228.) • The old Articles of Confederation contained a.clause which indicated in a.different form like view's as to what was proper in -treaties, and indicates a wise jealousy, of power exercised in hostility to the : policy of a State. That policy is never intended to be thwarted by any arrangements with foreign nations by reciprocal treaties, as they relate merely to the imposts on tonnage and cargoes by the national governments, requiring them to be equal, and do riot concern the. port and harbour fees or expenses imposed by the local authorities for local purposes. The. best security that these fees and taxes, will never be unreasonably high and in- . jurious to' foreigners is the tendency they would then have to drive trade to other ports or countries contiguous, where' they might' be lower.
The same right exists also in states to impose conditions on the selling of certain articles by foreigners and others within their'limits, as a state may prefer to encourage its own products, dr may deem the use of some foreign articles of bad influence in other respects. (Grotius on the Rights of Peace and War, B. 2, ch. 2, § 20; License Oases, 5 Howard.)
Nor can I see,' as has been urged, any collision between this statute and- the act of Congress to carry into effect our com-. *570 mercial arrangement of 1830 with Great Britain. (4 Stat. at Large, 419.) The intention of that act does not in any re•spect seem to go beyond that of the treaties just referred to, and in some respects is to have matters stand as they did before. Each side imposed charges and duties. They existed in England and her colonies, as well as with us ; but this arrangement sought only to have them not unequal nor prohibitory of trade, and not to discriminate against each- other by general legislation. (See 1 Commerce and Navigation, State. Papers, 158; 4 Stat. at Large, 419.)
A few remarks .as to some objections urged against the large amount and the motive of this tax, and I have done.
If the payment was to be vindicated under the general taxing power alone, it is clear that the amount could not affect the. question' of the constitutionality of the tax. And if it was very high, considering its- professed object “for the support of foreign paupers,” and was applied in part to other objects, that is a matter within the discretion of the State, and if it proved oppressive, and thus diverted this kind of business ,to the ports of other States, it would, like all high taxes, react, and be likely in time to remedy in a great degree the evil. But viewed as a ..police measure, the amount of the payment and the application of it may, in my view, have an important bearing. .
. Thus a State is authorized to impose duties on imports sufficient to defray the expenses of her inspection laws, but not an amount disproportionate to them, nor to app'ly the money thus collected to other purposes.
It would seem that the same rule would govern her assess^ ments, to enforce her quarantine laws, and it could hardly be tolerated, under the right to enforce them and demand sufficient to-defray their'charges, that they should be justified to' collect enough more for other purposes, and thus apply the quarantine funds to make roads or maintain schools.
In such events in these cases, either this court would be obliged to declare void assessments which were clearly perverted and improperly collected and applied, or Congress could direct the excess to be paid iuto the treasury.of the general government. (3 Elliot’s Deb. 291.) Congress is in the Constitution expressly empowered to revise and control' the sums collected by the States ;to defray the expenses of their inspection laws. (Art. 1, § 10 )
A mere pretext in a law colorably for one object, but really for another, as in condemning lands for public purposes when the true object was different, though not to be presumed to be done by any sovereign states must, if clearly proved, be difficult *571 to uphold. (West River Bridge v. Dix, 6 Howard, 548.) But here -the amount of the tax, compared with the burden flung on the State by foreign paupers, does not look so much like a wish to prohibit entirely the entrance of alien passengers, and thus disclose a covert design, hostile to the policy of the general government, as like a wish to obtain enough to cover the expenses and trouble of maintaining such of them as, though not paupers, are likely to become so in the ordinary couse of human events. This is a highly important consideration in judging whether the law throughout looked really to the subject of¿ pauperism, and not to hostility towards emigration, nor, under the third'section,, to revenue from foreign commerce, independent of the pauper system. It is unjust to regard such provisions as intended to conflict with foreign commerce, when there is another and local matter which they profess to reach, and can and do honestly reach.
It is, therefore, too broad in some cases to say that the object and motive of the State in requiring the payment, or the amount demanded, is of no importance; because, though the great question is a question of power, yet the object and motive may bring it within some existing power, when a different Object or motive would not. The different purpose iñ a State often shows that there is no collision or wrong, and justifies the measure. (4 Wheat. 196; 9 Wheat. 335; Baldwin’s Views, 193.)
So, as to the amount demanded, it might be sufficient only for a legitimate State object, and hence might be constitutional, as,, for instance, to pay the expenses of inspection laws, when a much larger amount would not be permissible, if too much for the particular object deemed constitutional. But in this case, as no excess is shown on the record, a conclusive opinion on this .point is unnecessary.
This construction of the Constitution, upholding concurrent laws by a State where doubts exist and it is fairly open for adoption, has much to commend it in. this instance, as the States, which singly become feebler and weaker daily as their number and the whole Union increases, being now thirty to one, instead of thirteen to one, will hot thus be rendered still feebler, and the central government, daily becoming more powerful and strong, .will not thus be rendered still stronger. So the authority of the latter will not thus, by mere construction, be made to absorb and overwhelm the natural and appropriate rights of sovereign States, nor mislead them by silence.- Leaving this matter also to each will not conflict with any existing action of the general government, but promote and sustain the peaceful operations of both in their appropriate spheres.
*572 It will operate justly among the States, no less than between them and the general government, as it will leave each to adopt the course best suited to its peculiar condition, and not leave one helplessly borne down with expenses from foreign sources while others are entirely free, nor draw the general government, in order to remedy such inequalities, into a system of police and local legislation, over which their authority is doubtful, as well as their ability to provide so' well for local wants as the local governments, and those immediately interested in beneficial results.
A course of harshness towards the States by the general government, or by any of its great departments, — a course of prohibitions and nullifications as to their domestic policies in doubtful cases, and this by mere implied power, — is a violation of sound principle, will alienate and justly offend, and tend ultimately, no less than disastrously, to dissolve the bands of that Union so useful and glorious to all concerned.
“libertas ultima mundi,
Quo steterit, ferienda loco.”
In conclusion, therefore, I think that,.in point of law, the conduct of the State in imposing this condition or payment on alien passengers can be vindicated under its police rights to provide for the maintenance of paupers, and under its authority as a sovereign State to decide on what conditions or terms foreigners, not citizens of any of the' United States, shall be allowed to enjoy its protection and privileges, and under its con-" current powers of taxation over every thing but imports and tonnage. I think, too, that this power in the State is not taken away by the authority ceded to Congress, either to tax imports and tonnage, or to prohibit the importation of persons (usually limited to slaves), or to regulate commerce.

Orders.

Smith v. Turner.
This cause came on to be heard on the transcript of the record of the Court for the Trial of Impeachments and the Correction of Errors of the State of New York, and was argued by counsel. On consideration whereof,' it is the opinion of this court, that the statute law of New York, by which the health-commissioner of the city of New Yorlt is declared entitled to demand and receive, from the master, of every vessel from- a foreign port that should arrive -in the port of said city, the sum' of one dollar for each steerage passenger brought in such vessel,' is repugnant to the Constitution, and laws of the United ' States, and therefore void. Whereupon, it is now here ordered *573 and adjudged by this court; that the judgment of the said Court for the Trial of Impeachments and the Correction of Errors be' and the same is hereby reversed, with costs, and that, this cause be and the same is hereby rémanded to the said Court for the Trial of Impeachments and the.Correction of Errors, in order that further proceedings may be had therein, in conformity to the aforesaid opinion and judgment of this court.
Norris v. City of Boston.
This cause' came on to be heard on the transcript of the record of the Supreme Judicial Court of Massachusetts, and was argued by counsel. On consideration whereof, it is the opinion of this coúrt, that the third section of the' act of the legislature of the Commonwealth of Massachusetts of the 20th of April, 1837, entitled, “ An act relating to, alien passengers,” under which the money mentioned in the record and pleadings was demanded of the plaintiif in.error,, and paid by him, is repugnant to the Constitution and laws of the United States, and. therefore void. Whereupon, it is now here ordered and adjudged by this court, that the judgment _of the said Supreme Judicial Court .of Massachusetts be and the same is hereby reversed, with costs, and that this, cause be and the same is hereby remanded to the said Supreme Judicial Court, in order that further proceedings may be had therein in conformity to the aforesaid opinion and judgment of this court.

 Commerce, from con and mera, which Yossius derives from the Hebrew, to divide a part of his own for a part of another’s, to exchange, to bargain and sell, to trade or traffic, to have intercourse for purposes of traffic. Merchand, or merchant, from merx or meres, contracted from mereis, is by some derived from mercari, by others from the Greek pepos, pars, quia res per partes venditur. To merchand, to buy, to trade, to traffic. — Richardson’s Dictionary.

 3 Madison Papers, August 21st, 1787. 1. Proposition by Mr, Martin against article 7. Motion to exclude slave-trade' (Vol. III. p. 1388). Mr. Rutledge, Mr. Ellsworth, and Mr. Pinckney, all opposed to Mr. Martin’s motion (pp. 1388 and 1389). August 22. — Mr. Sherman, though against slave-trade, was opposed to taking it from the States (p. 1390). Colonel Mason thought it immoral and dangerous, and was for its immediate abolition (pp. 1390, 1391). Mr. Ellsworth opposed to interference; if it was so immoral as to require interference, they ought to abolish it, and free all slaves (p. 1391); that slaves were necessary, and must be imported for use in the si.ckly riee-swamps of South Carolina and Georgia (p. 1392). Mi-. Pinckney, General Pinckney, Mr. Baldwin, Mr. Wilson, Mr. Gerry, Mr. Dickinson, Mr. Williamson, Mr. Rutledge, Mr. Sherman, (Vol. III. pp. 1392-1397,) all treat of this article as applicable only to the slave-trade.